**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| GABRIEL GONZÁLEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:18-cv-03044 |
| v. | ) | |
| | ) | |
| JBS LIVE PORK, LLC; JBS USA, | ) | |
| LLC; and SWIFT PORK COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF GABRIEL GONZALEZ'S
MOTION FOR SUMMARY JUDGMENT AGAINST
DEFENDANT SWIFT PORK CO.**

## Introduction

On March 1, 2016, while at work at the JBS meat processing plant in Beardstown, Illinois, Mr. Gonzalez suffered a severe nosebleed. His supervisor sent him to the nurses' station, where a nurse sent him home. When the same thing happened two days later, Mr. Gonzalez sought emergency room treatment and learned his blood pressure was dangerously high. For each subsequent work day, until March 30, 2016, Mr. Gonzalez could not work due to this condition and related symptoms. Mr. Gonzalez consistently informed Defendant of his need for leave, promptly submitting medical excuse forms from medical providers as he received them. Despite ample notice of the seriousness of Mr. Gonzalez's medical condition, which required ongoing treatment, Defendant persisted in assessing attendance points against him, and ultimately terminated him on March 30, 2016, for exceeding the maximum permissible number of points.

The Family and Medical Leave Act ("FMLA") gives eligible employees who cannot work due to a serious medical condition the right to unpaid medical leave, and forbids

employers from interfering with or denying such leave. Regardless of an employer's "no fault" absence policy, employers may not assess attendance points against employees for FMLA-qualified absences. Employers who dispute whether requested leave qualifies as FMLA leave must resolve such disputes through discussion with employees, and document those discussions; employers who dispute the adequacy of medical certifications must specify the basis for the dispute in writing to the employee. Defendant claims Mr. Gonzalez did not have a serious medical condition, but under the undisputed facts, it failed to document any discussion with Mr. Gonzalez about it. Defendant claims it rejected Mr. Gonzalez's request for leave on the basis that it considered his medical certification inadequate, but under the undisputed facts, Defendant failed to provide Mr. Gonzalez with written (or, for that matter, oral) notification of the claimed deficiencies in the certification. Defendant's decision to assess points against Mr. Gonzalez for leave-qualifying absences, and its ultimate decision to fire him for accumulation of those points, violated the FMLA. Because the material facts establishing Defendant's violations of the FMLA are not disputed, Mr. Gonzalez is entitled to summary judgment as to Defendant's liability.

## Undisputed Material Facts

1.      In November 2015, Defendant Swift Pork Company ("Swift" or "Defendant")[1] acquired the meat processing plant in Beardstown, Illinois, where Mr.

---

[1] Mr. Gonzalez has sued two other entities, JBS Live Pork, LLC, and JBS USA, LLC (collectively, "JBS Defendants"), as joint or integrated employers. Swift admits it employed Mr. Gonzalez; the JBS Defendants deny doing so. (*See* Def. Ans., Docket # 13, attached as Exh. A, ¶¶ 9-18.) Determining employer status under the FLMA is fact-intensive. *See Moldenhauer v. Tazewell Pekin Consol. Communs. Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008) ("[T]he ultimate determination will vary depending on the specific facts of each case."). Mr. Gonzalez maintains the JBS Defendants are liable, but seeks summary judgment against Swift only, because Swift does not dispute its status as employer. (Exh. A, ¶¶ 5, 9.)

Gonzalez had been working since 2008, and became his employer. (*See* Exh. A, ¶ 9; Dep. of D. Holland, Corporate Training Manager and former Director of Human Resources ("HR") at the Beardstown Plant, attached as Exh. B, 11:2-8;[2] Dep. of Mr. Gonzalez, attached as Exh. C, 57:20-25—58:1-21.[3])

2.     In March 2016,[4] Mr. Gonzalez had been working on the Plant's "kill floor," where workers "kill the hogs . . . and begin their disassembly." (*See* Exh. B, 86:11-15; Exh. C, 59:13-14, 59:23-25—61:1-7.)

3.     Mr. Gonzalez has no education past the fourth grade. (Exh. C, 21:11-16.) He learned his job skills on the job. (Exh. C, 22:16-22.)

4.     Mr. Gonzalez does not speak or read English; he speaks and reads only Spanish. (*See* Exh. C, 9:16-25—10:1; 129:21-22.)

5.     A significant portion of the employees at the Plant are likewise Spanish-speaking only. (*See* Exh. B, 11:16-24—12:1-2; 20:12-24; 21:1-4.)

6.     Mr. Gonzalez's last position at the Plant was called "save bungs." (Exh. C, 60:24-25; 61:1-3.)

7.     According to Defendant, Mr. Gonzalez's job involved operating a "bung gun," which is "a device that is used to remove the rectum from the carcass." (Exh. B,

---

[2] When citing to depositions, Mr. Gonzalez refers to the deposition by its exhibit letter, then to the relevant page, followed by a colon, followed by the relevant line numbers: Exh. X, page:line-line. Where the citation spans more than one page, the starting page is followed by a colon and the relevant line numbers, and then the ending page and line numbers, separated by a long dash: Exh. X, page:line-line—page:line-line. Mr. Gonzalez refers to the exhibits discussed at the depositions by attaching the number of the exhibit at the deposition to the letter of the exhibit to this Motion, separated by a period.

[3] While Defendants deny that the JBS Defendants constituted Mr. Gonzalez's "employer," Mr. Gonzalez referred to his employer as "JBS," which the Plant was, in fact, called, and which appears on many documents. (*See* Exh. B, 10:21-24—11:1; Exh. C, 47:6-13; 55:16-19.) During the deposition, Mr. Gonzalez became confused by references to his employer as "Swift Pork Company," believing Swift Pork Company to be a different company outside of Beardstown. (Exh. C, 48:10-13.) To diminish confusion, Defendant also referred to the employer as "JBS" in Mr. Gonzalez's deposition. (*See* Exh. C, 55:22-25—56:1-10.)

[4] Unless otherwise noted, each of the following facts refers to the relevant time period, March 2016.

87:2-6.)

8.      Mr. Gonzalez described this job as "cleaning the hog," cutting out "tripe" as part of a line on which different workers remove and isolate different parts from the hog. (Exh. B, 63:2-24—64:1-17.)

9.      The Plant had a nurses' station, staffed with four registered nurses on duty any time the plant was operating. (Exh. B, 24:11-16.)

10.      Defendant described work at the Plant as "labor intensive," stating and newer employees "do experience what we call break in pain and our nurses provide them ice and heat to help them get through that." (Exh. B, 25:15-21.)

11.      Among other duties, the nurses applied a "protocol" to evaluate employees who claimed they needed to go home because they were sick. (Exh. B, 26:2-16.)

12.      A nurse would not send the employee home unless the nurse believed the employee was too ill to work. (Exh. B, 27:16-21.)

13.      Defendant employed a "no fault attendance policy" ("Policy"), under which it assessed points for employee absences according to whether the absence was "accountable" or "unexcused." (Exh. B, 22:11-14, Exh. B., 18:24-19:1-11; Exh. B.3.)

14.      Under the Policy, Defendant required employees to call a computerized call-in system at least 30 minutes before their start time if they had to be absent or late. (Exh. B.3.)

15.      Under the Policy, Defendant assessed a point against any employee who was sent home by its nurse, even though the nurse only did so when the employee was too ill to work.[5] (Exh. B, 26:23-24—27:1-21.)

---

[5] In November 2016, Defendant changed this policy, so that no points would be assessed if the nurse sent an employee home after finding the employee to be ill. (Exh. B, 27:10-15.)

16.    Defendant permitted employees to contact the HR office to explain particular circumstances relevant to an absence, but even if they did so, HR required the employees to call the computerized system each day as well. (Exh. B, 29:19-22.)

17.    Under the Policy, an "accountable" absence occurred when an employee called in 30 minutes prior to his shift to state he would miss all or part of the shift. (Exh. B, 22:17-20; Exh. B.3.) Such an absence resulted in one attendance point. (Exh. B.3.)

18.    Under the Policy, as written, an unexcused absence occurred when the employee failed to notify the company within 30 minutes before the scheduled start time, which resulted in 3 points. (Exh. B, 22:21-24; B.3.)

19.    The Policy had no category for "excused absence." (Exh. B., 23:6-9; B.3.)

20.    Under the Policy, accumulation of 10 points over the course of a year resulted in termination. (Exh. B.3.)

21.    According to Defendant, even if employees knew they would be out sick for more than a day, the employee was not permitted to give notice in advance, but were instead required to call in every single day, because "based on the call-ins is how we staff our facility." (Exh. B, 30:21-24—31:1-3.)

22.    Defendant admitted that under some extenuating circumstances, such as an employee whose house burned down, Defendant would consider itself on notice that the employee would be out for a few days, and therefore would not expect that person to call every day. (Exh. B, 31:20-24.)

23.    Under Defendant's Policy, however, an employee whose wife called the number late after the employee had been knocked unconscious in a car accident would still be considered to have provided late notice and be assessed three points, at least "initially." (Exh. B, 32:1-10.)

24.     Defendant stated that "if an employee had a car accident and they weren't conscious, of course we wouldn't expect them to call in, but even if they were unconscious and didn't call in, they'd still be assessed three points until such time that we got their FMLA paperwork together and all that, then all that would come off." (Exh. B, 128:8-14.)

25.     Defendant asserted that under the Policy, "if somebody was taking medication that made it impossible for them to call in in a timely manner, that does not excuse the failure to call in." (Exh. B, 128:24—129:1-5.)

26.     Defendant stated such an employee could call or visit HR and explain extenuating circumstances and "we would apply discretion as needed." (Exh. B, 32:11-24—33:1-5.)

27.     Under Mr. Gonzalez's understanding of the Policy, he was required to call and would get three points if he did not, but he did not understand that if he called in late, he would be assigned three points. (Exh. C, 79:25, 80:1-11; 80:23-25—81:1-23.)

28.     Mr. Gonzalez understood that if an employee accrued points and brought in a medical certification, the employer had to erase those points. (Exh. C, 19-21.)

29.     Defendant likewise stated, "if days qualify for FMLA leave, they are not assessed points." (Exh. B, 172:1-8.)

30.     According to Mr. Gonzalez, he had only 3 attendance points at the beginning of March, 2016. (Exh. C, 142:12-15.)

31.     Defendant's records indicate that he had 5.[6] (Exh. C, 141:22-25—143:1-8.)

32.     On March 1, 2016, Mr. Gonzalez suffered a serious nosebleed at work. (*See*

---

[6] While the parties dispute this fact, the dispute does not foreclose summary judgment in Mr. Gonzalez's favor, as he is entitled to judgment as a matter of law even if Defendant's version of the facts is taken as true.

Pl. Resp. to Def. Interrog., attached as Exh. D, # 6; *see also* Exh. C, 97:8-10; 109:1-9; 147:18-25—148:1-10; 149:9-13.)

33.  Mr. Gonzalez's supervisor took him to the nurses' station, and the nurse sent him home. (Exh. D, #6, 6; Exh. C, 109:1-9; 149:9-13; 149:23-25—150:1-20.)

34.  Defendant charged Mr. Gonzalez an attendance point for March 1, 2016. (Exh. B, 44:24—45:1-3.)

35.  On March 2, 2016, Mr. Gonzalez worked his full shift, and he was not charged any points. (Exh. C, 147:6-13; Exh. B, 48:16-24—49:1-21.)

36.  On March 3, 2016, Mr. Gonzalez again suffered a serious nosebleed at work, his supervisor took him to the nurses' station, and the nurse sent him home. (Exh. D, #6; Exh. C, 109:1-9; 147:18-148:1-5.)

37.  On March 3, 2016, after Mr. Gonzalez returned home, his daughter and a friend took him to the emergency room because he was bleeding profusely. (Exh. C, 108:18-24-109:1-19; *see* Certified Medical Records from Passavant Area Hospital, dated March 3, 2016 ("March 3 Passavant Records"), attached as Exh. E, P208-P219.)

38.  A doctor at the Hospital diagnosed Mr. Gonzalez with hypertension and "epistaxis, acute," prescribed hydrochlorothiazide, and advised him to follow up with his primary care doctor. (Exh. E.)

39.  Defendant assessed Mr. Gonzalez a point for his absence on March 3, 2016. (Exh. B, 65:4-13.)

40.  After Mr. Gonzalez left the nurses' station on March 3, 2016, he never returned to see anyone there. (Exh. C, 104:24-25—105:1-6.)

41.  Defendant produced a document entitled "Home Care Instructions" dated

March 3, 2016 (SWIFT208),[7] from the Passavant Hospital Emergency Room ("March 3 Hospital Note"), stating Mr. Gonzalez was examined on an emergency basis, had been diagnosed with hypertension and epistaxis and prescribed hydrochlorothiazide, and should follow up with his primary care doctor. (Exh. B.7; Exh. C, 109:25—110:1-15; Exh. C.41; Exh. D, #6, 6; *see also* Exh. E, P219.)

42.    On March 4, 2016, Mr. Gonzalez gave the March 3 Hospital Note to Defendant's HR Department. (Exh. C.41, 109:25—110:1-15.)

43.    When Mr. Gonzalez did so, he told the individual who took it that he had to be out for a few days, and would need to be treated by a doctor. (Exh. C, 111:1-17.)

44.    The HR representative told Mr. Gonzalez to call in his absences each day. (Exh. C, 111:18-21.)

45.    Mr. Gonzalez testified that from March 4 on, he continuously called in his absences. (Exh. C, 157:4-11.)

46.    Mr. Gonzalez stated he always called on time, but acknowledged that his medication made him sleepy, and that it could have caused him to call late on some days in March 2016. (Exh. C, 81:21-25—82:1-8; 82:23-25—83:1-7; 164:6-25—165:1-6.)

47.    Defendant, speaking through its then HR Director, acknowledged the March 3 Hospital Note as a document HR may have requested. (Exh. B.7; Exh. B, 62:12-24—63:1-18.)

48.    When asked what Defendant would expect its HR to do with the March 3 Hospital Note, however, it said, "Nothing," adding, "[t]here's no value in the HR office of this document." (Exh. B.7; Exh. B, 66:11-24—67:1-12.)

---

[7] Defendant identified SWIFT175-301 as representing Mr. Gonzalez's "Medical and FMLA file." *See* Def. 2nd Supp. Resp. to Pl. 2nd and 4th Req. to Prod., attached as Exh. P, #29.

49.     Defendant produced a document called "Access Events" (SWIFT148), which it described as a "turnstyle gate log" ("Turnstyle Log") and which marked the time employees entered and left the Plant based on their ID cards. (Exh. B.6, Exh. B, 55:3-23.)

50.     Defendant produced an untitled document (SWIFT457) it claimed constituted a log of calls to its call-in system ("Defendant's Call Log"). (Exh.B.8, Exh. B, 67:23-24—69:1.)

51.     Defendant produced a document entitled "Attendance Editor" (SWIFT173), which it stated reflected the points it assigned Mr. Gonzalez. (Exh. B.4; Exh. B, 42:1-18.)

52.     Defendant also produced an untitled document (SWIFT174) it identified as coming from "Kronos" (the "Kronos Document"), which it said reflected Mr. Gonzalez's schedule. (Exh. B.5, Exh. B, 51:17-24—52:1-5.)

53.     The Kronos Document indicates that Mr. Gonzalez was scheduled to begin work at 4:30 p.m. on March 1 through 4, 2016, after which his schedule reflected a 3:45 start time each week day.[8] (Exh. B.5.)

54.     Defendant's records indicated that Mr. Gonzalez received a point for his absence on March 4, 2016, having called in at least 30 minutes before his start time.[9]

_____

[8] Mr. Gonzalez described his shift as starting at 4:00 p.m., but said he came 15 or 20 minutes early to bring tools to the line, and would therefore normally clock in at 3:40 p.m. (Exh. C, 67:8-25—68:1-10.) Whether Mr. Gonzalez was required to be a work at 3:40 (as he stated) or at 3:45 (as Exh. B.5 indicates) is not material.

[9] Defendant conceded that Mr. Gonzalez's call was timely on March 4, 2016, because Defendant charged him one point (not three), but nonetheless claimed its records indicated Mr. Gonzalez called in at 3:34 p.m. (Exh. B, 69:2-6.) The column on Defendant's Call Log, on which it relied, indicated the call times as "Call Time (EST)." (Exh. B.8.) Defendant denied knowing that "EST" means "Eastern Standard Time" (and therefore claimed not to know whether Mr. Gonzalez's timely call occurred at 2:34 p.m. local time). (Exh. B, 69:13-18.) Mr. Gonzalez asks this Court to take judicial notice that EST is a standard abbreviation for "Eastern Standard Time." Merriam-Webster Dictionary, https://www.merriam-

(Exh. C, 69:2-24.)

55.     With respect to the March 4, 2016 point, Mr. Gonzalez's supervisor told him the point would be removed in light of Mr. Gonzalez's documentation from the hospital, saying he would talk to HR about it. (Exh. C, 152:12-25—156:1-3.)

56.     Mr. Gonzalez was not scheduled to work Saturday, March 5, 2016, or Sunday, March 6, 2016. (Exh. B, 72:16-24—73:1-6.)

57.     On March 7, 2016, Mr. Gonzalez went to Defendant's HR's office at the Plant, where he signed paperwork requesting FMLA leave, and gave Defendant permission to get whatever information it needed from his doctors. (Exh. D, #6, 7.)

58.     Defendant acknowledged that on March 7, Mr. Gonzalez came to the Plant at 11:17 a.m. and left at 11:39 a.m., and has no record of what occurred during that time.[10] (Exh. B, 73:18-23.)

59.     Defendant produced several documents dated March 7, 2016, written in English, all of which it identified as part of Mr. Gonzalez's "Medical or FMLA File" (*see* Def. 2nd Supp. Resp. to Pl. 2nd &  4th Req. for Doc., #29, attached as Exh. P):

a.      A signed release (SWIFT205) ("HIPAA document"), which Defendant acknowledged would permit HR to contact Mr. Gonzalez's doctors. (Exh.

---

webster.com/dictionary/est. Were there any doubt of the meaning of EST, moreover, Defendant produced a similar document, "All Employee Absences" (SWIFT375-456), listing call-ins for all employees around the relevant time. A copy of the first page is attached as Exh. H. The time column there reads "Call Time (Eastern TZ)." (Exh. H.) Because the time on Defendant's Call Log plainly refers to Eastern Standard Time, the times it lists must be read to indicate a time one hour earlier, CST, which is local time in Beardstown, Illinois, regardless of Defendant's claimed agnosticism.

[10] Defendant claimed that HR maintained a "log" of pending FMLA claims, and that it would have reflected the steps HR took to process each FMLA application. (Exh. B, 73:24—74:1-21.) When Mr. Gonzalez specifically requested the log related to his case, however, Defendant claimed it had already produced its only log of FMLA claims from the relevant time, admitting that, for "unknown" reasons, that log did not contain any information related to Mr. Gonzalez's FMLA claim. A copy of Def.'s 4th Supp. Resp. to Pl. 4th Req. to Prod., #34, is attached as Exh. G.

B.14; Exh. B, 92:22-24—93:1-17, 149:3-5.)

b.  A signed "Leave Claim Form—Intermittent FMLA" (SWIFT207) ("March 7

Leave Claim"), confirming Mr. Gonzalez had an "intermittent FMLA leave

approved on file for [him]self," stating that he had been absent March 1, 3,

and 4th, 2016, and giving the reason, "Sent hom [*sic*] by nursing."[11] (Exh.

B.10; Exh. C, 121:9-18; Exh. C.45.)

c.  A document acknowledging receipt of Mr. Gonzalez's FMLA request

(SWIFT203) ("March 7 FMLA Receipt"), stating Defendant "received your

FMLA request for the below dates. You are <u>pending approval</u> at this time.

3/1/2016 to UNKNOWN," and providing until March 22, 2016 to provide

required documentation. (Exh. B.11; Exh. B, 81:23-24—82:1-12; 82:20-

23.)

d.  A "Request for Leave" (SWIFT204) ("March 7 Request for Leave"),

indicating leave was requested "from March 1 to UNKNOWN." (Exh. B.12;

Exh. B, 84:13-23; 84:24—85:1-17.)

e.  A "Notice of Eligibility Rights & Responsibilities, Family and Medical

Leave Act" (SWIFT202) ("Notice of Eligibility"). (Exh. B.13; Exh. B, 89:21-

24.)

60.   Defendant stated that its normal process to evaluate whether a request for

leave would be granted involved the employee providing "a certification packet from

their physician which would then be reviewed by [Defendant's] medical professionals,

our nurse, [to] determine if it does qualify under the FMLA guidance." (Exh. B, 89:2-6.)

---

[11] Mr. Gonzalez did not fill out the March 7 Leave Claim Form himself; a representative of HR did so.
(Exh. C.45; Exh. C, 121:23-25, 122:1-9.)

61. According to Defendant's records, on March 7, 2016, Mr. Gonzalez timely called in sick, and he was assessed one point. (Exh. B, 95:11-24—96:1-2.)

62. Mr. Gonzalez did not have a primary care physician. (Exh. C, 191:1-7.) On March 7, when submitting the FMLA paperwork, he told H.R. he had no primary care doctor, and H.R. suggested he go to the Taylor Clinic in Beardstown. (Exh. D, #6.)

63. Mr. Gonzalez produced medical records showing that on March 7, 2016, at around 10:30 p.m., he went back to the Passavant Hospital emergency room due to hypertension, with difficulty breathing and radiating chest pain; he was released on March 8, 2016 at 2:52 a.m. (*See* Certified Medical Records from Passavant Area Hospital, dated March 7-8, 2016 ("March 7-8 Passavant Records"), attached as Exh. F, P208, P220-231.)

64. The March 7-8 Passavant Records reveal Mr. Gonzalez was given intravenous Labetalol HCL and intravenous sodium chloride, and aspirin and potassium chloride by mouth in the emergency department. (Exh. F, P.223.) The Hospital also conducted a brain scan and sinus rhythm examination, which revealed "possible left atrial enlargement, incomplete right bundle branch block, nonspecific t-wave abnormality, and abnormal rhythm ECG." (Exh. F, P.116.)

65. Mr. Gonzalez's "home care instructions" stated he was seen for hypertension and hypokalemia, prescribed Ibuprofen and Metoprolol, and instructed to stop taking hydrochlorothiazide. (Exh. F, P.225.)

66. According to Defendant's records, on March 8, 2016, Mr. Gonzalez was scheduled to work at 3:45 p.m. (Exh. B, 96:3-9.)

67. Also according to Defendant's records, on March 8, 2016, Mr. Gonzalez entered the Plant at 9:49 a.m. and left again at 9:55 a.m. (Exh. B, 96:14-19.) Defendant

had no other record regarding Mr. Gonzalez's visit on March 8, 2016. (Exh. B, 96:17-19;
98:5-19.)

68.    Defendant produced two documents dated March 8, 2016, both of which it
identified as part of Mr. Gonzalez's "FMLA file" (Exh. P, #29):

a.    A second signed "Leave Claim Form—Intermittent FMLA" (SWIFT228)
("March 8 Leave Claim") stating Mr. Gonzalez was absent from work on
March 7, 2016, due to an "emergency visit," and stating "I acknowledge
that I have an intermittent FMLA leave approved on file for: Myself." (Exh.
B.15; Exh. B, 96:23-24—98:1-4.)

b.    An "Emergency Department Medical Certificate," from Passavant Area
Hospital (SWIFT187) ("March 8 Hospital Note"), bearing Mr. Gonzalez's
name and signature and stating, "Date seen: 3/8/16," with a check by the
phrase "is unable to work because of injury/illness for ____ days. May
return to work on 3/12/16 or cleared by PCP." (Exh. B.16; Exh. B, 99:3-19;
Exh. C.42.)

69.    Mr. Gonzalez received and signed the March 8 Hospital Note after having
returned to the hospital for the same problem as before, and stated he provided it to HR
"the next day."[12] (Exh. C.42, Exh. C, 112:1-25—113:1-11.)

70.    Mr. Gonzalez said that when he provided the March 8 Hospital Note, he
told the HR representative that he had been to the physician again, and that she read the

---

[12] At his deposition, Mr. Gonzalez agreed "the next day" would be March 9, 2016. (Exh. C, 112:13-25—
113:1-11.) After being admitted on March 7, 2016, Mr. Gonzalez was released just before 3:00 a.m. on
March 8, 2016, and therefore may have remembered March 8, 2016 as "the next day." The Turnstyle log
shows Mr. Gonzalez came to the Plant on March 8, rather than March 9, 2016. (Exh. B, 96:14-19.)
Regardless, Defendant cannot deny Mr. Gonzalez provided the March 8 Hospital Note, it claims no record
of when he did so, so whether he submitted the form on March 8 or March 9, 2016 is not material.

document, gave him a copy, and told him to continue to call in his absences. (Exh. C, 113:12-25—114:1-3.)

71.     Defendant admitted that if the March 8 Hospital Note states Mr. Gonzalez is unable to work but can return on March 12, Defendant would not have expected him to come to work on March 8, 9, 10, or 11. (Exh. B, 103:4-8; *see also* 109:15-23.)

72.     Defendant stated that even though Defendant did not expect Mr. Gonzalez to come to work, he was still required to call, "[b]ecause we need to know whether he's coming in or not." (Exh. B, 110:4-13.)

73.     Defendant stated the March 8 Hospital Note was not adequate to qualify Mr. Gonzalez for FMLA leave for the dates it covered, because it lacked a diagnosis, prognosis, or reason he had been in the emergency room, and therefore it "would fall in under the no fault attendance policy." (Exh. B, 100:8—101:7-11.)

74.     When asked what Defendant did to acquire the missing information, its representative stated that he did not know. (Exh. B, 102:7-13.)

75.     Mr. Gonzalez did not work on March 8, 2016 and incurred a point,[13] because, as Defendant stated, "him just being excused from work by a doctor does not excuse the points." (Exh. B, 103:13-18.)

---

[13] Defendant's Call Log indicates that on March 8, 2016, Mr. Gonzalez called in at 6:35 p.m. EST, or 5:35 p.m. local time, which would have been after the 3:45 p.m. start time indicated on its Kronos Document. (*See* Exh. B.8, Exh. B.5.) Defendant claimed its Policy required it to charge three points if a call came even a few minutes late. (Exh. B, 32:1-17.) Defendant also testified that it made no difference if an employee has already reported he would not be at work and was therefore not "expected" to be there, as was the case after the March 8 Hospital Note. (Exh. B, 103:4-8.) The discrepancy between Defendant's documents, which indicate Mr. Gonzalez called late on March 8 but was assigned one point (not three), and its stated policy, that all late calls initially received three points regardless of circumstances, may mean 1) that Defendant's call-in system data are unreliable, as Mr. Gonzalez testified (Exh. C, 143:2-7); 2) that Defendant waived its Policy requiring 3 points for a late call; or 3) that Mr. Gonzalez's understanding of the Policy, that only failure to call resulted in 3 points, while a late call resulted in 1 point, was Defendant's actual practice (Exh. C, 79:25—81:1-17). In any event, for reasons set out in Mr. Gonzalez's argument, *infra*, these factual disputes do not foreclose summary judgment in Mr. Gonzalez's favor—although they do foreclose summary judgment in Defendant's favor based on Defendant's claims of late calls or failure to call.

76.     Defendant's documents indicated that as of March 8, 2016, Mr. Gonzalez had reached 10 points, enough to result in his termination. (Exh. B, 104:4-13.)

77.     Defendant stated it did not know whether Mr. Gonzalez was told he was terminated at that time, but that "[n]ormally if we're working an FMLA case with an employee, they would not be informed that they're terminated until such time that they fail to provide adequate documentation." (Exh. B, 104:4-13.)

78.     Consistent with the March 8 Hospital Note, Mr. Gonzalez did not work his scheduled shift on March 9, 2016. (Exh. B, 104:14-16.)

79.     Defendant assessed a point against Mr. Gonzalez for his March 9 absence, and its records indicate that he called in timely. (Exh. B, 104:14-16; Exh. B.8; Exh. B.5.)

80.     Consistent with the March 8 Hospital Note, Mr. Gonzalez did not work his scheduled shift on March 10, 2016. (Exh. B, 109:5-14.)

81.     According to Defendant's records, Mr. Gonzalez called in sick at 7:16 p.m. EST (6:16 p.m. local time), and was assessed one point.[14]

82.     According to Defendant's records, on March 11, 2016, Mr. Gonzalez was scheduled to work, but did not; however, he came to the Plant at 9:38 a.m. and left again at 9:40. (Exh. B, 111:12-23.)

83.     Defendant has no knowledge or records regarding whom Mr. Gonzalez spoke to at the Plant on March 11, 2016. (Exh. B, 111:24—112:1-5.)

84.     Defendant's records indicate that Mr. Gonzalez called in sick on March 11, 2016, at 3:14 p.m. EST (2:14 p.m. local time), in addition to having come to the Plant in

---

[14] Again, while Defendant testified that three points would necessarily be assigned for any late call, its documents indicate either that the data on Defendant's Call Log are unreliable, that Defendant waived the assignment of three points, or that Mr. Gonzalez correctly stated Defendant's Policy as actually practiced. (*See* n.13, *supra*.) As explained in Mr. Gonzalez's argument, this dispute of fact does not foreclose summary judgment in his favor. (*See* n.13, *supra*.)

person that morning. (Exh. B.6, B.8.)

85.     However, Defendant classified Mr. Gonzalez as a "no call/no show" on March 11, 2016. (Exh. B, 112:16-23; Exh. B.8.)

86.     Defendant had no explanation why the absence was wrongly classified as a "no call/no show."[15] (Exh. B, 112:21-23 ("I can't explain that.").)

87.     Mr. Gonzalez was not scheduled to work on Saturday, March 12 or Sunday, March 13, 2016. (Exh. B, 112:24—113:1-5.)

88.     On March 14, 2016, Mr. Gonzalez was scheduled to work at 3:45 p.m. (Exh. B, 113:8-14.)

89.     Mr. Gonzalez produced medical records indicating that he attended a doctor's appointment at the Taylor Clinic in Beardstown on March 14, 2016.  (*See* Certified Medical Records from Taylor Clinic, dated March 14, 2016 ("March 14 Taylor Records") attached as Exh. J, P304-310.)

90.     The March 14 Taylor Records state that Mr. Gonzalez "went to Passavant H for nose bleed and was given time off work form [*sic*] 3/8/16 to 3/12/16 and today 3/14 comes and his BP 170/90 and is worried about his BP. Time off work from us from today until 3/17 of which [*sic*] he will return for evaluation." (Exh. J, P305.)

91.     The March 14 Taylor Records noted Mr. Gonzalez's diagnoses of "HTN (hypertension) [and] irregular heart beat," noted he was to start a new medication, Hydralazine HCl, at 10 milligrams four times per day, and instructed him to follow up regarding the hypertension in four days. (Exh. J, P305.)

---

[15] The inconsistency between Defendant's own Call Log and its claim that Mr. Gonzalez was a "no call/no show" forecloses Defendant from claiming that Mr. Gonzalez did not call in as required on March 11, 2016. No rational fact-finder could fairly conclude Mr. Gonzalez did not timely call in sick March 11, 2016, when he said he did, and when Defendant's own records indicate that he did.

92.     Defendant produced a document from the Taylor Clinic in Beardstown (SWIFT188), dated March 14, 2016 ("March 14 Doctor's Note"). (Exh. B.19; Exh. B, 113:21-24—114:1-4.)

93.     The March 14 Doctor's Note states with respect to Mr. Gonzalez,

The patient's absence is physician advised due to illness or injury. This certifies that he or she has been under our care for this problem. Please excuse Gabriel from work on the dates of March 14, 2016-March 17th, 2016. Gabriel will be returning to work on the day of March 17, 2016.

(Exh. B.19.) It is signed by Marguerite Taillefer, M.D. (Exh. B.19.)

94.     The March 14 Doctor's Note provides a number to call with questions. (Exh. B.19; Exh. B, 114:19-25—115:1.)

95.     On March 14, 2016, Mr. Gonzalez came to the Plant at 11:18 a.m. and left at 11:35 a.m. (Exh. B, 113:15-20.)

96.     Mr. Gonzalez gave the March 14 Doctor's Note to HR on that date. (Exh. D, 7.)

97.     Defendant had no knowledge of whether Mr. Gonzalez had brought the March 14 Doctor's Note to HR when he came to the Plant on March 14, 2016, and had no record indicating with whom Mr. Gonzalez met or what was discussed. (Exh. B, 114:7-9.)

98.     Defendant considered the March 14 Doctor's Note when denying Mr. Gonzalez's medical leave. (*See* Def. Supp. Ans. to Pl. 1st Set of Interrogs., attached as Exh. I, #7.)

99.     Defendant considered the March 14 Doctor's Note inadequate to qualify Mr. Gonzalez for FMLA on the 14th, 15th, or 16th, stating that to qualify for FMLA, the employee must provide information on a particular form created by the Department of

17

Labor; it does not suffice for the employee to provide all the information called for on that form. (Exh. B, 115:11-24—116:1-4.)

100.    Defendant had no knowledge whether anyone from HR contacted Dr. Taillefer about the March 14 Doctor's Note. (Exh. B, 116:11-16.)

101.    Defendant produced a letter from "JBS Human Resources" to Mr. Gonzalez (SWIFT179) dated March 14, 2016 ("March 14 Denial"), which stated it had "reviewed the paperwork submitted for your leave and . . . determined that the absences do not qualify under FMLA. This is because you have no active FMLA on file. . . . The following dates have been denied: 03/14/2016 through 03/16/2016." (Exh. B.20; Exh. B 116:20-24—117:1-4.)

102.    The March 14 Denial did not address Mr. Gonzalez's request for leave for "March 1 through unknown," submitted on March 7, 2016, and Defendant did not know of any document that did. (Exh. B, 119:15-19.)

103.    The March 14 Denial referred to an attached "Designation Notice," also dated March 14, 2016 ("March 14 Designation Notice") (SWIFT180). (Exh. B.21; Exh. B, 120:24—121:1-4.)

104.    The March 14 Designation Notice has an "x" by the statement, "Your FMLA Leave request is Not Approved," and states, in handwriting next to that statement, "You have no active FLMA on file." (Exh.B.21.)

105.    In its answers to interrogatories, Defendant described the March 14 Denial Letter and the March 14 Designation Notice as "advising that [Mr. Gonzalez's] request for leave is denied along with a designation notice. Plaintiff has not provided medical certification as requested on March 7, 2016." (Exh. B, 123:15-21; Exh. I, 7.)

106.    Defendant acknowledged that the requested medical certification was not

18

due until March 22, 2016 and admitted it was "odd" that Mr. Gonzalez was denied FMLA leave on March 14 for failing to provide medical certification that was not yet due. (Exh. B, 124:19-24—125:1-5.)

107.    On March 15, 2016, Mr. Gonzalez was scheduled to work, and entered the plant at 3:48 p.m., leaving again at 4:20 p.m. (Exh. B, 125:6-24.)

108.    Defendant has no knowledge of whether Mr. Gonzalez met with anyone in HR during that period on March 15, 2016. (Exh. B, 126:1-24—127:1-3.)

109.    Defendant claimed Mr. Gonzalez did not call in and assessed him three points for his March 15, 2016 absence, even though Mr. Gonzalez's March 14 Doctor's Note stated his absence was medically advised from March 14 through March 16, and even though he came to the Plant in person on March 15, 2016. (Exh. B, 127:4-23.)

110.    With respect to March 15, 2016, Mr. Gonzalez acknowledged that he could not state for certain whether he also called in, noting he had been taking prescription medication that made him sleepy. (Exh. C, 157:23-25—158:1-5.)

111.    Likewise, on March 16, 2016, Defendant assessed Mr. Gonzalez three points, claiming he was a "no call/no show," even though the March 14 Doctor's Note stated he should be excused from work that day on medical advice. (Exh. B, 129:19-22, Exh. B.19.)

112.    Defendant's Call Log does not reflect calls from Mr. Gonzalez on March 15 or 16, 2016, the dates the March 14 Doctor's Note stated Mr. Gonzalez's absence was medically advised.[16] (Exh. B.8.)

113.    Defendant produced a notice, entitled "Attendance Violation"

---

[16] As noted above, Mr. Gonzalez testified that he called on time each day he was absent, and he disputes the accuracy of Defendant's Call Log. As explained in Mr. Gonzalez's argument, *infra*, this dispute of fact does not foreclose summary judgment in Mr. Gonzalez's favor.

(SWIFT214), dated March 16, 2016, which had a handwritten notation on it reading "3/3/16-3/17/16 Pending," which Defendant acknowledged meant that Mr. Gonzalez was "[p]ending the resolution of an FMLA." (Exh. B.22, Exh. B, 130:22-24—131:1-17.)

114.    On March 17, 2016, Mr. Gonzalez did not come to work, and Defendant assessed Mr. Gonzalez one point, admitting he timely called in. (Exh. B, 130:6-15; *see also* Exh. B.8 (indicating Mr. Gonzalez called at 3:39 p.m. EST (2:29 p.m. local time).)

115.    Defendant testified that had Mr. Gonzalez's FMLA been approved for each date from March 3 through March 17, he would not have been terminated. (Exh. B, 132:8-14.)

116.    Defendant produced a Certification of Health Care Provider (SWIFT196-199), dated March 17, 2016 ("March 17 Certification"). (Exh. B.23.) Section One, which states "for completion by the employer," is not completed, except that it states the employer's name (as "JBS Pork"). (Exh. B.23.)

117.    Defendant acknowledged its HR office filled out Section One, and that the "employee's essential job functions" were not provided. (Exh. B, 133:18-24—134:1.)

118.    Defendant acknowledged that the March 17 Certification constituted the "doctor's paperwork" it required. (Exh. B, 134:7-10.)

119.    Defendant asked Mr. Gonzalez to take the form March 17 Certification to his physician, have it completed, and return it. (Exh. B, 134:11-14.)

120.    Mr. Gonzalez identified the March 17 Certification as paperwork he gave his doctor to fill out. (Exh. C, 127:1-25; *see also* Exh. C, 88:3-9.)

121.    The March 17 Certification as completed stated that Mr. Gonzalez had been seen at Passavant on March 8 and at the clinic on March 14, 2016, and, as "probable duration of condition," that "pt off work 3-14-16 3-15-16 and 3-16-16, may

return 3-17-16 to work with no restriction." (Exh. B.23 at 2.)

122.    The March 17 Certification stated that "Pt was seen in Dr. Taillefers office due to illness. She has excused the pt. for dates 3-14-2016-3-17-2016. Pt may return to work on March 17th 2016 with no restrictions." (Exh. B.23 at 2.)

123.    The March 17 Certification form requested the dates that the doctor treated the patient, and she filled in March 14, 2016. (Exh. B.23 at 2.)

124.    The March 17 Certification form asked whether medication was prescribed, and the doctor marked "Yes." (Exh. B.23 at 2.)

125.    The March 17 Certification form asked whether Mr. Gonzalez was "unable to perform any of his/her job functions due to the condition," and the doctor marked "Yes." (Exh. B.23 at 2.)

126.    The March 17 Certification form asked the doctor to "identify the job functions the employee is unable to perform," and the doctor filled in, "Pt. excused off work from Dr. Taillefer for the dates March 14th – March 17th 2016, return to work 3-17." (Exh. B.23 at 2.)

127.    The March 17 Certification form asked the doctor whether the employee would be incapacitated for a single continuous period of time to due to the medical condition, including any time for treatment and recovery, and the doctor marked "Yes." (Exh. B.23 at 3.)

128.    It stated, "If so, estimate the beginning and ending dates for the period of incapacity," which was filled in, "3-14-16, 3-15-16 + 3-16-16, may return 3-17-16 with no restrictions." (Exh. B.23 at 3.)

129.    The March 17 Certification form asked, "Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because

21

of the employee's medical condition," which the doctor marked "No." (Exh. B.23 at 3.)

130.    The March 17 Certification form asked, "Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions," which the doctor answered, "Unknown at this time." (Exh.B.23 at 3.)

131.    Of the March 17 Certification, Defendant stated, "there's no diagnoses in here. There's no condition mentioned. I don't know that the doctor even saw this document other than to sign it based on some of the wording in it. All it basically says is the employee is off for a condition. There's no way for us to determine whether it qualifies under the law of FMLA." (Exh. B, 138:8-15.)

132.    Defendant identified the March 17 Certification as one it considered when determining Mr. Gonzalez was not entitled to FMLA leave. (Exh. B, 139:5-8; *see also* Exh. I, #7.)

133.    When asked whether he agreed that the March 17 Certification did not include symptoms or a diagnosis, Mr. Gonzalez said he did not know the doctor had not included those things. (Exh. C, 129:21-25—130:1-4.)

134.    The March 17 Certification is written only in English. (Exh. B.23)

135.    Mr. Gonzalez was scheduled to work on March 17, 2016, called in sick, and was assessed a point. (Exh. B, 139:9-24.)

136.    On March 18, 2016, Mr. Gonzalez returned to the Taylor Clinic for follow-up. (*See* Certified Medical Records from Taylor Clinic, dated March 18, 2016 ("March 18 Taylor Records") attached as Exh. K, P304, P311-313.)

137.    The March 18 Taylor Records indicate Mr. Gonzalez's hypertension

continued "uncontrolled," at 180/80,[17] causing the doctor to increase Mr. Gonzalez's prescription for hydralazine from 10 mg to 50 mg, while continuing metoprolol. (Exh. K, P311-P312.) Mr. Gonzalez also complained of shortness of breath. (Exh. K, P311.)

138.    The time of Mr. Gonzalez's visit to the Taylor Clinic is not indicated in the Records, but Dr. Taillefer signed her notes that day at 12:49 p.m. (Exh. K, P313.)

139.    That same day, March 18, 2016, Mr. Gonzalez came into the Plant at 12:13 p.m. and left at 12:27 p.m. (Exh. B, 140:1-19.)

140.    Defendant could not identify who met with Mr. Gonzalez when he came to the Plant on March 18th, because "there's no notes." (Exh. B, 140:20-22.)

141.    That day, March 18, 2016, Mr. Gonzalez was scheduled to work, called in sick (according to Defendant's Call Log, at 4:22 p.m. EST (3:22 p.m. local time)), and was assessed a point. (Exh. B, 140:1-13.)

142.    Mr. Gonzalez was not scheduled to work on Saturday, March 19, or Sunday, March 20, 2016.

143.    On March 21, 2016, Mr. Gonzalez returned to the Taylor Clinic for follow-up ("DR T WANTS HIM BACK THIS DAY"). (*See* Certified Medical Records from Taylor Clinic, dated March 21, 2016 ("March 21 Taylor Records") attached as Exh. L, P304, P314-316.)

---

[17] The March 18 Taylor Records state, in the doctor's notes, "pt's bp is 108/80 [*sic*]," but states, under "vital signs," "BP 180/80." (Exh. K, P311-P312.) Mr. Gonzalez asks this Court to take judicial notice that 180/80 is considered "extremely high blood pressure" (or "hypertensive crisis"), while 108/80 would be well under normal. *See, e.g.*, WebMD, "Know Your Blood Pressure Numbers," https://www.webmd.com/hypertension-high-blood-pressure/guide/diastolic-and-systolic-blood-pressure-know-your-numbers#1. Courts take judicial notice of abnormal and dangerous blood pressure levels. *See, e.g.*, *Robinson v. Am. Airlines, Inc.*, 722 F. Supp. 757, 765 (D.D.C. 1989) (taking judicial notice that "blood pressure of 140/90 indicates 'mild hypertension.'"). That the doctor increased Mr. Gonzalez's medication, labeled it "uncontrolled," and required follow-up within three days (as stated below) indicates that the blood pressure reading of 108 was a typographical error in the doctor's notes, and should have read 180, as it did elsewhere in the same Record.

144.   On March 21, 2016, Mr. Gonzalez's blood pressure continued to be "uncontrolled" at 180/82. (Exh. L, P314-315.) The doctor's notes indicated that Mr. Gonzalez had taken his medication incorrectly, and she gave him additional instruction. (Exh. L, P314.) The nurse's note indicated that Mr. Gonzalez reported difficulty breathing and that felt he had to force himself to breathe. (Exh. L, P314.)

145.   The March 21 Taylor Records indicate the doctor wanted to see Mr. Gonzalez again in 48 hours and keep him off work due to his concern about shortness of breath at work. (Exh. L, P314.)

146.   The March 21 Taylor Records indicate Mr. Gonzalez reported anxiety and insomnia due to his hypertension, and was prescribed additional medication as treatment for these issues. (Exh. L, P314.)

147.   The March 21 Taylor Records do not indicate the time of Mr. Gonzalez's appointment, but the doctor signed her notes at 9:51 a.m. (Exh. L, P316.)

148.   Mr. Gonzalez timely called in sick that day, March 21, 2016, and was assessed a point. (Exh. B, 140:12-24; Exh. B.8.)

149.   Mr. Gonzalez also timely called in sick on March 22, 2016, and was assessed a point. (Exh. B, 142:1-13; Exh. B.8.)

150.   Defendant produced a second Designation Notice (SWIFT176), dated March 22, 2016 (the "March 22 Designation Notice"), to communicate that Mr. Gonzalez's FMLA had not been approved. (Exh. B.29; Exh. B, 143:2-22.)

151.   The March 22 Designation Notice stated, as the reason for the denial, "the FMLA does not apply to your leave request." (Exh. B, 143:23-24—144:1-2.)

152.   Defendant did not place a check mark next to the statement on the pre-printed form to indicate "additional information is needed to determine if your FMLA

leave request can be approved:" or the statement "The certification you have provided is not complete and sufficient to determine whether the FMLA applies to your leave request." (Exh. B.29.)

153.    Defendant did not to fill anything in the space provided for a deadline to submit additional information, or the space to "specify information needed to make the certification complete and sufficient." (Exh. B.29.)

154.    Defendant asserted the FMLA did not apply to Mr. Gonzalez's request because it did not have "enough information to qualify his request," but could not explain why its HR representative failed to indicate that "additional information is needed" by placing a check mark next to that statement on the form. (Exh. B, 144:1-14.)

155.    The March 22 Designation Notice did not tell Mr. Gonzalez what was missing from his FMLA request, or refer to his certification being inadequate. (Exh. B.29; Exh. B, 144:20-22—145:1-6.)

156.    The March 22 Designation Notice is written in English and there is no version of the document in Spanish. (Exh. B.29; Exh. B, 145:23-24—146:1-3.)

157.    Mr. Gonzalez had been approved in advance for a personal leave of absence on March 23, 2016, and was therefore not scheduled to work that day.[18] (Exh. B, 145:10-17.)

158.    On March 23, 2016, Mr. Gonzalez returned to the Taylor Clinic for an additional follow-up. (*See* Certified Medical Records from Taylor Clinic, dated March 23, 2016 ("March 23 Taylor Records") attached as Exh. M, P304, P317-319.)

159.    The March 23 Taylor Records indicate that Mr. Gonzalez's hypertension

---

[18] Mr. Gonzalez applied for this leave of absence on a form written in Spanish, dated March 14, 2016, which was approved that same day. (Exh. C.58, Exh. C, 166:1-23.)

remained "uncontrolled," but had improved to 160/80, although he was still having problems with shortness of breath and his heart racing. (Exh. M, P317.) The doctor increased his hydralazine dosage from 50 to 100 mg twice daily, and increased his antidepressant and anxiety medications. (Exh. M, P317.)

160.    The March 23 Taylor Records state Mr. Gonzalez is "not ready to start work still." (Exh. M, P317.)

161.    Defendant produced a letter to Mr. Gonzalez (SWIFT177) dated March 23, 2016 ("March 23 Denial"), and written in English. (Exh. B.24.) The March 23 Denial stated Defendant had "reviewed the paperwork submitted for your leave and . . . determined that the absences do not qualify under FMLA. This is because DOES NOT MEET CRITERIA . . . . The following dates have been denied: 03/14/2016 through 03/16/2016."[19] (Exh. B.24.)

162.    The March 23 Denial did not refer to any other dates for which Mr. Gonzalez had requested leave. (Exh. B.24.)

163.    Defendant stated that for March 14 through March 16, the documentation of Mr. Gonzalez's illness "did not provide enough substance to qualify him for FMLA." (Exh. B, 147:14-19.)

164.    Mr. Gonzalez understood there was something wrong with his paperwork, but did not know what it was. (Exh. C, 135:7-19.)

165.    Defendant acknowledged it had the right to request Mr. Gonzalez's medical records, but had no record of doing so. (Exh. B, 149:6-7; *see also* Exh. B.14.)

166.    Mr. Gonzalez was scheduled to work on March 24, 2016, and called in sick.

---

[19] Mr. Gonzalez did not know until March 30, 2016 that his FMLA was denied—either he did not receive the March 23 Denial, or had not received it by that date. (Exh. D, 7.)

(Exh. B, 150:2-6.) According to Defendant's records, he called at 6:49 p.m., EST (5:49 p.m. in Beardstown) and was assessed three points for "no call/no show." (Exh. B, 150:2-10.)

167.    On March 25, 2016, Mr. Gonzalez again returned to the Taylor Clinic for follow-up treatment. (*See* Certified Medical Records from Taylor Clinic, dated March 25, 2016 ("March 25 Taylor Records") attached as Exh. N, P304, P320-322, P358.)

168.    The March 25 Taylor Records indicate that his hypertension, anxiety, and insomnia were now under control, but he was still having shortness of breath, and two nights earlier had experienced heart palpitations and difficulty breathing, with pain in his left arm. (Exh. N, P320.)

169.    The March 25 Taylor Records indicate that the doctor told him he could return to work that day. (Exh. N., P320.)

170.    The March 25 Taylor Records do not state the time of his appointment that day, but the doctor signed her notes at 9:57 a.m.

171.    On March 25, 2016, Defendant's records show Mr. Gonzalez came into the Plant at 9:35 a.m., and left at 9:50 a.m. (Exh. B, 151:16-21.)

172.    Mr. Gonzalez produced an additional letter from the Taylor Clinic (P60; P358), dated March 25, 2016 ("March 25 Doctor's Note"), which referred to him and stated, "To Whom it May Concern, the patient's absence is physician advised due to illness or injury. Please excuse patient from work 3/14 through 3/24 due to hypertension. May return to work 3/25 with no restrictions. This certifies that he or she has been under our care for this problem." (Exh. B, 152:1-15; Exh. B.25; Exh. N, P358.)

173.    Defendant did not know whether Mr. Gonzalez had brought the March 25 Doctor's Note into the Plant on March 25, 2016, and did not know whether it had been

considered in denying him FMLA leave or terminating his employment. (Exh. B, 152:16-24—153:1-4.)

174.    Mr. Gonzalez did not specifically remember giving the March 25 Doctor's Note to HR, but testified that he received it from Taylor clinic, and brought every medical note that he received from a doctor to HR as soon as possible. (Exh. C, 190:17-4 Exh. C, 137:9-15; Exh. D, 7; Exh. N. )

175.    Mr. Gonzalez was scheduled to work at 3:45 p.m. on March 25, 2016, but, according to Defendant's Call Log, timely called in sick at 3:38 p.m., EST (2:38 p.m. local time). (Exh. B, 150:18-23; Exh. B.8.)

176.    Defendant classified Mr. Gonzalez as a no call/no show for March 25, 2016, but could not explain why, since its own records showed he called almost an hour before his shift began. (Exh. B.8; Exh. B, 150:24—151:1-7.)

177.    Mr. Gonzalez was not scheduled to work on March 26 or 27, 2016. (Exh. B, 153:15-17.)

178.    Mr. Gonzalez was scheduled to work on March 28, 2016, but, according to Defendant's Call Log, called in sick at 3:03 p.m. EST (2:03 p.m. local time), and was assessed one point. (Exh. B, 153:18-24—154:1-6; Exh. B.4; Exh. B.8.)

179.    On March 28, 2016, at 11:11 p.m., Mr. Gonzalez sought treatment at the emergency room at HSHS St. John's Hospital ("St. John's Hospital"), complaining of shortness of breath, radiating chest pain and left-arm numbness. (*See* Certified Medical Records from St. John's Hospital, dated March 28, 2016 ("March 28-29 Hospital Records") attached as Exh. O, P559-598.)

180.    The March 28-29 Hospital Records indicate that on March 28, 2016, Mr. Gonzalez was administered aspirin (oral), Pantoprazole (intravenous), Morphine

28

Sulphate (intravenous, twice), Ondansetron Hcl (intravenous, twice),

Albuterol/Ipratropium (via nebulizer), Sodium Chloride (intravenous, twice),

Acetaminophen (oral), and Nitroglycerin. (Exh. O, P564.)

181.    The March 28-29 Hospital Records indicate Dr. Lindorfer-Campbell

ordered an EKG, CBC, BMP, cardiac enzymes, chest x-ray, CT of the head, CT of the

chest and abdomen/pelvis, among other tests. (Exh. O, P570.)

182.    The CT revealed sinusitis and pulmonary nodules. (Exh. O, P570.)

183.    The March 28-29 Hospital Records indicate that Mr. Gonzalez's blood

pressure was 172/81. (Exh. O, P570.)

184.    Mr. Gonzalez was released on March 29, 2016, given instructions for his

diagnosis of "sinusitis/acute bronchitis," and prescribed Amoxicillin/Clavulanate K for

sinusitis. (Exh. O, P571, P591.)

185.    Defendant produced a document, the first page of which was called

"Patient Visit Information" (SWIFT189) from St. John's Hospital dated March 28, 2016

("March 28-29 Hospital Note"), stating that Mr. Gonzalez was seen that day for

"shortness of breath, sinusitis, and bronchitis," and that medication was prescribed.

(Exh. B.27; Exh. B, 159:9-23.)

186.    The second page of the March 28-29 Hospital Note was called

"Work/School Excuse" (SWIFT190), dated March 29, 2016 at 10:30, and stated that Mr.

Gonzalez had been examined at St. John's Hospital and advised not to work until March

30, 2016. (Exh. B.26, Exh. B, 155:2-18; Exh.C.44.)

187.    Mr. Gonzalez stated he took the March 28-29 Hospital Note to HR on the

day he was released, to show why he was out of work on that day, and to state that he

could return to work the next day.[20] (Exh. C, 115:19-25—118:1-24.)

188.    In response to interrogatories, Defendant stated it considered the March 29 Hospital Note in denying Mr. Gonzalez's FMLA leave. (Exh. I, #7.)

189.    Defendant, at the deposition of its representative, stated it did not consider the March 28-29 Hospital Note, because "it does not give the required information, nor is it on the certification document." (Exh. B, 155:19-24—156:1.)

190.    Defendant also stated the March 28-29 Hospital Note would not have made a difference to its termination decision, because "without FMLA to support the absences of 3/1 through 3/8, the employee was already in excess of ten points at 3/8," which it said resulted in his termination. (Exh. B, 156:5-13.)

191.    Defendant's appointed representative had never met Mr. Gonzalez and had no memory specific to Mr. Gonzalez's case. (Exh. B, 94:8-10, 157:2-24—158:1-4.)

192.    On March 30, 2016, Defendant issued a letter to Mr. Gonzalez ("March 30 Termination Letter") stating, "You applied for FMLA for 3/14/2016-3/16/2016, but it has been determined that the absences do not qualify under FMLA. This is because it does not meet criteria. As of 3/16/2016, you accumulated 22 attendance points. Currently, you now have 34.00 attendance points. The JBS Attendance Policy states that the maximum number of attendance points given within 12 month period is 10.00. Due to being over on your attendance points, you are hereby being terminated, effective immediately." (Exh. B.28; Exh. B, 20-24.)

193.    Mr. Gonzalez learned he was fired when he tried to enter the Plant on

---

[20] Mr. Gonzalez remembered being taken to St. John's on a Sunday, being released from the hospital and receiving the March 29 Hospital Note on a Monday, and being been cleared to work the next day, a Tuesday. (Exh. C, 115:19-25—118:1-24.) He acknowledged it was possible that he was mixing up the days of the week. (Exh. C, 118:25—119:1-14.) This Court may take judicial notice that March 28, 2016, the date Mr. Gonzalez was admitted at St. John's, fell on a Monday.

March 30, 2016. (Exh. C, 69:24-25—70:1-10.)

194.    On March 30, 2016, Mr. Gonzalez tried three times to get through the turnstyle, but his ID key card did not work, after which the security guard came and took the card, and the union representative told him he was fired. (Exh. B, 175:17-24—176:1-3; Exh. C, 69:24-25—70:1-10.)

195.    Defendant produced a fax cover sheet from the Taylor Clinic (SWIFT195) dated March 30, 2016 ("March 30 Cover Sheet"), directed to Defendant's agent Lisa Roberts, and identified it as part of Mr. Gonzalez's FMLA file. (Exh. B.31, Exh. B, 166:22-24—167:1-9.) It states, "Revised FMLA papers #4 on papers." (Exh. B.31.)

196.    Defendant produced a version of the March 17 Certification (SWIFT191) that had additional handwritten notes in the margin ("March 30 Certification"). The additional notes on the March 30 Certification say "revis[ed] FMLA Papers, see # [4], BJL 3-30." (Exh. B.32.)

197.    Defendant agreed it appeared as though Defendant received the March 30 Certification on or around March 30, and that it was the same as the March 17 Certification, except that someone had written additional comments and revised #4. (Exh. B, 168:7-24—169:1-4.)

198.    The revision stated "Patient was seen for high blood pressure and is being treated for that condition. Patient is taking metoprolotartrate 25 mg 1 tab twice daily and hydralazine HCL 50 mg 1 tab twice a day." Additional writing appeared to be cut off.[21] (Exh. B.32.)

199.    Nothing else was changed, including answers to the question, "Probable

---

[21] Plaintiff produced a more legible version of this document at P13-14. (Exh. C.50.) The cut-off portion of the handwritten revision states "for his Blood Pressure Per Doctor Taillefer." (Exh. C.50.)

duration of condition," which still read, "Pt. off work 3-14-16, 3-15-16, and 3-16-16, may return 3-17-16 to work with no restrictions." In addition, the "Date(s) you treated the patient for this condition" still read "3-14-16." (Exh.C.50.)

200.   Defendant did not identify this document as one that had been considered in deciding to terminate Mr. Gonzalez. (Exh. I, 7.)

201.    Defendant did not know whether review of the document would have changed the decision. (Exh. B, 169:12-24—170:1-4.)

202.   Defendant stated that its nurse "would have had to review it to see if it qualifies as a serious medical condition," and that she was the only source of the "medical review." (Exh. B, 169:21-24—170:1-13.)

203.   Mr. Gonzalez could not read the March 30 Certification, as it was written in English, and did not know what was included or not included in it. (Exh. C, 129:9-25—130:1-4.)

204.   Defendant claimed that had Mr. Gonzalez not been terminated for exceeding his point total, Mr. Gonzalez would have been terminated for "no call/no shows" on the 24th and 25th, and the 11th and the 15th.[22] (Exh. B, 171:20-24.)

205.   Defendant stated that Mr. Gonzalez's classification as "no call/no show" on March 15 and March 16, 2016 would "qualify [Mr. Gonzalez] for termination," even if his FMLA requests had been approved, as he was required to call in his absences while his FMLA was pending. (Exh. B, 181:1-12.)

206.   Defendant also stated that under its written Policy, two unexcused absences in a row results in "automatic termination," so that "even if an employ[ee] had

---

[22] As stated above, Defendant's own documents indicate Mr. Gonzalez timely called in sick on March 11, 2016 and March 25, 2016 (Exh. B.8), and therefore could not be charged as a "no call/no show" on those dates.

an FMLA application pending and they failed to call in two days in a row or failed to call in" on time, "they would qualify for termination." (Exh. B, 181:23-24—182:1-15.)

207.   While stating that Mr. Gonzalez "would qualify" for termination based on Defendant's records of whether and when he called in, Defendant stated if Mr. Gonzalez had been able to provide medical certification for each of the dates he was absent in March, that would have prevented his termination. (Exh. B, 178:10-24—179:1-10.)

208.   Defendant could not identify anything else it did to determine whether any of Mr. Gonzalez's absences qualified for FMLA leave. (Exh. B, 172:9-19.)

209.   Mr. Gonzalez described his condition throughout the month of March 2016 as being in "bad shape," saying his elevated blood pressure generally caused his hands and eye to shake, and caused him to feel dizzy. (Exh. C, 100:23-25; 97:20-25—98:1-10.) He also experienced shortness of breath. (Exh. C, 98:10; 99:10-15.)

210.   He said he experienced those symptoms throughout March, but noted they improved after he was released from St. John's Hospital at the end of March, 2016. (Exh. C, 98:15-22—99:1-6.)

211.   Mr. Gonzalez stated that during the month of March 2016, prior to his termination, he could not work, and the doctor advised him not to do so. (Exh. C, 100:23-25; 101:7-21.)

212.   Mr. Gonzalez applied for unemployment with the Illinois Department of Employment Security ("IDES") after Defendant fired him, and Defendant opposed the claim. A copy of Mr. Gonzalez's unemployment file is attached as Exh. Q., P68-P95.

213.   Defendant stated that it opposed all unemployment claims where the termination was associated with attendance, regardless of whether the absences were based on illness. (Exh. B, 176:12-22.)

214.    In Mr. Gonzalez's case, Defendant's agent sent IDES a "protest" letter stating Mr. Gonzalez was not eligible for benefits, as he was not "able and available to work because he was on a medical leave of absence." (Exh. Q, P76.)

215.    Defendant had no explanation for having taken the position that Mr. Gonzalez was on a medical leave of absence when it claimed to have terminated him because he did not qualify for such a leave. (Exh. B, 177:12-17.)

216.    As of March 2016, the period relevant to Mr. Gonzalez's complaint, Mr. Gonzalez had worked for Defendant for more than 12 months, and he worked at least 1,250 hours in the preceding year. (*See* Exh. A, ¶ 5.)

217.    Defendant employed 50 or more people within a 75-mile radius of Mr. Gonzalez's workplace, 8295 Arenzville Road, Beardstown, Illinois (the "Plant"), which Defendant owns. (Exh. A, ¶ 9.)

218.    Mr. Gonzalez continues to suffer from hypertension, for which he is required to see his doctor about every three to six months. (Exh. B, 95:1-25—96:1-10.)

## Argument

The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny" an employee's FMLA rights, or to discharge an employee for opposing such interference. 29 U.S.C. § 2615(a). To claim FMLA interference, an employee must show 1) he was eligible for the FMLA's protections, 2) his employer was covered, 3) he was entitled to leave under the FMLA, 4) he provided sufficient notice of his intent to take leave, and 5) his employer denied FMLA benefits to which he was entitled. *Preddie v. Bartholomew Consol. Sch. Corp.,* 799 F.3d 806, 816 (7th Cir. 2015). An FMLA interference claim does not require ill intent. *Id.* An employee may establish FMLA retaliation by showing he was fired because he took valid leave. *Id.* at 819.

34

Summary judgment must be granted "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), *quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Mr. Gonzalez is entitled to summary judgment, because no rational trier of fact could determine that Defendant's denial of his request for leave complied with the law, or that Mr. Gonzalez was fired for any reason other than for exercising his right to be absent on days he qualified for FMLA leave.

**I.    A rational trier of fact could only determine that Defendant committed interference when it repeatedly denied Mr. Gonzalez's requests for FMLA leave.**

The undisputed facts foreclose a finding for Defendant on Mr. Gonzalez's claim of FMLA interference. The facts irrefutably establish the elements of a claim: Mr. Gonzalez was eligible for FMLA leave and entitled to leave between March 1 and March 30, 2016, Mr. Gonzalez provided Defendant ample notice of his need for leave, and Defendant nonetheless repeatedly denied him the benefits to which he was entitled. The FMLA prohibits, *inter alia*, assigning points under a "no-fault" policy to an absence that qualifies for FMLA leave. 29 C.F.R. § 825.220(c). Defendant violated this provision, repeatedly charging Mr. Gonzalez points for missing work on days Mr. Gonzalez met all the requirements for FMLA leave, and ultimately by firing him for exceeding the maximum number of points. Defendant wrongly denied leave and fired Mr. Gonzalez as the result of that wrongful denial. No rational trier of fact could find otherwise.

**A.    Mr. Gonzalez was eligible for FMLA protections as a covered employee, and Defendant was a covered employer.**

The FMLA covers employees who have been employed for at least 12 months and 1,250 hours in the year preceding his need and request for FMLA leave. 29 U.S.C.

§ 2611(2)(A). Defendant admitted that Mr. Gonzalez met this requirement. (Exh. A, ¶ 5.) The FMLA covers employees of employers (including "successors in interest") with more than 50 employees within 75 miles of a worksite. *Id.*, § 2611(4)(A). Defendant admitted Mr. Gonzalez met this requirement, as well. (Exh. A, ¶ 9.) Mr. Gonzalez therefore establishes the first and second elements of his interference claim.

### B. Mr. Gonzalez was entitled to FMLA leave throughout March 2016, because he had a serious health condition that made him unable to perform the functions of his job.

An employee is entitled to FMLA leave if he suffers from a "serious health condition" that makes him unable to perform the functions of his job. 29 U.S.C. § 2612(a)(1)(D). The undisputed evidence establishes that Mr. Gonzalez met this requirement for each of the days he was charged attendance points in March 2016.

### 1. The medical evidence establishes that Mr. Gonzalez had a "serious health condition" within the meaning of the FMLA.

The FMLA defines "serious health condition" as an "illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.*, § 2611(11); 29 C.F.R. § 825.113(a). "Inpatient care" means treatment overnight. 29 C.F.R. § 825.114. The term "treatment" includes "examinations to determine if a serious health condition exists and evaluations of the condition." *Id.*, § 825.113(c). A regimen of "continuing treatment . . . includes, for example, a course of prescription medication (*e.g.*, an antibiotic)." *Id.* A serious health condition involving "continuing treatment by a health care provider" can be established in a number of ways—Mr. Gonzalez's condition indisputably meets at least two of those ways for the days he was charged points in March 2016.

First, a "serious health condition involving continuing treatment by a health care provider" includes any period of incapacity, or treatment for such incapacity, due to a "chronic serious health condition." 29 C.F.R. § 825.115(c). A chronic condition is one that "continues over an extended period, requires at least twice yearly treatment, and may cause episodic rather than a continuing period of incapacity (e.g. asthma, diabetes, epilepsy, etc.)" *Id.* "Incapacity" simply means "inability to work . . . due to the serious health condition." *Id.*, § 825.113(b).

The evidence establishes that Mr. Gonzalez's hypertension qualified as a "chronic condition," since Mr. Gonzalez has had the condition since March 1, 2016, and continues be treated and monitored for it at least twice a year.[23] (Exh. B, 95:1-25—96:1-10.) Mr. Gonzalez's testimony and the medical evidence establishes that Mr. Gonzalez suffered incapacity to work on March 1 and then from March 3, 2016 until his termination on March 30, due to that chronic condition. Mr. Gonzalez's supervisor sent him to the on-site nurse due to profuse bleeding on March 1, and the nurse sent him home, which the employer emphasized only occurred when the nurse made a medical determination the employee was too ill to work. (Exh. D, #6; Exh. B, 27:16-21; Exh. C, 109:1-9; 149:9-13; 149:23-25—150:1-20.) The same thing happened on March 3, after which Mr. Gonzalez sought and was given emergency room treatment, diagnosed with hypertension and epistaxis, prescribed medication, and advised to follow up with a primary care doctor. (Exh. C, 108:18-24; 109:5—110:1-9; Exh. E at P208-P219.) While Mr. Gonzalez did not

---

[23] The Department of Labor has recognized hypertension as an example of a well-recognized chronic condition. *See, e.g.*, Dept. of Labor, "[FMLA] Final Rule," 73 FR 67934, 68064 (noting comment citing hypertension as one of "five major chronic health diseases"); Dept. of Labor, "[FMLA] Interim Rule, 73 FR 7876, 7919 (noting comment citing "diabetes and hypertension" as chronic conditions). Other federal agencies do as well. *See, e.g.*, 38 C.F.R. § 3.309(a) (Dept. of Veterans' Affairs, listing hypertension as an example of a "chronic disease" that may granted service connection).

know, during the course of the month, how long his condition would incapacitate him, he ended up being incapacitated each working day until March 30, 2016. (Exh. D, #6; Exh. C, 98:10, 99:10-15, 100:23-25, 97:20-25—98:1-10.) Mr. Gonzalez's condition therefore plainly qualified as a serious health condition on each day he was absent in March 2016.[24]

Second, even if Mr. Gonzalez's hypertension did not qualify as a "chronic condition," it would still meet the test for a "serious health condition involving continuing treatment by a health care provider," which can be established by showing "[a] period of incapacity of more than three consecutive, full calendar days," and includes "any subsequent treatment or period of incapacity related to the same condition." *Id.*, § 825.115(a). Qualifying under this prong requires treatment "two or more times within 30 days of the first day of incapacity by a health care provider," resulting in a "regimen of continuing treatment" by a health care provider. *Id.* Treatment is required within the first seven days of the first day of incapacity. *Id.*

Mr. Gonzalez's medical condition, uncontrolled hypertension, indisputably qualified as a serious medical condition "involving continuing treatment by a health care provider" under this provision. Beginning March 3, 2016, Mr. Gonzalez suffered a period of incapacity of more than three consecutive full calendar days, medical treatment within 7 days of the first incapacity, and treatment for the same condition

---

[24] On March 25, 2016, Mr. Gonzalez's doctor opined that it was the first day his condition had stabilized so that he could return to work, but Mr. Gonzalez nonetheless called in sick, not feeling well enough to work. (Exh. N., P320.) Even if there is an issue of fact with respect to whether Mr. Gonzalez was incapacitated on March 25, there can be no dispute about any of the other days for which Mr. Gonzalez was assessed a point. Crediting Defendant's claim that Mr. Gonzalez had five points on March 1, 2016, he would only have had six points even if charged a point for his absence on March 25, 2016, and therefore would not have been terminated.

even more than the required two times within 30 days. Mr. Gonzalez described himself
as unable to work throughout March 2016 due to symptoms such as shaking, dizziness,
and shortness of breath.[25] (Exh. C, 98:10, 99:10-15, 100:23-25, 97:20-25—98:1-10.)
Defendant, whose supervisory employees observed and whose medical staff treated Mr.
Gonzalez, have provided no contrary evidence. Even if Mr. Gonzalez's first day of
incapacity is not counted, he indisputably suffered a three-day period of incapacity
beginning March 3, and certainly by March 7, when he sought and received emergency
room treatment at Passavant Hospital, where he remained until March 8, 2016, and
upon discharge from which his health care provider stated he was unable to work until
March 12, 2016. (Exh. F; *see also* Exh. B, 103:4-8.) During that hospital visit, Mr.
Gonzalez was given prescription medication and advised to follow up with his doctor,
which he did at least four times within 30 days. (Exh. F, P225, Exh. J-N.)

The incapacity and continuing treatment extended through the month. On March
14, 2016, Mr. Gonzalez's doctor at the Taylor clinic noted his prior hospitalization and
declared another three-day period of incapacity beginning the next work day, March 14,
through and including March 16, 2016, after which he received follow-up treatment and
monitoring every few days thereafter—March 18, 21, 23, and 25, 2016. (Exh. J-N.) (The
May 17 Certification expressly identified March 14 through 16 as a "period of
incapacity." (Exh. B.23.)) On May 25, the Taylor Clinic provided another document that
extended the period of incapacity from March 14 through and including March 24, 2016.
(Exh. B.25.)

---

[25] "Incapacity," for purposes of intermittent FMLA leave, can be established by lay testimony in
combination with medical records, and there need not be medical certification for every day of claimed
incapacity. *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 844 (7th Cir. 2014).

On March 28, Mr. Gonzalez was admitted to St. John's hospital, where he stayed overnight. (Exh. O.) Mr. Gonzalez was ultimately diagnosed with irregular heartbeat and sinusitis upon discharge, but this final hospitalization still qualifies as continuing treatment for his chronic, uncontrolled hypertension, because the term "treatment" includes "examinations to determine if a serious health condition exists and evaluations of the condition," and Mr. Gonzalez received heart monitoring and a battery of diagnostic exams based on his history of hypertension. *See* 29 C.F.R. § 825.113(c). Because Mr. Gonzalez was kept overnight, moreover, that hospitalization could qualify the new diagnoses as a serious health condition for which Mr. Gonzalez was separately entitled to FMLA leave. 29 C.F.R. §§ 825.113(a); 825.114.

Throughout March 2016, Mr. Gonzalez plainly suffered from a serious medical condition that entitled him to FMLA leave.

### 2.  Mr. Gonzalez's serious medical condition rendered him unable to perform the functions of his position.

"Unable to perform the functions of the position" means either that a health care provider has found the employee unable to work, or that the employee must be absent from work to receive medical treatment for a serious health condition. *Id.*, § 825.123(a). In Mr. Gonzalez's case, the medical evidence includes the opinion of healthcare providers that Mr. Gonzalez could not work, at least on March 1 and 3 and from March 7 through March 24, and then again on March 28 and 29, when he was hospitalized overnight and upon discharge received medical advice that he not return to work until March 30. (*See* Exh. B.15 (March 8 Hospital Note); B.19 (March 14 Doctor's Note); B.23 (March 17 Certification); B.25 (March 25 Doctor's Note); B.26-27 (March 28-29 Hospital Note); Exh. O.) For intermittent leave, inability to work can be established by

lay testimony in combination with medical records, and there need not be medical certification for every day of claimed incapacity. *Hansen*, 763 F.3d at 844. Mr. Gonzalez established inability to perform his work for each of the days for which he was charged points in March 2016.

### 3.   Defendant cannot dispute that Mr. Gonzalez's medical condition qualified for leave, because Defendant failed to follow basic requirements for doing so.

Defendant failed to take the steps required to dispute the existence of a serious medical condition, including by failing to communicate with Mr. Gonzalez's medical providers, as he gave it permission to do. "If there is a dispute between an employer and an employee as to whether leave qualifies as FMLA leave, it should be resolved through discussions between the employee and the employer. Such discussions and the decision must be documented." 29 C.F.R. § 825.301(c). Even though Mr. Gonzalez expressly applied for intermittent FMLA leave from March 1 to an unknown end date, Defendant failed to even discuss or formally deny leave for any of the days other than March 14-17, 2016, and its denials of leave for those dates offer no coherent reason—stating only the obvious falsehood that he had no "active FMLA on file" and the unreasonably vague "does not meet criteria." (Exh. B.20; B.29.) Defendant has no documentation of any discussion, in fact, regarding any day of leave requested, in violation of § 825.301(c). (*See* Exh. B, *passim*.)

Second, while an employer may require medical certification, "an employee may choose to comply with the certification requirement by providing the employer with an authorization, release, or waiver allowing the employer to communicate directly with the health care provider of the employee." 29 C.F.R. § 825.306; *see also Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 725 (7th Cir. 2007) (acknowledging that an employer with

notice of a serious health condition has a duty to request the information it needs to confirm entitlement). Mr. Gonzalez took this option, authorizing H.R. to contact his doctors, and relying on H.R. to do so as H.R. led him to believe it would. (Exh. B, 191:1-16.) However, H.R. did nothing to obtain certification or any other evidence it considered necessary from medical providers that treated Mr. Gonzalez on March 3 and March 7-8 or March 28-29, even though it plainly had notice of such treatment in connection with his application for leave, including the March 3 Hospital Note (Exh. B.7, from Passavant Hospital), the March 8 Hospital Note (Exh. B.16, also from Passavant, which stated Mr. Gonzalez was unable to work until March 12), and the March 28-29 Hospital Note (Exh. B.26-27). By March 8, Defendant knew that Mr. Gonzalez had been at Passavant Hospital twice for uncontrolled hypertension, and it had Mr. Gonzalez's March 7 Leave Claim and March 7 HIPAA Document, which permitted Defendant to obtain all relevant information from Passavant. Had Defendant done so, it would have learned that Mr. Gonzalez's medical condition was serious and met all of the other requirements for leave beginning at least March 3, 2016. (*See* Exh. E-F.)

Similarly, while Defendant apparently had some contact with the Taylor Clinic (Exh. B.31, Exh. B, 166:22-24—167:1-9), had Defendant simply requested the dates of Mr. Gonzalez's incapacity, it would have learned that Dr. Taillefer considered Mr. Gonzalez unable to work from March 14 to March 25, as she stated on the March 25 Doctor's Note (*see* B.25), and could have learned whatever details of his condition that formed the basis of that opinion that it wished (*see* Exh. J-N). Defendant failed to take reasonable steps to obtain this information, instead simply denying leave.

**4.    Even if H.R. had no responsibility to contact Mr. Gonzalez's medical providers, Defendant may not deny FMLA based on insufficient certification from them, because it failed to advise Mr. Gonzalez in writing of the nature of the claimed insufficiency of the documentation Mr. Gonzalez provided.**

Defendant provided an inadequate basis for denial of Mr. Gonzalez's FMLA leave from March 1 to March 30, 2016, when it terminated him—it claimed, and only with respect to three dates (March 14, 15, and 16), that Mr. Gonzalez's certification was inadequate to establish a serious medical condition. (Exh. P, #7.) That basis fails to justify denial as a matter of law.

When an employee requests FMLA leave, the employer may either "take the employee at his word and grant the request," or request certification from the healthcare provider. *Hansen*, 763 F.3d at 837, *citing* 29 U.S.C. § 2613(a). Before an employer may deny FMLA leave based on claimed incompleteness or insufficiency of a certification, however, the employer "shall state in writing what additional information is necessary to make the certification complete and sufficient."[26] 29 C.F.R. § 825.305(c). After such notice, the employee must have the opportunity to cure the deficiency before the employer may deny leave—the employer may not just declare the certification insufficient, deny leave, and fire the employee. *See Hansen*, 763 F.3d at 842 (reversing summary judgment for employer where an employee's absences continued after the period covered by a certification, but the employer did not adequately provide the opportunity to cure and obtain certification for those additional dates before firing him); *see also Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 887 (7th Cir. 2005) (reversing

---

[26] "A certification is considered incomplete if the employer receives a certification, but one or more of the applicable entries have not been completed. A certification is considered insufficient if the employer receives a complete certification, but the information provided is vague, ambiguous, or non-responsive." *Id.*

summary judgment for employer where doctor wrote "bronchitis" on form but omitted duration; employer could not "win its case by arguing the form was incomplete" without providing employee the opportunity to cure the deficiency).

Defendant unlawfully denied FMLA leave and fired Mr. Gonzalez without complying with this cure requirement. First, with respect to Mr. Gonzalez's claim for leave from March 1 to March 14, 2016 Defendant essentially denied leave for insufficient certification without even asking Mr. Gonzalez to obtain such certification from the relevant health care provider. Defendant's choices were to take Mr. Gonzalez at his word and grant leave, or request certification. *Hansen*, 763 F.3d at 837. For the March 1 to March 14 dates, it did neither. Defendant cannot deny both constructive and actual notice of Mr. Gonzalez's serious health condition at least by March 3, 2016; on March 7, he made a formal request for intermittent leave beginning March 1. Not only did Defendant's medical staff treat him on March 1 and March 3, on March 4, he provided the March 3 Hospital Note stating he had been to the emergency room at Passavant Hopsital, and on March 8 he provided the March 8 Hospital Note, stating he had returned to Passavant Hospital and could not work until March 12, 2016 (a Saturday). Defendant claims to have deemed the March 3 Hospital Note and the March 8 Hospital Note inadequate, but did nothing to advise Mr. Gonzalez of how to cure the inadequacy. (Exh. B.7; Exh. B, 66:11-24—67:1-12; 100:8—101:7-11.) Defendant has no evidence that it requested Mr. Gonzalez obtain a certification from Passavant. Defendant failed to fulfill its responsibility to investigate or obtain the information it claimed it needed to certify Mr. Gonzalez's request for FMLA leave up to March 14, 2016. (Exh. B, 102:7-13.)

Not only did Defendant fail to provide Mr. Gonzalez with written notice specifying how to cure documentation from Passavant Hospital it rejected as deficient,

Defendant affirmatively suggested that Mr. Gonzalez go to the Taylor Clinic and have a doctor there complete the certification form, even though Taylor Clinic could have no direct knowledge of Mr. Gonzalez's treatment at Passavant. (Exh. D, #7.) Thus, not only did Defendant fail to provide correct information, it provided affirmatively *incorrect* information, that it should have known would not result in a certification that covered any period before Mr. Gonzalez's March 14, 2016 appointment at Taylor Clinic.

With respect to Mr. Gonzalez's request for leave for dates beginning March 14, 2016, Defendant likewise denied leave claiming insufficient certification, but failed to provide legally adequate opportunity to cure. Defendant considered the March 14 Doctor's Note and March 17 Certification insufficient, but provided no notice specifying what would make them complete and correct, as the regulation requires. (*See* Exh. B.21 (March 14 Designation); B.29 (March 23 Designation Notice); *see also* Exh. I, #7.) Mr. Gonzalez acknowledged that someone at H.R. told him there was a problem with his certification from Taylor Clinic, but failed to specify what the issue was. (Exh. B, 91:5-7.) Defendant did not tell him orally, let alone in writing, as required.[27] Moreover, the written notices Defendant *did* provide have form statements for the employer to indicate what additional information is necessary, but Defendant failed to check those provisions or fill in those blanks. (*See* Exh. B.21 (March 14 Designation); B.29 (March 23 Designation).) Defendant's FMLA denials not only fail to specify the claimed inadequacy of Mr. Gonzalez's medical documents, they affirmatively cite reasons (albeit

---

[27] An employer who elects to require medical certification is required to make that request in writing, and to translate that request if its workforce is comprised of a significant portion of workers who are not literate in English. 29 C.F.R. §§ 825.300(a)(4); 825.300(c)(ii). In this case, Defendant admitted that a significant portion of its workers spoke Spanish only, but it advised Mr. Gonzalez in English that he had to provide medical certification. (Exh. B.13.) The spirit of this regulation, at least, would require that any notice of deficiencies in certifications also be translated into Spanish. In this case, Defendant's notice of insufficient certification was woefully inadequate and affirmatively incorrect regardless of language.

vague and nonsensical reasons) *other than* insufficiency.

Defendant's failure to comply with its obligations regarding the certifications directly resulted in wrongful denials for each of the dates in question. Mr. Gonzalez's medical records establish indisputably that he met the requirements for FMLA leave at least from March 3 through March 24 and March 28 through March 29, and that he should not have received attendance points for those dates. Mr. Gonzalez's medical records from Passavant establish dangerously high blood pressure and contain a medical opinion that he could not work from March 7 to March 12. (Exhs. E, I; *see also* n.17, *supra*.) While Mr. Gonzalez's doctor at the Taylor Clinic originally estimated the dates Mr. Gonzalez could not work as March 14-17, 2016 on the form it provided (even when she faxed a corrected form back on March 30, 3016), the medical evidence establishes that this was an oversight on the doctor's part; this doctor expressly opined, as she continued to treat Mr. Gonzalez during the course of the month, that his incapacity extended will past March 17, 2016 until his blood pressure stabilized (temporarily, it turned out) on March 25, 2016. (*See* Exhs. J-O.) Defendant did nothing to resolve the inconsistency between the March 25 Doctor's Note and the March 30 Certification, and Dr. Taillefer's express opinion that Mr. Gonzalez could not work the entire period she treated him, between March 14 and March 25, 2016. Mr. Gonzalez was again hospitalized between March 28 and March 29, 2016 at St. John's Hospital, and received a document stating he could not work until March 30, but by that date, Defendant had already elected to terminate him for excessive absences. (Exh. B.28.)

The medical evidence makes clear, in short, that had Defendant complied with its responsibility to give Mr. Gonzalez a meaningful opportunity to cure claimed deficiencies in his documentation, he would have done so. Defendant's multi-faceted

failure to comply with § 825.305(c) resulted in denial of leave to which Mr. Gonzalez was entitled. No rational juror could find otherwise.

### C.    Defendant had notice that Mr. Gonzalez needed and claimed intermittent FMLA leave beginning March 1, 2016.

Where leave is not foreseeable, the FMLA requires employees to provide notice "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). While the employee has the initial burden of providing notice that he needs FMLA leave, that burden requires no more than "'to place the employer on notice of a probable basis for FMLA leave. He doesn't have to write a brief demonstrating a legal entitlement. He just has to give the employer enough information to establish probable cause . . . to believe that he is entitled to FMLA leave.'" *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 724 (7th Cir. 2007), *quoting Aubuchon v. Knauf Fiberglass, GMBH*, 359 F.3d 950, 953 (7th Cir. 2004). Once the employer has that notice, it becomes "'the employer's duty to request such additional information from the employee's doctor or some other reputable source as may be necessary to confirm the employee's entitlement." *Stevenson*, 505 F.3d at 725, *quoting Aubuchon*, 249 F.3d at 953. An employer's own observation that an employee exhibits symptoms indicating a serious medical condition may constitute constructive notice of such a condition. *See Stevenson*, 505 F.3d at 726.

### 1.    Mr. Gonzalez provided the notice required by FMLA law.

Defendant cannot deny that Mr. Gonzalez provided Defendant with the required notice of his need for FMLA as soon as possible as he became aware of that need during the course of March 2016. First, Mr. Gonzalez's supervisor observed his condition of epistaxis on March 1 and 3, 2016, and Defendant's own medical staff treated him,

determining he was too ill to remain at work.[28] Defendant plainly had notice of Mr.
Gonzalez's need for leave, as it was Defendant's H.R. representative who suggested to
Mr. Gonzalez he was eligible on March 7, 2016. (Exh. D, #6.) Defendant produced
numerous documents dated March 7, 2016, reflecting Mr. Gonzalez's express request for
intermittent FMLA leave from March 1 to an unknown end date. (Exh. B.10-B.14; Exh.
P, #29.) At that time, Mr. Gonzalez did not know the duration of his incapacity; his
doctors' opinions evolved as his condition failed to respond to treatment over the course
of the month, and his incapacity was repeatedly extended as his medical providers
adjusted and changed his medications. (Exh. 4, #6, *see also, e.g.*, Exh. B.23 (the March
17 Certification); B.25 (the March 25 Doctor's Note); Exh. F, I, J-O (medical records).)
Mr. Gonzalez consistently testified he provided all the hospital and doctors' notes as
soon as possible after receiving them, and Defendant's own Turnstyle Log corroborates
that assertion—showing Mr. Gonzalez came to the Plant in the mornings of March 8,
March 14, March 15, March 18, March 25, and March 30, dates that correspond to the
March 8 Hospital Note (covering March 8-12), the March 14 Doctor's Note (covering
March 14-17), the March 17 Certification (same), the March 25 Doctor's Note (covering
March 14-March 24), and the March 28-29 Hospital Note (covering March 28-30).

Defendant claims it has no record of Mr. Gonzalez's meetings with H.R. on these
days, and admits it considered the above documents, dated March 8, March 14, March
17, and March 29, 2016. (Exh. I, #7.) No rational factfinder could determine that Mr.
Gonzalez did not provide Defendant actual notice of his need for leave as soon as

---

[28] Mr. Gonzalez made repeated requests for documents reflecting this treatment, and Defendant asserts
none exist. (*See* Exh. P, #29.) Defendant cannot dispute Mr. Gonzalez's consistent testimony that its
nurse sent him home, because his March 7 Leave Claim, which a representative of H.R. completed,
admitted Mr. Gonzalez was "sent hom[] by nursing," and because it lacks any evidence to the contrary.
(Exh. B.10; Exh. C.45; Exh. C, 121:23-25, 122:1-9.)

practicable under the circumstances, as required by FMLA law. *See* 29 C.F.R.

§ 825.303(a).

>   **2.      Defendant's claim that Mr. Gonzalez did not timely call in some absences as it required under its Policy, even if taken as true, cannot defeat his right to FMLA leave under the circumstances.**

Defendant claimed that Mr. Gonzalez's classification as a "no call/no show" on

March 11, 14, 15, 24, and 25 would have "qualified him for termination" under its Policy,

even if he established his eligibility for FMLA leave on those dates. (Exh. B, 171:20-24;

181:1-12.) According to Defendant, Mr. Gonzalez, in addition to providing the ample

actual notice set out above regarding his absences, had to provide additional notice by

calling Defendant's call-in line at least half an hour prior to his shifts each day, or

receive 3 attendance points. Mr. Gonzalez testified that he did call on time each day.

(Exh. C, 81:18-23.) Mr. Gonzalez disputes both the Policy, as applied (late calls did not

actually result in 3 points), and the accuracy of Defendant's Call Log. (Exh. C, 80:23-

25—82:1-8; 82:23-25—83:1-7; 143:2-7.) Defendant cannot dispute Mr. Gonzalez's

testimony that he called in on time each day, because its claim is based on repeatedly

self-contradictory documents. Further, even if those documents are not disregarded as

unreliable, Defendant's claim that Mr. Gonzalez failed to provide sufficient notice under

its internal Policy fails as a matter of law.

>   **a.      Defendant's Call Log squarely contradicts its charges of "no-call, no show."**

First, with respect to March 11 and March 25, 2016, Defendant's own Call Log

shows that Mr. Gonzalez made timely calls on those dates (and its Turnstyle Log says he

came to the Plant in the morning of both of those days, as well). (*See* Exh. B.6; Exh.

B.8.) Defendant had no explanation for nonetheless classifying Mr. Gonzalez as "no

49

call/no show" and charging him three points for his absences on those dates. (Exh. B.8; Exh. B, 112:21-23; Exh. B, 150:24—151:1-7.) No rational fact-finder could find to the contrary.

> **b.    Under the circumstances, Mr. Gonzalez could not lawfully be denied leave based on strict enforcement of Defendant's internal call-in Policy, even if Mr. Gonzalez had violated it as claimed.**

Second, even if Defendant's claims that Mr. Gonzalez called late or failed to call on some of the days he missed work were credited, applying the Policy to deny leave in this case would violate the FMLA. The FMLA regulation requires "practicable" notice that accounts for "facts and circumstances in the individual case." *Id.*, 825.303(a). Defendant cannot dispute that Mr. Gonzalez provided *advance* notice to the extent possible of all of his absences, including those which Defendant deemed him a "no show," March 15 and 16, 2016. In particular, Defendant cannot dispute that it was in possession of Mr. Gonzalez's March 14 Doctor's Note (stating he should be excused from work from March 14-March 17) on March 14, because it issued the March 14 Denial on that day. (Exh. B.20.) The March 14 Doctor's Note (Exh. B.19) was the only document up to that date that specifically requested March 14-17, 2016 as leave, and Defendant's March 14 Denial referred only and specifically to those dates. (Exh. B.20) Therefore, Defendant had to have known on March 14, 2016 that Mr. Gonzalez specifically needed leave March 14 to March 17, 2016. Defendant therefore had ample *advance* notice of Mr. Gonzalez's absence on March 15 and 16, 2016, regardless of whether he called on those dates.

Defendant admitted that Mr. Gonzalez would not be "expected" to come to work on dates a doctor stated in advance that he would be unable to work, but Defendant

nonetheless purports to have imposed the requirement that he call each separate day. (Exh. B, 103:4-8; *see also* 109:15-23.) That requirement, under the circumstances of this case, would have no purpose but to impose an additional impediment for an employee suffering a serious health condition in need of leave. The undisputed facts show that Mr. Gonzalez provided actual notice as soon as he could, as the FMLA requires, while continuing to make timely calls in good faith.

The regulation makes clear that the determination of when an employee could practicably provide notice must take into account the employee's individual facts and circumstances. *See* 29 C.F.R. § 825.304(d). Mr. Gonzalez testified he always called on time, but acknowledged that his medication "knock[ed him] out," and that this condition could have caused him to call late on some days in March 2016.[29] (Exh. C, 81:21-25—82:1-8; 82:23-25—83:1-7; 164:6-25—165:1-6.) To the extent Defendant can credibly claim Mr. Gonzalez forgot to call or called late on March 14 and 15, or any other relevant date, his condition and medication caused that situation. (Exh. C, 81:25—82:1-8; 82:23-25—83:1-7; 164:6-25—165:1-6.) Thus, even if Defendant were correct that there were days Mr. Gonzalez called late or forgot to call, the facts and circumstances—being debilitated by his condition—excuse any failure to provide notice to the strictest letter of Defendant's Policy.

---

[29] This Court may take judicial notice that high blood pressure itself can cause memory loss and trouble concentrating when it reaches the levels Mr. Gonzalez experienced. *See* Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/high-blood-pressure/art-20045868. *See* Fed. R. Evid. 201(b); *Wesley Health Sys., LLC v. Forrest Cty. Bd. of Supervisors*, No. 2:12-CV-59-KS-MTP, 2014 U.S. Dist. LEXIS 7764, at *43 n.14 (S.D. Miss. Jan. 22, 2014) (taking judicial notice that nausea and vomiting are common symptoms of concussion); *Schenk v. City of N.Y.*, No. 08-CV-914 (SLT)(LB), 2010 U.S. Dist. LEXIS 94576, at *15 (E.D.N.Y. Aug. 12, 2010) (taking judicial notice of symptom of low pressure CSF syndrome).

### c. Defendant waived enforcement of its internal Policy for FMLA-qualified leave.

Third, an employer may not terminate an employee for FMLA-qualified absences based on failure to conform to an internal policy for providing notice, where the employer has waived application of that policy. *See* 29 C.F.R. § 825.304(e). Defendant's own documents and testimony establish that it waived its call-in Policy, both with respect to allegedly late calls and failures to call, if FMLA-qualified leave is established.

With respect to March 24, 2016, according to Defendant's Call Log, Mr. Gonzalez called, just outside the 30-minute window. (Exh. B.8.) Defendant claimed a call even a few minutes late made the employee a "no call/no show," for which it charged 3 points, and claimed it made no difference if an employee has already reported he would not be at work and was therefore not "expected" to be there. (Exh. B, 32:1-17; 103:4-8.) But Defendant's documents belie that claim, showing Defendant charged Mr. Gonzalez one point on March 8, 10, 14, 18, and 29, even though Defendant's Call Log did not show calls before 3:15 local time, half an hour before Mr. Gonzalez's shift, on those days. (*See* Exh. B.4, Exh. B.8.) Only the allegedly late call on March 24, 2019 was charged as a "no call/no show." (*See* Exh. B.4.) Defendant's Call Log, even if it were accurate (which there is ample reason to doubt) thus shows Defendant waived its claimed Policy requiring 3 points for a late call, and requiring an absence following a late call to be deemed a "no call/no show." That waiver was consistent with Mr. Gonzalez's understanding. (Exh. C, 80:23-25—82:1-8; 82:23-25—83:1-7.)

With respect to March 15th and 16th, 2016, the only days Defendant claimed as "no call/no show" for which Defendant's Call Log does not show a call from Mr.

Gonzalez[30] (Exh. B.4; Exh. B.8), Defendant's testimony established that it waived application of the Policy to the extent the days were FMLA-qualifying. Defendant testified that had Mr. Gonzalez's FMLA been approved for each date from March 3 through March 17, he would not have been terminated. (Exh. B, 132:8-14.) Thus, while Defendant asserted the Policy provided for "automatic" termination with two "no call/no show" charges, and that Mr. Gonzalez "qualified" for such termination (Exh. B, 181:23-24—182:1-15), Defendant admitted that once it found leave to be FMLA-qualifying, it retroactively waived attendance points for qualifying days. As explained above, Mr. Gonzalez's absence was FMLA-qualifying, and Defendant's denial of FMLA, based on allegedly insufficient certification, failed as a matter of law.

### d. Defendant could not lawfully refuse to waive its Policy in FMLA cases, while waiving it in non-FMLA cases.

Finally, where an employer chooses not to waive an internal policy, that choice may not "discriminate against employees taking FMLA leave." 29 C.F.R. 825.304(e). Defendant stated that where an employee experienced a house fire and needed to be out for a few days, Defendant considered itself on notice of the employee's absence, and did not expect that person to call each day. (Exh. B, 31:20-24.) Defendant insisted, however, that an employee who was not expected to come to work because he has a doctor's note saying he should not come to work *is* still expected to call each day. (Exh. B, 110:4-10.) Thus, to the extent Defendant is not deemed to have waived the Policy in this case, its refusal to do so would constitute unlawful discrimination against pending FMLA claims,

---

[30] The Turnstyle Log reflects, moreover, that Mr. Gonzalez came to the Plant on March 15, 2016. (Exh. B.6.)

compared to other reasons employees need leave. That Policy therefore may not provide a basis for any finding that Mr. Gonzalez's provided Defendant insufficient notice.

### E.   Defendant wrongly denied FMLA leave to which Mr. Gonzalez was entitled, and its claimed basis for that denial fails as a matter of law.

Defendant denied Mr. Gonzalez his FMLA rights by repeatedly penalizing him for missing work on days that qualified for FMLA leave by assigning him attendance points, ultimately firing him for accumulating those points. Defendant implicitly denied Mr. Gonzalez leave for FMLA-qualified work days between March 1, 2016 through March 13, and March 17 through March 30, 2016, by disregarding his clear request for leave covering those dates. (*See* Exh. B.10; Exh. B, 116:20-24—117:1-4.) Defendant explicitly denied Mr. Gonzalez leave for FMLA-qualified work days between March 14 and March 17, 2016, first on March 14, 2016 (stating, inexplicably, that he had "no active FMLA on file") and then again on March 22, 2016, stating only "does not meet criteria." (Exh. I, #7; Exh. B.20; Exh. B.29.) Defendant later claimed these notices referred to Mr. Gonzalez not having provided a medical certification and not suffering from a serious health condition. (Exh. I, #7.) As explained above, however, Defendant had no permissible basis for denying leave for the dates Mr. Gonzalez was absent in March 2016. Mr. Gonzalez thus established his claim of interference as a matter of law.

## II.   Defendant unlawfully retaliated against Mr. Gonzalez.

Where an employer's wrongful denial of FMLA leave results in the accumulation of attendance points that constitute the express, undisputed basis to terminate employment, the employee also establishes his claim of unlawful retaliation. *See Hanson*, 763 F.3d at 835 n.1. For all of the reasons explained in Argument I, Mr. Gonzalez qualified for FMLA for each of the days he was assigned points in March 2016;

at the very least, the undisputed evidence establishes that for March 1, 3-24 and March 28-30 (all but one of the days Mr. Gonzalez received attendance points in March), he could not work due to a serious health condition. Because Defendant admitted Mr. Gonzalez had no more than 5 attendance points at the beginning of March 2016 (Exh. C, 141:22-25—143:1-8), had Defendant not charged him points indisputably in violation of the FMLA, Mr. Gonzalez would not have reached the maximum of 10, and he would not have been terminated.

  Defendant admitted that had Mr. Gonzalez had medical certification for each of the dates he had been absent in March, including March 14-17, "that would have prevented his termination." (Exh. B, 178:10-24—179:1-10.) Because Defendant could not, as a matter of law, terminate Mr. Gonzalez for an insufficient certification, having failed either to contact his medical providers or give him sufficient information to cure any deficiency it claimed, and because Defendant admitted that sufficient certification would have prevented the termination, Mr. Gonzalez establishes Defendant's liability.

**CONCLUSION**

  For all the above reasons, Mr. Gonzalez prays that this Court enter a finding of liability on all counts in his favor and against Defendant Swift Pork Company.

       /s/<u>Miriam Hallbauer</u>

Miriam Hallbauer
Carlos Cisneros-Vilchis
Legal Aid Chicago
120 South LaSalle Street, Suite 900
Chicago, IL  60603
Phone: 312-229-6360
mhallbauer@legalaidchicago.com

ATTORNEYS FOR PLAINTIFF GABRIEL GONZALEZ

55

**CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMTATION**
**Rule 7.1(B)(4)(c) and 7.1(D)(5)**

Counsel for Mr. Gonzalez hereby certifies that the Argument section of this Motion for Summary Judgment contains 6729 words as counted by Microsoft Word word processing system.

/s/<u>Miriam Hallbauer</u>

Miriam Hallbauer
Carlos Cisneros-Vilchis
Legal Aid Chicago
120 South LaSalle Street, Suite 900
Chicago, IL 60603
Phone: 312-229-6360
mhallbauer@legalaidchicago.com

ATTORNEYS FOR PLAINTIFF GABRIEL GONZALEZ

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that pursuant to Local Rule 49.9 and the Protective Order entered in this case (Doc. #29), the foregoing Motion for Summary Judgment was filed upon filing of a motion for leave to file under seal, using the separate docket event "sealed document." It was served upon the persons listed below by electronic mail on September 20, 2019.

/s/Miriam Hallbauer

Ruth A. Horvatich
Aaron A. Clark
McGrath North Mullin & Kratz
1601 Dodge Street, First National Tower Suite 3700
Omaha, NE  68102
rhorvatich@mcgrathnorth.com
aclark@mcgrathnorth.com

Lance T. Jones
HeplerBroom, LLC
4340 Acer Grove Drive, Suite A
Springfield, IL  62711
(212) 528-3674
Lance.jones@heplerbroom.com

Dated: September 20, 2019            Respectfully submitted,

/s/ Miriam Hallbauer

Attorney for Plaintiff
Miriam Hallbauer
Legal Aid Chicago
120 South LaSalle Street, Suite 900
Chicago, IL  60603
312-229-6360
mhallbauer@legalaidchicago.org