E-FILED
Friday, 18 October, 2019  05:14:59 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| GABRIEL GONZÁLEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:18-cv-03044 |
| v. | ) | |
| | ) | |
| JBS LIVE PORK, LLC; JBS USA, | ) | |
| LLC; and SWIFT PORK COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF GABRIEL GONZALEZ'S
RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### (a) INTRODUCTION

Mr. Gonzalez's Amended Complaint sets out each of the elements of his interference and retaliation claims under the FMLA: that he qualified for coverage as an "employee," that his medical condition qualified as "serious," that the Defendants had notice of his need for leave, and that Defendants unlawfully denied leave and penalized him for his leave-qualifying absences by assigning him "attendance points," ultimately terminating him for having more than the maximum number. Ample evidence supports each of these elements.[1] Defendants seek summary judgment based on claims that must be rejected as premised on legal error, contrary to the evidence, or both.

First, Defendants claim deficiencies in Mr. Gonzalez's certifications of his serious medical condition—that they contained insufficient information and failed to cover all

---

[1] Mr. Gonzalez attached evidentiary documentation supporting each of these elements as exhibits to his Motion for Summary Judgment, filed September 20, 2019. Where necessary to show the basis of a factual dispute, Mr. Gonzalez will refer to that evidentiary documentation by the same exhibit letters and numbers as in his motion, but will add "Pl." to reduce confusion between Mr. Gonzalez's exhibits and those of Defendants.

the dates for which Mr. Gonzalez requested leave. That claim fails, because the law required Defendants to advise Mr. Gonzalez of the *specific deficiencies* of his medical certification in writing, and Defendants never did so. Defendants do not claim they told Mr. Gonzalez (or his medical providers), in writing or otherwise, that they needed more detail about his condition or that the dates in the March 17 Certification failed to cover the requested FMLA leave dates, and Mr. Gonzalez never knew that Defendants rejected his certifications for those reasons. Moreover, ample (in fact, undisputed) medical evidence establishes that had Defendants specifically advised Mr. Gonzalez or his medical providers that they needed certification that covered the other dates for which Mr. Gonzalez needed and requested leave, Mr. Gonzalez could have produced certifications covering those dates.

Second, Defendants claim Mr. Gonzalez would have been terminated for accumulation of points regardless of the insufficient certification. That claim is premised on the fiction that Mr. Gonzalez only sought leave for March 14, 15, and 16, 2016, which is contradicted by numerous documents plainly indicating he sought leave from March 1, 2016 to an unknown date. Moreover, human resources ("HR") manager Don Holland testified that had Mr. Gonzalez produced adequate certification for his absences in March, he would not have been terminated. Had Defendants complied with regulations governing claims of inadequate certification, Mr. Gonzalez could and would have produced adequate certification. Therefore, Mr. Gonzalez would not have been terminated for accumulation of points.

Finally, Defendants JBS USA, LLC ("JBS USA") and JBS Live Pork ("JBS Live") claim that no evidence supports Mr. Gonzalez's case against them, and that Defendant Swift Pork Company ("Swift") is Mr. Gonzalez's sole employer. In fact, ample evidence

supports a finding that Defendants JBS USA and JBS Live and Defendant Swift are so integrated in their HR operations that a jury could reasonably find them to be joint employers.

## (b) RESPONSE TO DEFEDANTS' STATEMENT OF FACTS

### (1) UNDISPUTED MATERIAL FACTS

The following facts, quoted from paragraphs in Defendants' Motion for Summary Judgment, are both undisputed and material.[2]

"1.     Plaintiff Gabriel Gonzalez filed this action against JBS USA, LLC, JBS Live Pork, LLC, and Swift Pork Company asserting claims for interference and retaliation under the Family and Medical Leave Act ('FMLA')."

"2.     During the relevant time period, Plaintiff, Gabriel Gonzalez, was an employee of Swift Pork. (Ex. B, Holland Decl. ¶ 6)."

"3.     Defendant Swift Pork Company ('Swift Pork' or the 'Company') is a pork meat processing and distributing company that operates a facility in Beardstown, Illinois. (Ex. B, Holland Decl. ¶ 2). The Beardstown facility has approximately 2,300 employees. (*Id*. at ¶ 3)."

"4.     The Beardstown facility was previously operated by Cargill Meat Solutions. (Ex. B, Holland Decl. ¶ 3). Swift Pork began running the Beardstown facility in November 2015. (*Id*.)."

"5.     . . . JBS USA is the parent company of Swift Pork. . . . [T]he Beardstown facility . . . is owned and operated by Swift Pork." The omitted first sentence, indicated by ellipses, of paragraph 5 of Defendants' Motion is immaterial and undisputed; the

---

[2] Where part of a paragraph is disputed or not material, or both, Mr. Gonzalez omits it from this section, indicates the omission with ellipses, and notes the section where the omitted material is discussed.

omitted portions of the second sentence are material and disputed; each is discussed in Sections b(4) and b(2), respectively), below.

"6.     Defendant JBS Live Pork, LLC ("Live Pork") is a wholly-owned subsidiary of Swift Pork. (Ex. B, Holland Decl. ¶ 5). Live Pork is the owner and operator of live swine operations . . . ." The omitted portion of the second sentence, indicated by ellipses, is material and disputed and discussed in Section (b)(2), below.

"8.     During Gonzalez's employment, Swift Pork maintained an attendance policy which provides that employees must personally call in and report an absence, including the reason for the absence. (Ex. B, Holland Decl. ¶ 8; Ex. A, C. Cornelus Decl. Ex. A(2)). Employees are required to report their absences no later than 30 minutes prior to their scheduled start time. (*Id.*)."

"9.     During Gonzalez's employment, employees were required to call a specific number, which was managed by a third party. (Ex. B, Holland Decl. ¶ 9; Ex. D, Gonzalez Depo. 79:1-24.) The call-in number was a touch tone system in which employees would select the applicable option for their absence (sick, vacation, FMLA, etc.). (*Id.*)."

"10.     Gonzalez understood that he needed to call in and report any absences from work. (Ex. D, Gonzalez Depo. 68:11-14; 78:22-25)."

"11.     The call-in records are reviewed and maintained by human resources at the Beardstown facility. (Ex. B, Holland Decl. ¶ 10). The call-in report is downloaded and the options selected by the employees from the call-in touch tone system are entered into Swift Pork's attendance system. (*Id.*)."

"12.     Under the attendance policy, employees receive an attendance point for each absence from work, regardless of the reason for the employees' absence. (Ex. B, Holland Decl. ¶ 11; Ex. A, Cornelius Decl. Ex. A(2). . . ." The second sentence of

4

paragraph 12 of Defendants' Motion is material and disputed, and is discussed in Section (b)(2), below.

"13.    Under the attendance policy, employees that fail to report their absence at least 30 minutes prior to their scheduled start time and miss a full shift, will receive three (3) attendance points. (Ex. B, Holland Decl. ¶ 12; Ex. A, Cornelius Decl. Ex. A(2))." (Mr. Gonzalez agrees that Defendants' *stated* attendance policy ("Policy") contains this provision—however, Mr. Gonzalez presents evidence as additional material facts, in Section b(5), showing that Defendants waived this aspect of its claimed Policy.)

"14.    While a request for FMLA is pending, employees continue to accumulate attendance points until [their] FMLA is approved. (Ex. B, Holland Decl. ¶ 13; Ex. A, Cornelius Decl. Ex. A(8)). Employees are required to call in absences each day and report absences pursuant to the attendance policy while their request for FMLA leave is pending. (*Id.*). . . ." The second sentence of paragraph 14 of Defendant's Motion is omitted because it is material and disputed, and Mr. Gonzalez discusses it in Section (b)(2), below.

"15.    Under the attendance policy, an employee is subject to termination after earning ten (10) attendance points. (Ex. B, Holland Decl. ¶ 14; Ex. A, Cornelius Aff. Ex. A(2)). . . . " The second sentence of paragraph 15 of Defendant's Motion is omitted because it is material and disputed, and Mr. Gonzalez discusses it in Section (b)(2), below.

"16.    Attendance points remain active on an employee's record for a 365-day rolling period. (Ex. B, Holland Decl. ¶ 15)."

"21.    On this same date [March 7, 2016], Swift Pork notified Gonzalez that he was eligible for FMLA leave and that he needed to provide sufficient certification to

support his request for FMLA leave. (Ex. B, Holland Decl. ¶ 20; Ex. A, Cornelius Decl. Ex. A(7) and A(8))."

"22.     Swift Pork additionally notified Gonzalez that he would continue to accumulate attendance points until his FMLA is approved, that if his FMLA is approved, his points would be removed for the qualifying days, and that if he has exhausted his attendance points and his FMLA is not approved, he would be terminated for violating the Company's attendance policy. (Ex. B, Holland Decl. ¶ 21; Ex. A, Cornelius Decl. Ex. A(8))."

"23.     Gonzalez understood that he would continue to accumulate attendance points:

> Q:     Did you understand that under JBS's FMLA policy if you applied for FMLA, you would continue to earn attendance points until the FMLA was approved?
> A:     Yes.
> . . .
> Q:     Did you understand that before your FMLA was approved you would still be accumulating attendance points for your absences?
> A:     Well, yes.

(Ex. D, Gonzalez Depo. 86:4-8; 126:15-18)."

"24.     Gonzalez was further notified by Swift Pork that he was still required to call in 30 minutes prior to his start time for every work day he is absent while his request for FMLA leave was pending approval. (Ex. B, Holland Decl. ¶ 22; Ex. A, Cornelius Decl. Ex. A(8))."

"25.     Gonzalez provided Swift Pork with a doctor's note for his absences on March 8-11, however, the doctor's note did not provide any specific reason or medical diagnosis indicating a serious health condition relating to Gonzalez's absences on those dates. (Ex. B, Holland Decl. ¶ 23; Ex. A, Cornelius Decl. Ex. A(6)). Under Swift Pork's

attendance policy, these absences qualified for attendance points as employees earn attendance points for each absence from work, regardless of the reason for the employees' absence. (Ex. B, Holland Decl. ¶ 23)."

"26.    Gonzalez later returned the FMLA medical certification paperwork to Swift Pork . . . but the certification contained no description of his alleged serious health condition to determine if his leave was covered under the FMLA. (Ex. B, Holland Decl. ¶ 24; Ex. A, Cornelius Decl. Ex. A(9))." The omitted portion of paragraph 26 of Defendant's Motion, indicated by ellipses, is disputed, although immaterial, and discussed in Section b(3), below.

"27.    In addition, his medical certification paperwork only excused Gonzalez for three days from work on March 14, 2016, March 15, 2016, and March 16, 2016. (Ex. B, Holland Decl. ¶ 25; Ex. A, Cornelius Decl. Ex. A(9)).  . . .

. . .

Probable duration of condition: [Patient] off work 3-14-16, 3-15-16, and 3-16-16, may return 3-17-16 to work with no restriction.
. . .

Is the employee unable to perform any of his/her job functions due to the condition: yes.

If so, identify the job functions the employee is unable to perform:

[Patient] excused off work from Dr. Taillefer for the dates March 14th – March 17th, 2016, return to work 3-17.

Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

[Patient] was seen in Dr. Taillefer's office due to illness. She has excused the [patient] for dates 3-14-2016 – 3-17-2016. [Patient] may return to work on March 17th 2016 with no restrictions.

Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recover? Yes.

If so, estimate the beginning and ending dates for the period of incapacity 3-14-16, 3-15-16 & 3-16-16, may return 3-17-16 with no restrictions. . . .

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.

[Patient] off work March 14th, 15th and 16th 2016 may return to work on March 17th 2016 with no restrictions.

(Ex. A, Cornelius Decl. Ex. A(9)).” The second sentence of paragraph 27 of Defendants’ Motion is material and disputed, and discussed in Section (b)(2), below.

“28.    Gonzalez’s FMLA leave request was denied because it did not provide enough information to show that his absences qualified under the FMLA. (Ex. B, Holland Decl. ¶ 26).”

“29.    Gonzalez was provided an opportunity to submit a revised certification which was received by Swift Pork on March 30, 2016. (Ex. B, Holland Decl. ¶ 27; Ex. D, Gonzalez Depo. 135:7-19; Ex. E, Gonzalez Depo Ex. 50; Ex. A(10)).”

“30.    Gonzalez’s revised certification did not update or revise the dates Gonzalez was to be off work. (Ex. B, Holland Decl. ¶ 28; Ex. A, Cornelius Decl. Ex. A(10); Ex. D, Gonzalez Depo. 135:24-137:1; Ex. E, Gonzalez Depo. Ex. 50). The certification paperwork still provided that Gonzalez was only excused from work on March 14, 2016, March 15, 2016, and March 16, 2016. (*Id.*).”

“31.    The only revision to Gonzalez’s certification paperwork was to question number 4, which did not revise the dates Gonzalez was excused from work. (Ex. B, Holland Decl. ¶ 28; Ex. A, Cornelius Decl. Ex. A(10); Ex. E, Gonzalez Depo. Ex. 50).”

“34.    On March 30, 2016, Gonzalez was terminated due to accumulating over 10

8

attendance points pursuant to Swift Pork's attendance policy. (Ex. B, Holland Decl. ¶ 29; Ex. A, Cornelius Decl. Ex. A(3))."

### (2) DISPUTED MATERIAL FACTS

Mr. Gonzalez disputes the following claims, following each disputed claim with evidentiary documentation. To distinguish Defendants' disputed claim from the discussion that follows, Mr. Gonzalez presents the disputed claim in bold typeface.

**"2.    . . . Gonzalez was never an employee of JBS USA."**

This legal conclusion is undermined by evidence of Defendant JBS USA's operations being highly integrated with those of Defendants Swift and JBS Live. (*See* Dep. of Nicholas White, attached as Pl.Exh. R.) Mr. White, Defendant JBS USA's general counsel, testified that while he considers an entity called "Swift Beef Company" to be his employer, "because that's the name that's on my pay stub," he actually works for a number of JBS USA-affiliated companies "[a]s a practical matter," including all three Defendants. (Pl.Exh. R. 11:3-9; 26:16-19.) In this litigation, Mr. White identified himself as general counsel for Defendant Swift. (Pl.Exh. R, 34:2-13.) In his registration with the Colorado Bar, Mr. White identified his employer as JBS USA, LLC. (Pl.Exh. R, 15:17-22; Colorado Supreme Court, Office of Attorney Regulation Counsel, https://www.coloradosupremecourt.com/Search/Attinfo.asp?Regnum=35909. White acknowledged that JBS USA is "the main client that I represent" in his employment. (Pl.Exh. R, 15:23-25—16:1-2.)

All three Defendants used shared employees, which Mr. White referred to as a "shared services unit," based in JBS USA's central office in Greeley, Colorado, for a range of functions, including legal, IT, finance, benefits, "IS" ("information services"), some payroll, compliance, and tax services. (Pl.Exh. R, 26:20-23—27:1-5; 32:19-25—

9

33:1-9; 44:21-22.) All three Defendants also share "components" of HR. (Pl.Exh. R, 26:20-23—27:1-5.) One HR "function" is shared between all three Defendants, and another one is "dedicated specifically to the pork business unit," which comprises Defendant Swift and Defendant JBS Live. (Pl.Exh. R, 27:23-25—28:1-4.) Some of Defendant Swift's HR employees work at the JBS USA headquarters in Greeley, Colorado. (Pl.Exh. R, 52:12-22.)

Defendant JBS USA, now known as JBS USA Lux, has indirect control over Defendant Swift's business. (Pl.Exh. R, 36:22-25—37:1-23.) All three Defendants may draw upon the same bank account for various needs of the business. (Pl.Exh. R, 49:19-23.) Information about termination of employees at the Beardstown Plant ("Plant") is entered into a central IT system that shared employees can access from the corporate office. (Pl.Exh. R, 55:14-25—56:1-13.) Prospective employees may apply for jobs at the Plant in Beardstown, including positions like the one Mr. Gonzalez held, through JBS USA's website. (Pl.Exh. R, 56:18-25—57:1-5.) Shared services HR works with HR specific to Defendant Swift to draft job descriptions, or review such descriptions to ensure legal compliance. (Pl.Exh. R, 59:6-25—60:1-10; 61:14-19.) JBS's main employee benefits program is shared by all subsidiaries. (Pl.Exh. R, 63:2-12.)

The shared services unit creates policies that apply to Defendant Swift. (Pl.Exh. R, 63:18-25.) The shared services unit would have recourse if Defendant Swift adopted an attendance policy that the parent company did not agree with. (Pl.Exh. R, 64:1-25—65:1-11.) The shared services unit would also have recourse if Defendant Swift made a personnel decision that resulted in an adverse outcome, such as a lawsuit. (Pl.Exh. R, 77:3-25—78:1-5.) During the period at issue in this case, shared services personnel would have fielded phone calls from employees at the Beardstown Plant to consult about

terminations under the Policy, which may or may not have occurred in Mr. Gonzalez's case. (Pl.Exh. R, 81:9-22.) Such consultations were often done by phone and did not generate records. (Pl.Exh. R, 81:9-16.) Shared services exist in part to ensure that JBS subsidiaries comply with the law, including the FMLA. (Pl.Exh. R, 88:3-6.)

Shared services created form documents used by subsidiaries, and Mr. White testified that shared employees may have been involved in preparation of the form used, for example, for the Leave Claim form from March 7, 2016 ("March 7 Leave Claim") (although not the completion of that form specifically for Mr. Gonzalez). (Pl.Exh. R, 85:4-24—88:1-2; Pl.Exh. B.10 (SWIFT207).[3]

Defendant Swift uses the JBS logo and consistently presents itself as a company called "JBS" or "JBS USA," and did so in connection with its HR functions at issue in this case, including the documents Defendants rely upon. (*See* Pl.Exh. R, 29:18-20—30:1-2; Def.Exh. A(1), at 4 (JBS Employee Handbook, welcoming employees "to the JBS USA team") and at 27 (noting Employee Handbook . . . outlines the benefits and policies of JBS USA"); Def.Exh. A(2) (the "JBS Attendance Policy"); Def.Exh. A(8) (March 7 FMLA Receipt, stating, *e.g.*, "JBS agrees to continue your employment while you are pending FMLA/STD approval"); Exh. A(11) (referring to Mr. Gonzalez as a "JBS Employee"); *see also* Pl.Exh. B.10, B.15 (March 7 Leave Claim and March 8 Leave Claim, both containing JBS logos).) The JBS Employee Handbook, drafted by shared HR, is uniform across subsidiaries. (Pl.Exh. R, 72:1-25—73:1.) On Mr. Gonzalez's March 17 Certification, the first section, which Defendant Swift acknowledged its HR completed, listed the employer name and contact as "JBS Pork." (Pl.Exh. B.23; Pl.Exh. B., 133:3-21;

---

[3] Defendant identified SWIFT175-301 as representing Mr. Gonzalez's "Medical and FMLA file." (*See* Def. 2nd Supp. Resp. to Pl. 2nd and 4th Req. to Prod., attached as Pl.Exh. P, #29 at 1-2.)

Def.Exh. E.) HR, when completing Mr. Gonzalez's HIPAA Document to permit release of his medical information for his FMLA claim, identified the employer as "JBS Pork in Beardstown, IL." (Pl.Exh. B.14.) Defendant Swift referred to itself as JBS when stating it had determined that Mr. Gonzalez's absences did not qualify for FMLA, and signed the document "JBS Human Resources." (Pl.Exh. B.20.) The sign in front of the Plant says "JBS" in large letters. (Pl.Exh. B, 10:15-17.). Defendant Swift would not have been permitted to remove the JBS logo without consulting with the CEO for JBS USA Food Company, a subsidiary of JBS USA. (Pl.Exh. R, 30:11-16.)

The shared services unit did not disapprove of Defendant Swift referring to itself as JBS. (Pl.Exh. R, 89:12-19.) If HR at the Plant violated the law when referring to itself as JBS Human Resources, the shared services unit, in response, could take such actions as "call[ing] for additional training" for the subsidiary or "simply say[ing], you know, When this happens in the future, you need to do it a different way." (Pl.Exh. R, 90:11-23.) Then, shared legal employees would handle any resulting legal issues. (Pl. Exh R., 90:24-25—91:1-4.)

Shared employees negotiated Mr. Gonzalez's union contract along with the "pork specific" HR employees. (Pl.Exh. R, 31:18-22.) While Defendant Swift signed Mr. Gonzalez's checks, Mr. White acknowledged that Mr. Gonzalez could have be paid out of a JBS USA shared bank account on behalf of Defendant Swift. (Pl.Exh. R, 35:20-25.)

All of the above evidence indicates that the three Defendants were integrated and that JBS USA maintained sufficient control of the Plant to share liability in this case.

## "5.    Defendant JBS USA . . . does not employ or manage persons working at the Beardstown facility."

Mr. Gonzalez disputes this conclusion based on the overall integration of

12

operations of all three Defendants, and the control exercised by JBS USA over the HR functions at issue, as set out in Section (b)(2), ¶ 4, above.

"**6.    . . . [JBS Live] does not employ or manage persons working at the Beardstown facility. [(Ex. B, Holland Decl. ¶ 4)].**"

Mr. Gonzalez disputes this fact based on the integration of operations of all three Defendants, as set out in Section (b)(2), ¶ 4, above.

"**12.   . . . However, if an employee has approved FMLA leave, absences covered under the FMLA and for which proper notice is provided will not be counted under the attendance policy. (Ex. B, Holland Decl. ¶ 11.)**"

Mr. Gonzalez disputes this claim to the extent it implies that covered absences are retracted *only* where "proper notice is provided," and to the extent "proper notice" means a daily call at least 30 minutes before the beginning of the shift. Defendant Swift testified that Mr. Gonzalez's points would have been retracted even where its records showed a late or omitted call, had Mr. Gonzalez had adequate medical certification. (Pl.Exh. B, Holland Dep., 130:19-24—132:1-14; 177:21-24—179:1-10.) Defendants' notice to Mr. Gonzalez ("March 7 FMLA Receipt") states that if approved for FMLA leave, his points would be removed for the qualifying days, without condition—in other words, whether he received one or three points. (Pl. B.11; Def.Exh. A(8).) Defendants' own Employee Handbook does not condition FMLA leave on a daily phone call, stating instead that in cases of unforeseeable leave, the employee must notify the company "as soon as possible and generally within 1 or 2 business days of learning of your need for leave." (Def.Exh. A(1) at App. 27.)

"**14.   . . . If an employee's FMLA is approved, attendance points will be retracted for the FMLA-qualifying days where the employee provided**

**proper notice of his or her absence. (*Id.*).**"

Mr. Gonzalez disputes this claim to the extent it implies that points for covered absences are retracted *only* "where the employee provided proper notice" and to the extent "proper notice" means a daily call at least 30 minutes before the beginning of the shift. Defendant Swift testified that Mr. Gonzalez's points would have be retracted even where its records showed a late or omitted call, had Mr. Gonzalez had adequate medical certification. (Pl.Exh. B, Holland Dep., 130:19-24—132:1-14; 177:21-24—179:1-10.) The March 7 FMLA Receipt Defendants gave to Mr. Gonzalez states that if approved for FMLA leave, his points would be removed for the qualifying days, without condition—in other words, whether he received one or three points. (Pl. B.11; Def.Exh. A(8).) Defendants' own Employee Handbook does not condition FMLA leave on a daily phone call, stating instead that in cases of unforeseeable leave, the employee must notify the company "as soon as possible and generally within 1 or 2 business days of learning of your need for leave." (Def.Exh. A(1) at App. 27.)

"**15.  . . . Additionally, two full-day unexcused absences in a row result in automatic termination. [(Ex. B, Holland Decl. ¶ 14; Ex. A, Cornelius Aff. Ex. A(2))].**"

This statement may reflect Defendants' stated Policy, but Mr. Gonzalez disputes that it was Defendants' practice, at least when a FMLA request was pending, based on the following evidence:

Defendants claimed Mr. Gonzalez did not call in at all on March 15 and 16, 2016, recording these absences as "unexcused." (*See* Pl.Exh. B.22 (Attendance Violation dated March 17, 2016 ("March 17 Attendance Violation").) Defendant Swift admitted that had Mr. Gonzalez produced an acceptable medical certification that covered the dates he was

14

absent, including those dates, he would not have been terminated. (Pl.Exh. B, 177:21-24—179:1-10 (had Mr. Gonzalez had medical certification for each of his March absences, his termination would have been prevented). Defendant Swift also testified that had Mr. Gonzalez been approved for FMLA leave through March 17, including the dates charged as "unexcused," he would have had 5 points (the number it claims he had before March 1). (Pl.Exh. B, 130:19-24—132:1-14.) In other words, Mr. Gonzalez's point charges would have been retracted, whether he received three points or one point, for each FMLA-qualified day.

In addition, the evidence shows Defendants did not terminate Mr. Gonzalez "automatically," and that it waived any Policy permitting it to do so. Defendants considered and generated documents relating to his FMLA request on March 17, 23, 29, and 30, after the days it now claims he failed to call (March 15 and 16), and did not decide to terminate him until March 30, 2016. (Pl.Exh. I, Def. Swift Supp. Ans. To Pl. 1st Interrogs., #7 at 2.) That Defendants continued to consider Mr. Gonzalez's FMLA request for weeks after an event they now claim required "automatic" termination squarely belies that claim—had termination been "automatic," he would have been terminated as of March 17, and the subsequent deliberation about Mr. Gonzalez's FMLA qualification would not have occurred. Further, Defendant specifically identified the accumulation of points, and not the alleged consecutive unexcused absences, as the reason for Mr. Gonzalez's termination. (*See* Def.Exh. A(3), Pl. B.28 (March 30 Termination Letter).) All of these facts constitute ample evidence that Defendants waived this purported Policy, either generally or in this case, or waived it once absences were shown to be FMLA-qualifying, as its representative testified.

"**19.    During the month of March 2016, Gonzalez accumulated thirty-**

**two (32) attendance points as a result of numerous absences. (Ex. B,**
**Holland Decl. ¶ 18; Ex. A, Cornelius Decl. Exs. A(4) and A(5)).**"

Mr. Gonzalez does not dispute that Defendants charged him with attendance
points over the course of March 2016, but disputes that they could lawfully charge these
points consistent with the FMLA. While Mr. Gonzalez disputes the number of points
stated in paragraph 19 of Defendants' Motion, he discusses that dispute in Section b(3),
below, because it is not material. The precise number of points Defendants unlawfully
assessed against Mr. Gonzalez is not material because Defendant Swift admitted these
points would have been retracted had Mr. Gonzalez been able to produce a medical
certification for each of the days he was absent. (Pl.Exh. B, 177:21-24—179:1-10.)

All the March points, in fact, should have been retracted, because Defendants
were not permitted to deny FMLA leave due to an insufficient medical certification, as
they did, since Defendants failed to comply with FMLA regulations requiring them to
specify the nature of the insufficiency so that it could be rectified. (*See* Pl.Exhs. B.20,
B.24; Pl.Exh. C, 90:5-25—91:1-7.) Had they done so, Mr. Gonzalez could have produced
certification that covered all of the dates he was absent, because the medical evidence
shows that Mr. Gonzalez qualified for FMLA leave, as stated in Section (b)(5),
Additional Material Facts. Therefore, Defendants could not lawfully charge Mr.
Gonzalez with any points for his absences in March 2016.

"**20.    Gonzalez first notified Swift Pork of his need for potential**
**FMLA leave on or around March 7, 2016. (Ex. B, Holland Decl. ¶ 19; Ex. A,**
**Cornelius Decl. Ex. A(7)). Information regarding the FMLA was translated**
**to Gonzalez in Spanish. (Ex. B, Holland Decl. ¶ 19; Ex. D, Gonzalez Depo.**
**106:17-24.)**"

16

Mr. Gonzalez agrees that he filled out a request for FMLA leave with Defendant's HR Department on March 7, 2016, but disagrees that this constituted his "first" notice to Defendant, in that Defendant had constructive notice of his need for leave beginning March 1, 2016, when the floor supervisor brought him to see one of Defendants' nurses, who sent him home because his nose was bleeding profusely. (*See* Pl. Resp. to Def. Interrog., attached as Pl.Exh. D, #6 at 6; *see also* Pl.Exh. C, 97:8-10; 148:11-25; 149:9-25—150:1-2.) Defendant Swift also had notice on March 3, 2016, when the same thing happened. (Pl.Exh. D, #6, 7; Exh. C, 109:1-17; 147:18-25—148:1-5; 150:3-20.) It also had notice on March 4, 2016, when Mr. Gonzalez brought HR a medical excuse from Passavant Hospital ("March 3 Hospital Note"), where he had been the night before (*see* Exh. C.41, Exh. C, 109:25—111:1-17). Mr. Gonzalez's supervisor, the floor supervisor, and Defendant's nurses thus knew about his potentially qualifying condition as of March 1, 2016.

With respect to Defendants' claim that "[i]nformation regarding the FMLA was translated to Gonzalez in Spanish," it is not clear what "information" Defendants refer to. Defendants produced several documents dated March 7, 2016, all in English, and all of which Defendants identified as part of Mr. Gonzalez's "Medical or FMLA File" (*see* Def. 2nd Supp. Resp. to Pl. 2nd &  4th Req. for Doc., #29 at 1-2, attached as Pl.Exh. P):

    a.      A signed release (SWIFT205) ("HIPAA document"), which Defendant Swift acknowledged would permit HR to contact Mr. Gonzalez's doctors. (Pl.Exh. B.14; Pl.Exh. B, 92:22-24—93:1-17, 149:3-5.)

    b.      A signed "Leave Claim Form—Intermittent FMLA" (SWIFT207) ("March 7 Leave Claim"), confirming Mr. Gonzalez had an "intermittent FMLA leave approved on file for [him]self," stating that he had been absent March 1, 3,

and 4, 2016, and giving the reason, "Sent hom [*sic*] by nursing." (Pl.Exh. B.10; Pl.Exh. C, 121:9-18.)

c.  The March 7 FMLA Receipt (SWIFT203), acknowledging receipt of Mr. Gonzalez's FMLA request, stating Defendant "received your FMLA request for the below dates. You are <u>pending approval</u> at this time. 3/1/2016 to UNKNOWN," and providing until March 22, 2016 to provide required documentation. (Pl.Exh. B.11; Pl.Exh. B, 81:23-24—82:1-12; 82:20-21; Def.Exh. A(8).)

d.  A "Request for Leave" (SWIFT204) ("March 7 Request for Leave"), indicating leave was requested "from March 1 to UNKNOWN." (Pl.Exh. B.12; Pl.Exh. B, 84:13-23.)

e.  A "Notice of Eligibility Rights & Responsibilities, Family and Medical Leave Act" (SWIFT202) ("Notice of Eligibility"). (Pl.Exh. B.13; Pl.Exh. B, 89:21-24—90:1-9; Def.Exh. A(7))

Defendant's then-HR Director, Don Holland, admitted, with respect to the March FMLA Receipt and the Notice of Eligibility, that no version was written in Spanish. (Pl.Exh. B, 81:23-24—83:23; 89:21-24—92:1-6.) Mr. Gonzalez testified that a representative of HR spoke to him in Spanish regarding his FMLA request. (Def.Exh. D, 106:17-24.) Mr. Gonzalez did not testify that HR translated the March 7 documents to him. Mr. Gonzalez stated, "HR staff filled out some paperwork, and told me that I was eligible for FMLA. They also told me to take some paperwork to my primary care physician. I told them that I did not have one, and they recommended I go to the Taylor [C]linic to have my FMLA paperwork filled out, which I did." (Pl.Exh. D, #6 at 7.)

**"27.   . . . In fact, [the March 17 Certification] indicated his need for**

**FMLA medical leave was limited to those specific dates [March 14, 15, and 16, 2016] in multiple areas of the certification . . . .”**

Mr. Gonzalez disputes that the March 17 Certification affirmatively indicated any limitation. First, the March 17 Certification provides the March 14, 15, and 16, 2016 dates in response to a request that the provider “estimate” the period of incapacity. (*See* Def.Exh. A(9); Pl.Exh. B.23, at SWIFT198.) It indicates that Mr. Gonzalez had been at Passavant Emergency Room on March 8, 2016, and not seen at the clinic until March 14, 2016. (*See* Def. Exh. A(9); Pl.Exh. B.23, at SWIFT197.) The March 17 Certification does not purport to address dates before March 14, 2016, before any doctor at the Taylor Clinic ever treated Mr. Gonzalez. (*See* Def.Exh. A(9); Pl.Exh. B.23.) The March 17 Certification also requests that the medical provider state whether “the condition would cause episodic flare-ups periodically preventing the employee from performing his/her job functions,” which is answered, “unknown at this time.” (*See* Def. Exh. A(9); Pl.Exh. B.23, at SWIFT 198.) This evidence suggests that the estimated March 14-17 dates were just that, and that the medical provider understood that flare-ups may recur.

“**32.    As of March 30, 2016, Gonzalez’s attendance point record showed that he had 37 attendance points: [chart reproducing information contained on Defendants’ Exh. A.5]. (Ex. A, Cornelius Decl. Exs. A(4) and A(5)).**” Mr. Gonzalez does not dispute that Defendant Swift purported to charge him with these attendance points over the course of March 2016, pending resolution of his claim for FMLA, but disputes that these points could lawfully be charged to him consistent with the FMLA, as stated in response to Paragraph 19 of Defendants’ Motion, above.

In addition, Mr. Gonzalez disputes the information in the chart they have

reproduced, on which they based calculation of these points. First, Defendants' own exhibits reflect a total of 34.00 attendance points, not 37 as they now claim. (Def. Exhs. A(3), A(4).) Defendants apparently charged an additional three points for the day they terminated him, claiming he was a "no call, no show" on that date, even though Defendants' records show he was not scheduled to be at work that day, presumably because he was terminated (*see* Pl.Exh. B.5), and even though Defendant Swift admitted Mr. Gonzalez came to the Plant on March 30, 2016, attempted to get in three times, and was denied access, due to having been terminated. (Pl.Exh. B, 175:17-24—176:1-3.)

Second, Mr. Gonzalez disputes the claim he was absent on March 1, 2016 for "[n]o reason." On March 1, 2016, he was sent home by nursing because he was suffering a serious nosebleed. (*See* Pl.Exh. D, #6 at 6; *see also* Pl.Exh. C, 97:8-10; 148:11-25—150:1-2.) The same thing happened on March 3, 2016, for which Defendants state the "reason" only as "[o]ther." (Pl.Exh. D, #6 at 6; Pl.Exh. C, 109:1-17; 147:18-25—148:1-10.) Not only do Defendants have no basis to deny Mr. Gonzalez's testimony on this point, Mr. Gonzalez's signed March 7 Leave Claim stated he had been absent March 1, 3, and 4, 2016, and stated as the reason, "Sent hom [*sic*] by nursing."  (Pl.Exh. B.10; Pl.Exh. C, 121:9-18.) Mr. Gonzalez did not fill out the March 7 Leave Claim himself; a representative of HR did so. (Pl.Exh. C, 121:23-25, 122:1-9; Pl.Exh. B.10; Pl.Exh. C.25.) Likewise, Mr. Gonzalez disputes that on March 28 and 29, 2016, he was absent for "[n]o reason." On March 28, 2016, Mr. Gonzalez received treatment at the emergency room of St. John's Hospital for complaints of chest pain and shortness of breath, and he was not released until early morning on March 29, 2016. (Pl.Exh. B.26-B.27; Pl.Exh. C.44; Pl.Exh. O.) His discharge stated he was not to work until March 30, 2016. (Pl.Exh. B.26-B.27; Pl.Exh. C.44.)

20

In addition, Mr. Gonzalez disputes *all* of the dates Defendants claim he was a "no call, no show," stating he always called on time when he was going to be absent. (Pl.Exh. C, 81:21-23.) Defendants' own records contradict the claim that Mr. Gonzalez was a "no call, no show" on March 11, 2016 and March 25, 2016. Defendant's records indicated Mr. Gonzalez came to the Plant the morning of March 11, 2016, and that he also called in sick more than half an hour before his shift started. (Pl.Exh. B.6; Pl.Exh. B.8; Def.Exh. A(11).) Defendant Swift had no explanation for the erroneous claim that Mr. Gonzalez was a "no call, no show." (Pl.Exh. B, Holland Dep., 112:16-23 ("I can't explain that.").) Likewise, Defendants' own records indicate Mr. Gonzalez came to the Plant the morning of March 25 and timely called in sick as well. (Pl.Exh. B, 150:18-23; 151:16-21; Pl.Exh. B.8; Def.Exh. A(11).) Defendant Swift had no explanation why that absence was classified as a "no call/no show," given that Mr. Gonzalez called on time. (Pl.Exh. B, 151:2-15.)

**"33.   Even if the attendance points Gonzalez earned on the dates covered by his FMLA leave request—March 14, 15, and 16, 2016—were removed, he still would have accumulated well-over the attendance points necessary to be subject to termination under Swift Pork's attendance policy. (Ex. A, Cornelius Ex. A(4), A(5), and A(10); Ex. E, Gonzalez Depo. Ex. 50.)"**

Mr. Gonzalez disputes, first, that the only dates covered by his request were March 14, 15, and 16, 2016, a claim squarely contradicted by Defendant's own records, which show that Mr. Gonzalez requested intermittent FMLA leave beginning March 1, 2016 to an unknown date; his March 7 Leave Claim confirmed Mr. Gonzalez had an "intermittent FMLA leave approved on file for [him]self," stated that he had been absent March 1, 3, and 4th, 2016, and gave as the reason, "Sent hom [*sic*] by nursing." (Pl.Exh.

B.10; Pl.Exh. C, 121:9-18.) Mr. Gonzalez did not fill out the March 7 Leave Claim himself; a representative of HR did so. (Pl.Exh. C, 121:9-25, 122:1-9; Pl.Exh. C.45.) The March 7 FMLA Receipt stated Defendants "received your FMLA request for the below dates. You are pending approval at this time. 3/1/2016 to UNKNOWN." (Pl.Exh. B.11; Pl.Exh. B, 81:23-24—82:1-12; 82:20-21; Def.Exh. A(8).) Mr. Gonzalez's March 7 Request for Leave also indicates leave was requested from March 1 to an unknown end date. (Exh. B.12; Exh. B, 84:13-23.) Defendant confuses the dates specified on Mr. Gonzalez's March 17 Certification (March 14, 15, and 16, 2016) from the Taylor Clinic with the dates for which Mr. Gonzalez requested and was entitled to FMLA leave. As explained in Mr. Gonzalez's argument, Defendants could not, consistent with FMLA law, deny Mr. Gonzalez FMLA leave based on his certifications; had Defendants properly advised him of the claimed insufficiencies in his certifications, he could and would have cured those deficiencies with respect to each day he was absent from work due to illness in March 2016. Defendant Swift admitted that if it had been satisfied with Mr. Gonzalez's certification for each day he was absent in March, he would not have been terminated. (Pl.Exh. B, 177:22-24—179:1-10.)

### (3) DISPUTED IMMATERIAL FACTS

The following claims, quoted from paragraphs in Defendants' Motion for Summary Judgment, are both immaterial and disputed, for the reasons and with the evidentiary support provided. Mr. Gonzalez follows each disputed claim or portion of a claim with the reason the claim (or dispute regarding the claim) is immaterial, and with evidentiary documentation to dispute the claim. To distinguish Defendants' claim from Mr. Gonzalez's response, Mr. Gonzalez presents the disputed claim in bold typeface.

"**18.   At the beginning of March 2016, Gonzalez had accumulated five**

22

**(5) attendance points. (Ex. B, Holland Decl. ¶ 17; Ex. A, Cornelius Decl. Ex. A(4)."**

Mr. Gonzalez testified at his deposition that as of March 2016, he had only three attendance points. (Pl.Exh. C, 141:12-15.) The number of points Mr. Gonzalez had to begin March 2016 is generally material, in that it is well under the maximum, but the dispute whether Mr. Gonzalez had five points or three points is not. Defendant Swift admitted that had Mr. Gonzalez had a satisfactory medical certification for each of the days he was absent in March 2016, assuming he had five points to begin March, that would have prevented his termination. (Pl.Exh. B, 177:21-24—179:1-10.)

**"19.   During the month of March 2016, Gonzalez accumulated thirty-two (32) attendance points as a result of numerous absences. (Ex. B, Holland Decl. ¶ 18; Ex. A, Cornelius Decl. Exs. A(4) and A(5))."**

The precise number of points Defendants unlawfully assessed against Mr. Gonzalez is not material to Defendants' liability, because Defendant admitted Mr. Gonzalez would not have been terminated had he provided a satisfactory medical certification for each of the days he was absent. (Pl.Exh. B, 177:21-24—179:1-10.) Defendants are not permitted to deny FMLA leave based on claimed insufficiency in his medical certification, because Defendants failed to comply with FMLA regulations requiring them to specify the nature of the insufficiency so that it could be rectified, which Defendants failed to do. (*See* Pl.Exh. B.20; B.24; Pl.Exh. C, 90:5-25—91:1-7.) Had they done so, Mr. Gonzalez could have produced certification that covered all of the dates he was absent, because Mr. Gonzalez qualified for FMLA leave, as shown in Section (b)(5), Additional Material Facts. Therefore, Defendants could not lawfully charge Mr. Gonzalez with any points for absences that month.

23

As stated in Section (b)(2), above, in response to Defendants' paragraph 19, Mr. Gonzalez disputes that any of the points he received in March was lawfully charged, a material issue. In addition, while the precise number of points Defendants unlawfully charged is not material, as discussed above in Section (b)(2), Mr. Gonzalez also disputes the claims that underlie many of the unlawfully charged points and reasons given therefore, including any claim that he failed to call in sick in a timely manner on any day in March 2016.

### "**26.    Mr. Gonzalez later returned the FMLA medical certification paperwork . . . on or around March 22, 2016 . . . .**"

Mr. Gonzalez disputes the date in paragraph 26 of Defendants' Motion. The original certification paperwork Defendant Swift gave Mr. Gonzalez to have completed at the Taylor clinic is dated March 17, 2016 ("March 17 Certification"). (*See* Def.Exh. E; Pl.Exh. B.23.) The revised version of the certification contains a notation in the corner, apparently written by the health care provider, "faxed + received 3-17-2016." (*See* Def.Exh. E; Pl. B.32.) Defendant Swift, through Mr. Holland, denied any specific memory of the March 17 Certification, and is therefore not competent to state when Mr. Gonzalez returned it. (Pl.Exh. B.23; Pl.Exh. B, 139:2-4.) Furthermore, Mr. Gonzalez averred he consistently brought medical notes to HR as soon as he could. (Pl.Exh. D, #11 at 12.) Defendant admits Mr. Gonzalez came to the Plant on March 18, 2016, entering at 12:13 p.m. and leaving at 12:27 p.m. (Pl.Exh. B, 140:1-19.) Mr. Gonzalez had an appointment on March 18, 2016 at the Taylor Clinic that ended around that time. (Pl.Exh. K.) Defendant has no record of Mr. Gonzalez's meeting with HR on March 18, 2016. (Exh. B., 140:14-22.) All of this evidence establishes a) that the Taylor Clinic faxed the March 17 Certification on March 17, 2016, and b) that Mr. Gonzalez followed up with

HR on March 18, 2016; Defendant lacks any evidence that the certification was not returned until March 22, 2016. However, because Defendant admits that Mr. Gonzalez returned the March 17 Certification at least by the date it was due, March 22, 2016, this dispute is immaterial—Defendant does not claim the certification was returned too late.

### (4) UNDISPUTED IMMATERIAL FACTS

The following facts, quoted from Defendants' Motion for Summary Judgment, are undisputed but immaterial, for the reasons stated.

"**5.     Defendant JBS USA, LLC is no longer an active entity and has been redomiciled as a Luxembourg entity, now known as JBS USA Lux S.A. ('JBS USA').**"

Defendant JBS USA's current nomenclature and domicile do not bear upon its status as a joint or integrated employer. As stated above in Section (b)(2), Disputed Material Facts, in response to paragraph 2 of Defendants' Motion, ample evidence would permit a jury to find JBS USA had sufficient involvement and control over, and was sufficiently integrated with, Defendant Swift Pork Company to share liability.

"**5.     . . . JBS USA . . . [has] no direct control over the business of Swift Pork . . . .**"

Joint employer status does not require "direct control" of one business over another, but may be established by indirect control over employees, among other factors. 29 C.F.R. § 825.106(a).

"**7.     During Gonzalez's employment with Swift Pork, Gonzalez was represented by the United Food and Commercial Workers International Union, Local 431. (Ex. B, Holland Decl. ¶ 7.)**"

Defendants do not state the relevance of Mr. Gonzalez's membership in a union,

and there is none. FMLA rights may not be diminished by any collective bargaining agreement. 29 U.S.C. § 2652(b); 29 C.F.R. § 825.700(a).

"**17.    Swift Pork's attendance policy was posted in English, Spanish, and French on bulletin boards throughout the Beardstown facility. (Ex. B, Holland Decl. ¶ 16).**"

Defendants do not state the relevance of posting the Policy. Defendants' obligations to provide Mr. Gonzalez notice of his FMLA rights in Spanish are not satisfied by posting the Policy, which makes no mention of whether and how it is applied in the context of FMLA. (*See* Def.Exh. A(2).)

## (5) ADDITIONAL MATERIAL FACTS

1.     Mr. Gonzalez worked on the "kill floor" of the Beardstown Plant ("Plant"), where workers "kill the hogs . . . and begin their disassembly." (Pl.Exh. B, 86:11-15; Pl.Exh. C, 59:13-14, 59:23-25—61:1-7.)

2.     Mr. Gonzalez has no education past the fourth grade. (Pl.Exh. C, 21:11-16.) He learned his job skills on the job. (Pl.Exh. C, 22:16-23.)

3.     Mr. Gonzalez does not speak or read English; he speaks and reads only Spanish. (*See* Pl.Exh. C, 9:16-25—10:1, 129:21-22.)

4.     A significant portion of the employees at the Plant are likewise Spanish-speaking only. (*See* Pl.Exh. B, 11:16-24—12:1-2, 20:12-24, 21:1-4.)

5.     The Plant had a nurses' station, staffed with four registered nurses on duty any time the Plant was operating. (Pl.Exh. B, 24:11-16.)

6.     Among other duties, the nurses applied a "protocol" to evaluate employees who claimed they needed to go home because they were sick. (Pl.Exh. B, 26:2-16.)

7.     A nurse would not send the employee home unless the nurse believed the

employee was too ill to work. (Pl.Exh. B, 27:16-21.)

8.      Defendants' attendance Policy had no category for "excused absence," and it did not mention the FMLA. (Pl.Exhs. B., 23:6-9, B.3; Def.Exh. A(2).)

9.      Defendant Swift admitted that under some extenuating circumstances, such as an employee whose house burned down, it would consider itself on notice that the employee would be out for a few days, and therefore would not expect that person to call every day. (Pl.Exh. B, 31:20-24.)

10.     Under the Policy, however, an employee whose wife called the number late after the employee had been knocked unconscious in a car accident would still be considered to have provided late notice and be assessed three points, "initially." (Pl.Exh. B, 32:1-10.)

11.     Defendant Swift stated that "if an employee had a car accident and they weren't conscious, of course we wouldn't expect them to call in, but even if they were unconscious and didn't call in, they'd still be assessed three points until such time that we got their FMLA paperwork together and all that, then all that would come off." (Pl.Exh. B, 128:8-14.)

12.     Defendant Swift asserted that under the Policy, "if somebody was taking medication that made it impossible for them to call in in a timely manner, that does not excuse the failure to call in." (Pl.Exh. B, 128:15-24—129:1-5.)

13.     Defendant stated such an employee could call or visit HR and explain extenuating circumstances and "we would apply discretion as needed." (Pl.Exh. B, 32:11-24—33:1-5.)

14.     Under Mr. Gonzalez's understanding of the Policy, he was required to call and would get three points if he did not, but he did not understand that if he called in

late, he would be assigned three points. (Pl.Exh. C, 79:25—80:1-11; 80:23-25—81:1-23.)

15.     Mr. Gonzalez understood that if an employee accrued points and brought in a medical certification, the employer had to erase those points. (Pl.Exh. C, 86:13-21; Def.Exh. D, 86:13-21.)

16.     Defendant likewise stated, "If days qualify for FMLA leave, they are not assessed points." (Pl.Exh. B, 172:1-8.)

17.     On March 1, 2016, Mr. Gonzalez suffered a serious nosebleed at work. (*See* Pl.Exh. D, #6 at 6; *see also* Pl.Exh. C, 97:8-10; 148:11-25—150:1-2.)

18.     Mr. Gonzalez's supervisor took him to the nurses' station, and the nurse sent him home. (Pl.Exh. D, #6 at 6; Pl.Exh. C, 149:9-13; 149:23-25—150:1-20.)

19.     Defendants charged Mr. Gonzalez an attendance point for March 1, 2016. (Pl.Exh. B, 44:24—45:1-3.)

20.     On March 2, 2016, Mr. Gonzalez worked his full shift, and he was not charged any points. (Pl.Exh. C, 147:6-13; Pl.Exh. B, 48:16-24—49:1-21.)

21.     On March 3, 2016, Mr. Gonzalez again suffered a serious nosebleed at work, his supervisor took him to the nurses' station, and the nurse sent him home. (Pl.Exh. D, #6 at 6; Pl.Exh. C, 109:1-17, 147:18-25—148:1-10.)

22.     On March 3, 2016, after Mr. Gonzalez went home, he went to the emergency room because he was still bleeding profusely. (Pl.Exh. C, 108:15-25—109:1-24; *see* Certified Medical Records from Passavant Area Hospital, dated March 3, 2016 ("March 3 Passavant Records"), attached as Pl.Exh. E, P208-P219.)

23.     A doctor at the Hospital diagnosed Mr. Gonzalez with hypertension and "epistaxis, acute," prescribed hydrochlorothiazide, and advised him to follow up with his primary care doctor. (Pl.Exh. E, P219.)

24.     Defendant assessed Mr. Gonzalez a point for his absence on March 3, 2016. (Pl.Exh. B, 65:4-13.)

25.     Defendant produced a document entitled "Home Care Instructions" dated March 3, 2016 (SWIFT208),[4] from the Passavant Hospital Emergency Room ("March 3 Hospital Note"), stating Mr. Gonzalez was examined on an emergency basis, had been diagnosed with hypertension and epistaxis and prescribed hydrochlorothiazide, and should follow up with his primary care doctor. (Pl.Exh. B.7; Pl.Exh. C, 109:25—110:1-15; Pl.Exh. C.41; Pl.Exh. D, #6 at 6; *see also* Pl.Exh. E, P219.)

26.     On March 4, 2016, Mr. Gonzalez gave the March 3 Hospital Note to Defendants' HR Department. (Pl.Exh. C.41; Pl.Exh. C, 109:25—110:1-15.)

27.     When Mr. Gonzalez did so, he told the individual who took it that he had to be out for a few days, and would need to be treated by a doctor. (Pl.Exh. C, 111:1-17.)

28.     The HR representative told Mr. Gonzalez to call in his absences each day. (Pl.Exh. C, 111:18-21.)

29.     Mr. Gonzalez testified that from March 4 on, he continuously called in his absences. (Pl.Exh. C, 157:4-11.)

30.     Mr. Gonzalez stated he always called on time, but acknowledged that his medication made him sleepy and "knock[ed him] out," and that this condition could have caused him to call late on some days in March 2016.[5] (Pl.Exh. C, 81:21-25—82:1-8;

---

[4] Defendant admits SWIFT175-301 represents Mr. Gonzalez's "Medical and FMLA file." (*See* Pl.Exh. P, #29.)

[5] This Court may take judicial notice that high blood pressure itself can cause memory loss and trouble concentrating at the levels Mr. Gonzalez experienced. *See* Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/high-blood-pressure/art-20045868; https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/expert-answers/hypertensive-crisis/faq-20058491. *See* Fed. R. Evid. 201(b); *Wesley Health Sys., LLC v. Forrest Cty. Bd. of Supervisors*, No. 2:12-CV-59-KS-MTP, 2014 U.S. Dist. LEXIS 7764, at *43 n.14 (S.D. Miss. Jan. 22, 2014) (taking judicial notice that nausea and vomiting are common symptoms of concussion); *Schenk v. City of N.Y.*, No. 08-CV-914 (SLT)(LB), 2010 U.S. Dist. LEXIS 94576, at *15 (E.D.N.Y. Aug. 12,

82:23-25—83:1-7; 164:6-25—165:1-6.)

31.    Defendant Swift acknowledged the March 3 Hospital Note as a document HR may have requested. (Pl.Exh. B.7; Pl.Exh. B, 62:12-24—63:1-18.)

32.    When asked what Defendant Swift would expect its HR to do with the March 3 Hospital Note, however, it said, "Nothing," adding, "[t]here's no value in the HR office of this document." (Pl.Exh. B.7; Pl.Exh. B, 66:11-24—67:1-12.)

33.    Defendant Swift produced a document called "Access Events" (SWIFT148), which it described as a "turnstyle gate log" ("Turnstyle Log") and which marked the time employees entered and left the Plant based on their ID cards. (Pl.Exh. B.6, Pl.Exh. B, 55:3-23.)

34.    Defendant Swift produced an untitled document (SWIFT457) it claimed constituted a log of calls to its call-in system ("Defendant's Call Log"). (Pl.Exh. B.8, Pl.Exh. B, 67:23-24—69:1; Def.Exh. A(11).)

35.    Defendant Swift produced a document entitled "Attendance Editor" (SWIFT173), which it stated reflected the points it assigned Mr. Gonzalez. (Pl.Exh. B.4; Pl.Exh. B, 42:1-18; Def.Exh. A(5).)

36.    Defendant Swift also produced an untitled document (SWIFT174) it identified as coming from "Kronos" ("Kronos Document"), which it said reflected Mr. Gonzalez's schedule. (Pl.Exh. B.5, Pl.Exh. B, 51:17-24—52:1-5.)

37.    The Kronos Document indicates Mr. Gonzalez's start time as 16:30 from March 1-4, 2016, and 15:45 from March 7 to March 29, 2016, after which he was not scheduled to work at all. (Pl.Exh. B.5.)

---

2010) (taking judicial notice of symptom of low pressure CSF syndrome).

38.   Defendants' records indicated that Mr. Gonzalez received a point for his absence on March 4, 2016, having called in at least 30 minutes before his start time.[6] (Pl.Exh. B, 69:2-24; Pl.Exh. B.5; Pl.Exh. B.9; Def.Exh. A(11).)

39.   With respect to the March 4, 2016 point, Mr. Gonzalez's supervisor told him the point would be removed in light of Mr. Gonzalez's documentation from the hospital, saying he would talk to HR about it. (Pl.Exh. C, 152:12-25—156:1-3.)

40.   Mr. Gonzalez was not scheduled to work Saturday, March 5, 2016, or Sunday, March 6, 2016. (Pl.Exhs. B, 72:16-24—73:1-6, B.5.)

41.   On March 7, 2016, Mr. Gonzalez went to the HR office at the Plant, where he signed paperwork requesting FMLA leave, and gave Defendants permission to get whatever information they needed from his doctors. (Pl.Exhs. D, #6 at 7, B.14.)

42.   Defendant Swift acknowledged that on March 7, Mr. Gonzalez came to the Plant at 11:17 a.m. and left at 11:39 a.m., and has no record of what occurred during that time.[7] (Pl.Exh. B, 73:18-23.)

43.   Defendants produced numerous documents dated March 7, 2016, described in Section (b)(2), *supra*, including the March 7 Leave Claim, the March 7

---

[6] Defendant Swift conceded that Mr. Gonzalez's call was timely on March 4, 2016. (Pl.Exh. B, 69:2-24.) The column on Defendant's Call Log, on which it relied, indicated the call times as "Call Time (EST)." (Pl.Exh. B.8; Def.Exh. A(11).) Defendant Swfit denied knowing that "EST" means "Eastern Standard Time" (and therefore claimed not to know whether Mr. Gonzalez's timely call occurred at 2:34 p.m. local time). (Pl.Exh. B, 69:13-18.) Mr. Gonzalez asks this Court to take judicial notice that EST is a standard abbreviation for "Eastern Standard Time." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/est. Were there any doubt of the meaning of EST, moreover, Defendant Swfit produced a similar document, "All Employee Absences" (SWIFT375-456), listing call-ins for all employees around the relevant time. A copy of the first page is attached as Pl.Exh. H. The time column there reads "Call Time (Eastern TZ)." (Pl.Exh. H.) Because the time on Defendant's Call Log plainly refers to Eastern Standard Time, the times it lists must be read to indicate a time one hour earlier, CST, which is local time in Beardstown, Illinois.

[7] Defendant Swift claimed that HR maintained a "log" of pending FMLA claims, and that it would have reflected the steps HR took to process each FMLA application. (Pl.Exh. B, 73:24—74:1-21.) When Mr. Gonzalez requested the log related to his case, Defendant Swift claimed it had already produced its only log from the relevant time, admitting that, for reasons "unknown," the log did not contain Mr. Gonzalez's claim. (Def.'s 4th Supp. Resp. to Pl. 4th Req. to Prod., #34, is attached as Pl.Exh. G.)

FMLA Receipt, the March 7 Request for Leave, the Notice of Eligibility, and the HIPAA

Document. (Pl.Exhs. B.10-B.14; Def.Exh. A(7).)

44.     According to Defendants' records, on March 7, 2016, Mr. Gonzalez timely

called in sick, and he was assessed one point. (Pl.Exh. B, 95:11-24—96:1-2.)

45.     Mr. Gonzalez did not have a primary care physician at this time. (Pl.Exh.

C, 191:1-7.) On March 7, when submitting the FMLA paperwork, he told HR he had no

primary care doctor, and HR suggested he go to the Taylor Clinic in Beardstown.

(Pl.Exh. D, #6 at 6-7.)

46.     Mr. Gonzalez produced medical records showing that on March 7, 2016, at

around 10:30 p.m., he went back to the Passavant Hospital emergency room due to

hypertension, as he was experiencing difficulty breathing and radiating chest pain; he

was released on March 8, 2016 at 2:52 a.m. (*See* Certified Medical Records from

Passavant Area Hospital, dated March 7-8, 2016 ("March 7-8 Passavant Records"),

attached as Pl.Exh. F at P208, P220-231.)

47.     The March 7-8 Passavant Records reveal Mr. Gonzalez was given

intravenous Labetalol HCL and intravenous sodium chloride, and aspirin and potassium

chloride by mouth in the emergency department. (Pl.Exh. F, P.223.) The Hospital also

conducted a brain scan and sinus rhythm examination, which revealed "possible left

atrial enlargement, incomplete right bundle branch block, nonspecific t-wave

abnormality, and abnormal rhythm ECG." (Pl.Exh. F, P.116.)

48.     Mr. Gonzalez's "home care instructions" stated he was seen for

hypertension and hypokalemia, prescribed Ibuprofen and Metoprolol, and instructed to

stop taking hydrochlorothiazide. (Pl.Exh. F, P.225.)

49.     According to Defendants' records, on March 8, 2016, Mr. Gonzalez entered

the Plant at 9:49 a.m. and left again at 9:55 a.m. (Pl.Exh. B, 96:14-19.) Defendant had no

other record regarding Mr. Gonzalez's visit on March 8, 2016. (Pl.Exh. B, 96:17-19;

98:5-19.)

50.     Defendant produced two documents dated March 8, 2016, both of which it

identified as part of Mr. Gonzalez's "FMLA file" (Pl.Exh. P, #29):

a.     A second signed "Leave Claim Form—Intermittent FMLA" (SWIFT228)

("March 8 Leave Claim") stating Mr. Gonzalez was absent from work on

March 7, 2016, due to an "emergency visit," and stating "I acknowledge

that I have an intermittent FMLA leave approved on file for: Myself."

(Pl.Exh. B.15; Exh. B, 96:23-24—98:1-4.)

b.     An "Emergency Department Medical Certificate," from Passavant Area

Hospital (SWIFT187) ("March 8 Hospital Note"), bearing Mr. Gonzalez's

name and signature and stating, "Date seen: 3/8/16," with a check by the

phrase "is unable to work because of injury/illness for ____ days. May

return to work on 3/12/16 or cleared by PCP." (Pl.Exh. B.16; Pl.Exh. B,

99:3-19; Pl.Exh. C.42.)

51.     Mr. Gonzalez received and signed the March 8 Hospital Note after having

returned to the hospital for the same problem as before, and stated he provided it to HR

"the next day."[8] (Pl.Exh. C.42, Pl.Exh. C, 112:1-25—113:1-11.)

52.     Mr. Gonzalez said that when he provided the March 8 Hospital Note, he

---

[8] At his deposition, Mr. Gonzalez agreed "the next day" would be March 9, 2016. (Pl.Exh. C, 112:13-25—113:1-11.) After being admitted on March 7, 2016, Mr. Gonzalez was released just before 3:00 a.m. on March 8, 2016, and therefore may have remembered March 8, 2016 as "the next day." The Turnstyle log shows Mr. Gonzalez came to the Plant on March 8, rather than March 9, 2016. (Pl.Exh. B, 96:14-19.) In any event, Defendant does not deny Mr. Gonzalez provided the March 8 Hospital Note (Def.Mot. ¶ 25), so whether he submitted the form on March 8 or March 9, 2016 is not material.

told the HR representative that he had been to the physician again, and that she read the document, gave him a copy, and told him to continue to call in his absences. (Pl.Exh. C, 113:12-25—114:1-3.)

53.     Defendant Swift admitted that if the March 8 Hospital Note states Mr. Gonzalez is unable to work but can return on March 12, it would not have expected him to come to work on March 8, 9, 10, or 11. (Pl.Exh. B, 103:4-8.)

54.     Defendant Swift stated that even though it would not expect Mr. Gonzalez to come to work, he was still required to call, "[b]ecause we need to know whether he's coming in or not." (Pl.Exh. B, 110:4-13.)

55.     With respect to the information Defendants claim is missing from the March 8 Hospital Note (Def.Mot. ¶ 25), Defendant Swift could not identify anything it did to acquire the missing information. (Pl.Exh. B, 102:7-13.)

56.     Mr. Gonzalez did not work on March 8, 2016 and incurred a point,[9] because, as Defendant stated, "him just being excused from work by a doctor does not excuse the points." (Pl.Exh. B, 103:13-18.)

57.     Consistent with the March 8 Hospital Note, Mr. Gonzalez did not work his scheduled shift on March 9, 2016. (Pl.Exh. B, 104:14-16.)

58.     Defendants assessed a point against Mr. Gonzalez for his March 9 absence,

---

[9] Defendant's Call Log indicates that on March 8, 2016, Mr. Gonzalez called in at 6:35 p.m. EST, or 5:35 p.m. local time, which would have been after the 3:45 p.m. start time indicated on its Kronos Document. (*See* Pl.Exhs. B.8, B.5; A(11).) Defendant claimed its Policy required it to charge three points if a call came even a few minutes late. (Pl.Exh. B, 32:1-17; *see also* Def.Mot. 13.) Defendant also testified that it made no difference if an employee has already reported he would not be at work and was therefore not "expected" to be there, as was the case after the March 8 Hospital Note. (Pl.Exh. B, 103:4-8.) However, the discrepancy between Defendants' documents, which indicate Mr. Gonzalez called late on March 8 but was assigned one point (not three), and the stated Policy, that all late calls initially received three points regardless of circumstances, can only mean 1) that the call-in system data are unreliable, as Mr. Gonzalez testified (Pl.Exh. C, 143:2-7); 2) that Defendants waived the Policy requiring 3 points for a late call; or 3) that Mr. Gonzalez's understanding of the Policy, that only failure to call resulted in 3 points, while a late call resulted in 1 point, was Defendant's actual practice (Pl.Exh. C, 79:25—81:1-17).

and Defendant's Call Log indicates that he called in timely. (Pl.Exhs. B, 104:14-16, B.8, B.5; Def.Exh. A(11).)

59.    Consistent with the March 8 Hospital Note, Mr. Gonzalez did not work his scheduled shift on March 10, 2016. (Pl.Exh. B, 109:5-14.)

60.    According to Defendants' records, Mr. Gonzalez called in sick at 7:16 p.m. EST (6:16 p.m. local time), and was assessed one point.[10] (Pl.Exh. B.8; Def.Exh. A(11).)

61.    According to Defendants' records, on March 11, 2016, Mr. Gonzalez was scheduled to work, but did not; however, he came to the Plant at 9:38 a.m. and left again at 9:40. (Pl.Exhs. B, 111:12-23, B.6.)

62.    Defendants have no knowledge or records regarding whom Mr. Gonzalez spoke to at the Plant on March 11, 2016. (Pl.Exh. B, 111:24—112:1-5.)

63.    Defendants' records indicate that Mr. Gonzalez called in sick on March 11, 2016, at 3:14 p.m. EST (2:14 p.m. local time), in addition to having come to the Plant in person that morning. (Pl.Exhs. B.6, B.8; Def.Exh. A(11).)

64.    However, Defendant classified Mr. Gonzalez as a "no call/no show" on March 11, 2016. (Pl.Exh. B, 112:16-23, B.4; Def.Exh. A(5).)

65.    Defendant had no explanation why the absence was wrongly classified as a "no call/no show." (Pl.Exh. B, 112:21-23 ("I can't explain that.").)

66.    Mr. Gonzalez was not scheduled to work on Saturday, March 12 or Sunday, March 13, 2016. (Pl.Exh. B, 112:24—113:1-5.)

67.    On March 14, 2016, Mr. Gonzalez was scheduled to work at 3:45 p.m.

---

[10] Again, while Defendant testified that three points would necessarily be assigned for any late call, its documents indicate either that the data on Defendant's Call Log are unreliable, that Defendant waived the assignment of three points, or that Mr. Gonzalez correctly stated Defendant's Policy as actually practiced—that only failure to call resulted in 3 points. (*See* n.9, *supra*.)

(Pl.Exh. B, 113:8-14.)

68.     Mr. Gonzalez produced medical records indicating that he attended a doctor's appointment at the Taylor Clinic in Beardstown on March 14, 2016.  (*See* Certified Medical Records from Taylor Clinic, dated March 14, 2016 ("March 14 Taylor Records") attached as Pl.Exh. J, P304-310.)

69.     The March 14 Taylor Records state that Mr. Gonzalez "went to Passavant H for nose bleed and was given time off work form [*sic*] 3/8/16 to 3/12/16 and today 3/14 comes and his BP 170/90 and is worried about his BP. Time off work from us from today until 3/17 of which [*sic*] he will return for evaluation." (Pl.Exh. J, P305.)

70.     The March 14 Taylor Records noted Mr. Gonzalez's diagnoses of "HTN (hypertension) [and] irregular heart beat," noted he was to start a new medication, Hydralazine HCl, at 10 milligrams four times per day, and instructed him to follow up regarding the hypertension in four days. (Pl.Exh. J, P305.)

71.     Defendant produced a document from the Taylor Clinic in Beardstown (SWIFT188), dated March 14, 2016 ("March 14 Doctor's Note"). (Pl.Exhs. B.19; B, 113:21-24—114:1-4.)

72.     The March 14 Doctor's Note states with respect to Mr. Gonzalez,

> The patient's absence is physician advised due to illness or injury. This certifies that he or she has been under our care for this problem. Please excuse Gabriel from work on the dates of March 14, 2016-March 17th, 2016. Gabriel will be returning to work on the day of March 17, 2016.

(Pl.Exh. B.19.) It is signed by Marguerite Taillefer, M.D. (Pl.Exh. B.19.)

73.     The March 14 Doctor's Note provides a number to call with questions. (Pl.Exhs. B.19; B, 114:19-25—115:1.)

74.     On March 14, 2016, Mr. Gonzalez came to the Plant at 11:18 a.m. and left

at 11:35 a.m. (Pl.Exh. B, 113:15-20.)

75.     Mr. Gonzalez gave the March 14 Doctor's Note to HR on that date. (Pl.Exh. D, #6-7 at 7-8.)

76.     Defendant had no knowledge of whether Mr. Gonzalez had brought the March 14 Doctor's Note to HR when he came to the Plant on March 14, 2016, and had no record indicating with whom Mr. Gonzalez met or what was discussed. (Pl.Exh. B, 114:7-9.)

77.     Defendant considered the March 14 Doctor's Note when denying Mr. Gonzalez's medical leave. (*See* Def. Supp. Ans. to Pl. 1st Set of Interrogs., attached as Pl.Exh. I, #7 at 2.)

78.     Defendant produced a letter from "JBS Human Resources" to Mr. Gonzalez (SWIFT179) dated March 14, 2016 ("March 14 Denial"), which stated it had "reviewed the paperwork submitted for your leave and . . . determined that the absences do not qualify under FMLA. This is because you have no active FMLA on file. . . . The following dates have been denied: 03/14/2016 through 03/16/2016." (Pl.Exhs. B.20; B, 116:20-24—117:1-4.)

79.     The March 14 Denial did not address Mr. Gonzalez's request for leave for "March 1 through unknown," submitted on March 7, 2016, and Defendant did not know of any document that did. (Pl.Exh. B, 119:15-19.)

80.     The March 14 Denial referred to an attached "Designation Notice," also dated March 14, 2016 ("March 14 Designation Notice") (SWIFT180). (Pl.Exhs. B.21; B, 120:24—121:1-4.)

81.     The March 14 Designation Notice has an "x" by the statement, "Your FMLA Leave request is Not Approved," and states, in handwriting next to that

statement, "You have no active FLMA on file." (Pl.Exh. B.21.)

82.     In its answers to interrogatories, Defendants described the March 14 Denial Letter and the March 14 Designation Notice as "advising that [Mr. Gonzalez's] request for leave is denied along with a designation notice. Plaintiff has not provided medical certification as requested on March 7, 2016." (Pl.Exh. B, 123:15-21; Pl.Exh. B.21; Pl.Exh. I, # 7 at 2.)

83.     Defendant acknowledged that the requested medical certification was not due until March 22, 2016 and admitted it was "odd" that Mr. Gonzalez was denied FMLA leave on March 14 for failing to provide medical certification that was not yet due. (Pl.Exh. B, 124:19-24—125:1-5.)

84.     On March 15, 2016, Mr. Gonzalez was scheduled to work, and entered the plant at 3:48 p.m., leaving again at 4:20 p.m. (Pl.Exh. B, 125:6-24.)

85.     Defendant has no knowledge of whether Mr. Gonzalez met with anyone in HR during that period on March 15, 2016. (Pl.Exh. B, 126:1-24—127:1-3.)

86.     Defendant claimed Mr. Gonzalez did not call in and assessed him three points for his March 15, 2016 absence, even though Mr. Gonzalez's March 14 Doctor's Note stated his absence was medically advised from March 14 through March 16, and even though he came to the Plant in person on March 15, 2016. (Pl.Exh. B, 127:4-23.)

87.     Likewise, on March 16, 2016, Defendant assessed Mr. Gonzalez three points, claiming he was a "no call/no show," even though the March 14 Doctor's Note stated he should be excused from work that day on medical advice. (Pl.Exhs. B, 129:19-22; B.19.)

88.     Defendant's Call Log does not reflect calls from Mr. Gonzalez on March 15 or 16, 2016, the dates the March 14 Doctor's Note stated Mr. Gonzalez's absence was

medically advised.[11] (Pl.Exh. B.8; Def.Exh. A(11).)

89.     Defendant produced a notice, entitled "Attendance Violation" (SWIFT214), dated March 17, 2016, which had a handwritten notation on it reading "3/3/16-3/17/16 Pending," which Defendant acknowledged meant that Mr. Gonzalez was "[p]ending the resolution of an FMLA." (Pl.Exhs. B.22; B, 130:22-24—131:1-17.)

90.     On March 17, 2016, Mr. Gonzalez did not come to work, and Defendant assessed Mr. Gonzalez one point, admitting he timely called. (Pl.Exh. B, 130:6-15; *see also* Pl.Exh. B.8; Def.Exh. A(11).)

91.     Defendant testified that had Mr. Gonzalez's FMLA been approved for each date from March 3 through March 17, he would not have been terminated. (Pl.Exh. B, 132:8-14.)

92.     In addition to the facts stated in Sections (b)(2) and (b)(3), above with respect to the March 17 Certification form, the Certification requested the dates that the doctor treated the patient, and she filled in March 14, 2016. (Pl.Exh. B.23 at 2.)

93.     The March 17 Certification form asked whether medication was prescribed, and the doctor marked "Yes." (Pl.Exh. B.23 at 2.)

94.     The March 17 Certification form asked the doctor whether the employee would be incapacitated for a single continuous period of time to due to the medical condition, including any time for treatment and recovery, and the doctor marked "Yes." (Pl.Exh. B.23 at 3.)

95.     The March 17 Certification was written only in English. (Pl.Exh. B.23.)

96.     When asked whether he agreed that the March 17 Certification did not

---

[11] As noted above, Mr. Gonzalez testified that he called on time each day he was absent, and he disputes the accuracy of Defendant's Call Log.

include symptoms or a diagnosis, Mr. Gonzalez said he did not know the doctor had not included those things. (Pl.Exh. C, 129:21-25—130:1-4.)

97.     On March 18, 2016, Mr. Gonzalez returned to the Taylor Clinic for follow-up. (*See* Certified Medical Records from Taylor Clinic, dated March 18, 2016 ("March 18 Taylor Records") attached as Pl.Exh. K, P304, P311-313.)

98.     The March 18 Taylor Records indicate Mr. Gonzalez's hypertension continued "uncontrolled," at 180/80,[12] causing the doctor to increase Mr. Gonzalez's prescription for hydralazine from 10 mg to 50 mg, while continuing metoprolol. (Exh. K, P311-P312.) Mr. Gonzalez also complained of shortness of breath. (Exh. K, P311.)

99.     The time of Mr. Gonzalez's visit to the Taylor Clinic is not indicated in the Records, but Dr. Taillefer signed her notes that day at 12:49 p.m. (Exh. K, P313.)

100.    That same day, March 18, 2016, Mr. Gonzalez came into the Plant at 12:13 p.m. and left at 12:27 p.m. (Exh. B, 140:1-19.)

101.    Defendant Swift could not identify who met with Mr. Gonzalez when he came to the Plant on March 18th, because "there's no notes." (Exh. B, 140:20-22.)

102.    That day, March 18, 2016, Mr. Gonzalez was scheduled to work, called in sick (according to Defendant's Call Log, at 4:22 p.m. EST (3:22 p.m. local time)), and

---

[12] The March 18 Taylor Records state, in the doctor's notes, "pt's bp is 108/80 [*sic*]," but states, under "vital signs," "BP 180/80." (Pl.Exh. K, P311-P312.) Mr. Gonzalez asks this Court to take judicial notice that 180/80 is considered "extremely high blood pressure" (or "hypertensive crisis"), while 108/80 would be well under normal. *See, e.g.*, WebMD, "Know Your Blood Pressure Numbers," https://www.webmd.com/hypertension-high-blood-pressure/guide/diastolic-and-systolic-blood-pressure-know-your-numbers#1; *see also* Mayo Clinic website, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/expert-answers/hypertensive-crisis/faq-20058491 (identifying systolic pressure of 180 or higher as "hypertensive crisis"). Courts take judicial notice of abnormal and dangerous blood pressure levels. *See, e.g.*, *Robinson v. Am. Airlines, Inc.*, 722 F. Supp. 757, 765 (D.D.C. 1989) (taking judicial notice that "blood pressure of 140/90 indicates 'mild hypertension.'"). That the doctor increased Mr. Gonzalez's medication, labeled it "uncontrolled," and required follow-up within three days indicates that the blood pressure reading of 108 was a typographical error in the doctor's notes, and should have read 180, as it did elsewhere in the very same Record. (Pl.Exh. K, P312.)

was assessed a point. (Pl.Exhs. B, 140:1-13; B.8; Def.Exh. A(11).)

103.    Mr. Gonzalez was not scheduled to work on Saturday, March 19, or Sunday, March 20, 2016.

104.    On March 21, 2016, Mr. Gonzalez returned to the Taylor Clinic for follow-up ("DR T WANTS HIM BACK THIS DAY"). (*See* Certified Medical Records from Taylor Clinic, dated March 21, 2016 ("March 21 Taylor Records") attached as Pl.Exh. L, P304, P314-316.)

105.    On March 21, 2016, Mr. Gonzalez's blood pressure continued to be "uncontrolled" at 180/82.[13] (Pl.Exh. L, P314-315.) The doctor's notes indicated that Mr. Gonzalez had taken his medication incorrectly, and she gave him additional instruction. (Pl.Exh. L, P314.) The nurse's note indicated that Mr. Gonzalez reported difficulty breathing and that felt he had to force himself to breathe. (Pl.Exh. L, P314.)

106.    The March 21 Taylor Records indicate the doctor wanted to see Mr. Gonzalez again in 48 hours and keep him off work due to his concern about shortness of breath at work. (Pl.Exh. L, P314.)

107.    The March 21 Taylor Records indicate Mr. Gonzalez reported anxiety and insomnia due to his hypertension, and was prescribed additional medication as treatment for these issues. (Pl.Exh. L, P314.)

108.    Mr. Gonzalez timely called in sick that day, March 21, 2016, and was assessed a point. (Pl.Exhs. B, 140:12-24; B.8; Def.Exh. A(11).)

109.    Mr. Gonzalez also timely called in sick on March 22, 2016, and was assessed a point. (Pl.Exhs. B, 142:1-13; B.8; Def.Exh. A(11).)

---

[13] *See* n.12, *supra*.

110.    Defendants produced a second Designation Notice (SWIFT176), dated March 22, 2016 (the "March 22 Designation Notice"), to communicate that Mr. Gonzalez's FMLA had not been approved. (Pl.Exhs. B.29; B, 143:2-22.)

111.    The March 22 Designation Notice stated, as the reason for the denial, "the FMLA does not apply to your leave request." (Pl.Exhs. B.29; B, 143:23-24—144:1-2.)

112.    Defendants did not place a check mark next to the statement on the pre-printed form to indicate "additional information is needed to determine if your FMLA leave request can be approved:" or the statement "The certification you have provided is not complete and sufficient to determine whether the FMLA applies to your leave request." (Pl.Exh. B.29.)

113.    Defendants did not fill anything in the space provided for a deadline to submit additional information, or the space to "specify information needed to make the certification complete and sufficient." (Pl.Exh. B.29.)

114.    Defendant Swift asserted the FMLA did not apply to Mr. Gonzalez's request because it did not have "enough information to qualify his request," but could not explain why its representative failed to indicate "additional information is needed" by placing a checkmark next to that statement on the form. (Pl.Exh. B, 144:1-14.)

115.    The March 22 Designation Notice did not tell Mr. Gonzalez what was missing from his FMLA request, or refer to his certification being inadequate. (Pl.Exhs. B.29; B, 144:20-22—145:1-6.)

116.    The March 22 Designation Notice is written in English and there is no version of the document in Spanish. (Pl.Exhs. B.29; B, 145:23-24—146:1-3.)

117.    Mr. Gonzalez had been approved in advance for a personal leave of absence on March 23, 2016, and was therefore not scheduled to work that day. (Pl.Exh.

B, 145:10-17.)

118.    On March 23, 2016, Mr. Gonzalez returned to the Taylor Clinic for an additional follow-up. (*See* Certified Medical Records from Taylor Clinic, dated March 23, 2016 ("March 23 Taylor Records") attached as Pl.Exh. M, P304, P317-319.)

119.    The March 23 Taylor Records indicate that Mr. Gonzalez's hypertension remained "uncontrolled," but had improved to 160/80, although he was still having problems with shortness of breath and his heart racing. (Pl.Exh. M, P317.) The doctor increased his hydralazine dosage from 50 to 100 mg twice daily, and increased his antidepressant and anxiety medications. (Pl.Exh. M, P317.)

120.    The March 23 Taylor Records state Mr. Gonzalez is "not ready to start work still." (Pl.Exh. M, P317.)

121.    Defendant produced a letter to Mr. Gonzalez (SWIFT177) dated March 23, 2016 ("March 23 Denial"), and written in English. (Pl.Exh. B.24.) The March 23 Denial stated Defendant had "reviewed the paperwork submitted for your leave and . . . determined that the absences do not qualify under FMLA. This is because DOES NOT MEET CRITERIA . . . . The following dates have been denied: 03/14/2016 through 03/16/2016."[14] (Pl.Exh. B.24.)

122.    The March 23 Denial did not refer to any other dates for which Mr. Gonzalez had requested leave. (Pl.Exh. B.24.)

123.    Defendant Swift stated that for March 14 through March 16, the documentation of Mr. Gonzalez's illness "did not provide enough substance to qualify him for FMLA." (Pl.Exh. B, 147:14-19.)

---

[14] Mr. Gonzalez did not know until March 30, 2016 that his FMLA was denied—either he did not receive the March 23 Denial, or had not received it by that date. (Pl.Exh. D, #6 at 7; *see also* Pl.Exh. C, 134:19-25—135:1.)

124. Mr. Gonzalez understood there was something wrong with his paperwork, but did not know what it was. (Pl.Exh. C, 90:5-25—91:1-7, 135:7-19.)

125. Defendant Swift acknowledged it had the right to request Mr. Gonzalez's medical records, but had no record of doing so. (Pl.Exh. B, 149:6-7; *see also* Pl.Exh. B.14.)

126. Mr. Gonzalez was scheduled to work on March 24, 2016, and called in sick. (Pl.Exh. B, 150:2-6.) According to Defendants' records, he called at 6:49 p.m., EST (5:49 p.m. in Beardstown) and was assessed three points for "no call/no show." (Pl.Exh. B, 150:2-10.)

127. On March 25, 2016, Mr. Gonzalez again returned to the Taylor Clinic for follow-up treatment. (*See* Certified Medical Records from Taylor Clinic, dated March 25, 2016 ("March 25 Taylor Records") attached as Pl.Exh. N, P304, P320-322, P358.)

128. The March 25 Taylor Records indicate that his hypertension, anxiety, and insomnia were now under control, but he was still having shortness of breath, and two nights earlier had experienced heart palpitations and difficulty breathing, with pain in his left arm. (Pl.Exh. N, P320.)

129. The March 25 Taylor Records indicate that the doctor told him he could return to work that day. (Pl.Exh. N., P320.)

130. The March 25 Taylor Records do not state the time of his appointment that day, but the doctor signed her notes at 9:57 a.m.

131. On March 25, 2016, Defendant's records show Mr. Gonzalez came into the Plant at 9:35 a.m., and left at 9:50 a.m. (Pl.Exh. B, 151:16-21.)

132. Mr. Gonzalez produced an additional letter from the Taylor Clinic (P60; P358), dated March 25, 2016 ("March 25 Doctor's Note"), which referred to him and

44

stated, "To Whom it May Concern, the patient's absence is physician advised due to illness or injury. Please excuse patient from work 3/14 through 3/24 due to hypertension. May return to work 3/25 with no restrictions. This certifies that he or she has been under our care for this problem." (Pl.Exhs. B, 152:1-15; B.25; N, P358.)

133.    Defendant Swift did not know whether Mr. Gonzalez had brought the March 25 Doctor's Note into the Plant on March 25, 2016, and did not know whether it had been considered in denying him FMLA leave or terminating his employment. (Pl.Exh. B, 152:16-24—153:1-4.)

134.    Mr. Gonzalez did not specifically remember giving the March 25 Doctor's Note to HR, but testified that he received it from Taylor clinic, and brought every medical note that he received from a doctor to HR as soon as possible. (Pl.Exh. C, 190:17-4; 137:9-15; D, #11-#13 at 11-14; N.)

135.    Mr. Gonzalez was scheduled to work at 3:45 p.m. on March 25, 2016, but, according to Defendant's Call Log, timely called in sick at 3:38 p.m., EST (2:38 p.m. local time). (Pl.Exhs. B, 150:18-23; B.5; B.8; Def.Exh. A(11).)

136.    Defendant Swift classified Mr. Gonzalez as a no call/no show for March 25, 2016, but could not explain why, since its own records showed he called almost an hour before his shift began. (Pl.Exhs. B.8; B, 150:24—151:1-7; Def.Exh. A(11).)

137.    Mr. Gonzalez was not scheduled to work on March 26 or 27, 2016. (Pl.Exh. B, 153:15-17.)

138.    Mr. Gonzalez was scheduled to work on March 28, 2016, but, according to Defendant's Call Log timely called, and was assessed one point. (Pl.Exhs. B, 153:18-24—154:1-6; B.4, B.8; Def.Exhs. A(5), A(11).)

139.    On March 28, 2016, Mr. Gonzalez sought treatment at the emergency

room at HSHS St. John's Hospital ("St. John's Hospital"), complaining of shortness of breath, radiating chest pain and left-arm numbness. (*See* Certified Medical Records from St. John's Hospital, dated March 28, 2016 ("March 28-29 Hospital Records") attached as Pl.Exh. O, P559-598.)

140.    The March 28-29 Hospital Records indicate that on March 28, 2016, Mr. Gonzalez was administered aspirin (oral), Pantoprazole (intravenous), Morphine Sulphate (intravenous, twice), Ondansetron Hcl (intravenous, twice), Albuterol/Ipratropium (via nebulizer), Sodium Chloride (intravenous, twice), Acetaminophen (oral), and Nitroglycerin. (Pl.Exh. O, P564.)

141.    The March 28-29 Hospital Records indicate Dr. Lindorfer-Campbell ordered an EKG, CBC, BMP, cardiac enzymes, chest x-ray, CT of the head, and CT of the chest and abdomen/pelvis, among other tests. (Pl.Exh. O, P570.)

142.    The CT revealed sinusitis and pulmonary nodules. (Pl.Exh. O, P570.)

143.    The March 28-29 Hospital Records indicate that Mr. Gonzalez's blood pressure was 172/81. (Pl.Exh. O, P570.)

144.    Mr. Gonzalez was released on March 29, 2016, given instructions for his diagnosis of "sinusitis/acute bronchitis," and prescribed Amoxicillin/Clavulanate K for sinusitis. (Pl.Exh. O, P571, P591.)

145.    Defendant produced a document, the first page of which was called "Patient Visit Information" (SWIFT189) from St. John's Hospital dated March 28, 2016 ("March 28-29 Hospital Note"), stating that Mr. Gonzalez was seen that day for "shortness of breath, sinusitis, and bronchitis," and that medication was prescribed. (Pl.Exhs. B.27; B, 159:9-23.)

146.    The second page of the March 28-29 Hospital Note was called

46

"Work/School Excuse" (SWIFT190), dated March 29, 2016 at 10:30, and stated that Mr. Gonzalez had been examined at St. John's Hospital and advised not to work until March 30, 2016. (Pl.Exhs. B.26; B, 155:2-18; C.44.)

147.    Mr. Gonzalez stated he took the March 28-29 Hospital Note to HR on the day he was released, to show why he was out of work on that day, and to state that he could return to work the next day.[15] (Pl.Exh. C, 115:19-25—118:1-24.)

148.    Defendant Swift stated it considered the March 29 Hospital Note in denying Mr. Gonzalez's FMLA leave. (Pl.Exh. I, #7 at 2.)

149.    Defendant Swift also stated it did not consider the March 28-29 Hospital Note, because "it does not give the required information, nor is it on the certification document." (Pl.Exh. B, 155:19-24—156:1.)

150.    On March 30, 2016, Defendant issued a letter to Mr. Gonzalez ("March 30 Termination Letter") stating, "You applied for FMLA for 3/14/2016-3/16/2016, but it has been determined that the absences do not qualify under FMLA. This is because it does not meet criteria. As of 3/16/2016, you accumulated 22 attendance points. Currently, you now have 34.00 attendance points. The JBS Attendance Policy states that the maximum number of attendance points given within 12 month period is 10.00. Due to being over on your attendance points, you are hereby being terminated, effective immediately." (Pl.Exhs. B.28; B, 20-24; Def.Exh. A(3).)

151.    Mr. Gonzalez learned he was fired when he tried to enter the Plant on

---

[15] Mr. Gonzalez remembered being taken to St. John's Hospital on a Sunday, being released from the hospital and receiving the March 29 Hospital Note on a Monday, and being been cleared to work the next day, a Tuesday. (Pl.Exh. C, 115:19-25—118:1-24.) He acknowledged it was possible that he was mixing up the days of the week. (Pl.Exh. C, 118:25—119:1-14.) This Court may take judicial notice that March 28, 2016, the date Mr. Gonzalez was admitted at St. John's, fell on a Monday; March 29, 2016, the day St. John's released Mr. Gonzalez fell on a Tuesday, and March 30, 2016, the day the March 28-29 Hospital Note stated Mr. Gonzalez could return to work, was a Wednesday.

March 30, 2016. (Pl.Exh. C, 69:24-25—70:1-10.)

152.    Mr. Gonzalez's certification, as revised on March 30, 2016 ("March 30 Certification") specified Mr. Gonzalez's medication, specified Mr. Gonzalez's condition as high blood pressure, and stated he "is being treated for that condition." (Pl.Exh. B.32; Def.Exh. A(10).)

153.    The March 30 Certification stated only March 14 as the "Date(s) [the doctor] treated the patient for this condition." (Pl.Exh. B.32; Def.Exh. A(10).)

154.    Defendant Swift did not identify the March 30 Certification as one it had considered in deciding to terminate Mr. Gonzalez. (Pl.Exh. I, #7 at 2.)

155.    Defendant Swift did not know whether review of the March 30 Certification would have changed the decision. (Pl.Exh. B, 169:12-24—170:1-4.)

156.    Mr. Gonzalez could not read the March 30 Certification, as it was written in English, and did not know what was included or not included in it. (Exh. C, 129:9-25—130:1-4.)

157.    Defendant Swift pointed out that the certification did not appear to have been written by the doctor herself. (Exh. B, 138:11-13.) The revised version, the March 30 Certification, stated "revised FMLA Papers see #4 BJL 3-30-16," and "revised BJL 3-30-16," next to the revised provision, and listed Mr. Gonzalez's medications "for his blood pressure per Doctor Taillefer." (Def.Exh. A(10), Pl.Exh. B.32.)

158.    Mr. Gonzalez described his condition throughout the month of March 2016 as being in "bad shape," saying his elevated blood pressure generally caused his hands and eye to shake, and caused him to feel dizzy. (Pl.Exh. C, 100:23-25; 97:20-25—98:1-10.) He also experienced shortness of breath. (Pl.Exh. C, 98:10; 99:10-15.)

159.    He said he experienced those symptoms throughout March, but noted they

improved after he was released from St. John's Hospital at the end of March, 2016. (Pl.Exh. C, 98:15-22—99:1-6.)

160.    Mr. Gonzalez stated that during the month of March 2016, prior to his termination, he could not work, and the doctor advised him not to do so. (Pl.Exh. C, 100:23-25; 101:7-21.)

161.    Mr. Gonzalez continues to suffer from hypertension, for which he is required to see his doctor about every three to six months. (Pl.Exh. C, 95:1-25—96:1-10.)

### (c) ARGUMENT

Mr. Gonzalez has produced ample evidence showing that Defendants' decision to deny him FMLA leave, charge him "attendance points" for days he qualified for leave, and then terminate him for those points violated the FMLA. Defendants assert that whether they were right or wrong to deny leave, Mr. Gonzalez cannot show he was prejudiced, because they could have terminated him anyway. That argument fails. Defendant Swift admitted Mr. Gonzalez would not have been fired, had he been able to provide medical certification for his absences in March 2016. Ample evidence shows that Mr. Gonzalez qualified for leave each day he was absent, and that but for Defendants' unlawful failure to specify deficiencies in his certification and give him a chance to cure them, he could and would have done so. Defendants may not avoid their obligations under the FMLA by finding post-hoc reasons they claim they *could* have fired Mr. Gonzalez—Defendant Swift's own testimony was that but for the certification issue, they would not have fired him. Because Defendants' failure to fulfill their responsibilities with respect to the certification caused Mr. Gonzalez to be wrongfully denied FMLA leave, and because that denial resulted in his termination, Defendants are liable. Certainly, factual disputes foreclose summary judgment in Defendants' favor.

I.   **Defendants cannot dispute that Mr. Gonzalez qualified for leave beginning March 1, 2016, because they failed to follow basic requirements for disputing his qualification.**

Defendants failed to follow the law when denying Mr. Gonzalez's request for leave; they are liable for his resulting termination.

A.   **Defendants failed to take reasonable steps to determine Mr. Gonzalez's qualification for leave for all the requested dates, despite ample notice of Mr. Gonzalez's serious medical condition and need for leave.**

Generally, "[i]f there is a dispute between an employer and an employee as to whether leave qualifies as FMLA leave, it should be resolved through discussions between the employee and the employer. Such discussions and the decision must be documented." 29 C.F.R. § 825.301(c). Even though Mr. Gonzalez expressly applied for FMLA leave from March 1 to an unknown end date, Defendant failed to even discuss or formally deny leave for any days other than March 14-17, 2016, and its denials of leave for those dates offer no coherent reason. (Pl.Exh. B.20, B.24, B.28.) Defendant lacks documentation of any discussion, in fact, regarding any day of leave requested, in violation of § 825.301(c). (*See* Pl.Exh. B, *passim*.) Defendant Swift claimed that HR maintained a "log" of FMLA claims, which would have reflected the steps HR took to process each, but, for reasons "unknown," that log did not contain Mr. Gonzalez's claim. (Pl.Exh. B, 73:24—74:1-21; Pl.Exh. G.) Defendants' failure to comply with § 825.301(c) invalidates their denial of leave for each date Mr. Gonzalez was absent in March 2016.

B.   **HR failed to contact Mr. Gonzalez's medical providers, even though he authorized them to do so.**

Furthermore, while an employer may require an employee to provide medical certification, "an employee may choose to comply with the certification requirement by providing the employer with an authorization, release, or waiver allowing the employer

50

to communicate directly with the health care provider of the employee." 29 C.F.R.

§ 825.306; *see also Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 725 (7th Cir. 2007) (an

employer with notice of a serious health condition has a duty to request information it

needs to confirm entitlement). Mr. Gonzalez took this option, authorizing HR to contact

his doctors, and relying on HR to do so. (Pl.Exh. B, 191:1-16.) However, HR did nothing

to obtain certification or any other evidence it considered necessary from medical

providers that treated Mr. Gonzalez on March 3 and March 7-8 or March 28-29, even

though it plainly had notice of such treatment in connection with his application for

leave, including the March 3 Hospital Note (Pl.Exh. B.7, from Passavant Hospital), the

March 8 Hospital Note (Pl.Exh. B.16, also from Passavant, which stated Mr. Gonzalez

was unable to work until March 12), and the March 28-29 Hospital Note (Pl.Exh. B.26-

27). By March 8, Defendants knew they had sent Mr. Gonzalez home March 1 and

March 3 for severe bleeding and that Mr. Gonzalez had been at Passavant Hospital on

March 3 and March 7 for these symptoms and underlying hypertension; they also had

Mr. Gonzalez's March 7 Leave Claim and March 7 HIPAA Document, permitting them to

obtain all relevant information from Passavant. Yet they did nothing to obtain this

information.

"The FMLA does not permit employers—who are classic 'repeat-players' with

superior knowledge of the law and incentives to seek favorable interpretations of the law

through litigation—to make no effort to learn about an employee's potential eligibility

for leave." *Mabins v. AEP NVH OPCO, LLC*, No. 16 C 10261, 2018 U.S. Dist. LEXIS

45673, at *19-20 (N.D. Ill. Mar. 20, 2018). Mr. Gonzalez's medical condition was serious

and met all of the other requirements for leave as of March 1, and at least by March 3,

2016. (*See* Pl.Exhs. E-F, J-O.) During the course of March 2016, Mr. Gonzalez informed

HR of his treatment at two different hospitals, Passavant and St. John's, but Defendants failed to inquire further, either directly or by asking Mr. Gonzalez to do so. Similarly, while Defendant apparently had some contact with the Taylor Clinic (Pl.Exh. B.31; B, 166:22-24—167:1-14), had Defendants requested updated dates of Mr. Gonzalez's incapacity, they would have learned that Dr. Taillefer ultimately considered Mr. Gonzalez unable to work from the time she started treating him, March 14, to March 25, as she stated in the March 25 Doctor's Note. (Pl.Exh. B.25, *see also* J-N). Defendant failed to take reasonable steps to obtain this information, instead simply denying leave and terminating him.

### C.    Defendants wrongly denied leave based on insufficient certification, because it failed to advise Mr. Gonzalez in writing of the claimed insufficiency.

Defendants claim deficiencies in the documents Mr. Gonzalez provided HR: that the March 8 Doctor's Note and March 17 Certification contained insufficient information about his medical condition, and that the March 30 Certification (which it never actually considered—*see* Pl.Exh. I, #7 at 2), failed to cover sufficient dates. (Def.Mot. 12-13.) Defendant claims it was "entitled to rely on" the deficient certifications as establishing lack of FMLA coverage. (Def.Mot. 15.) In this case, neither claimed deficiency provides a lawful basis to deny leave, because the regulations require the employer to advise employees in writing of the specific insufficiency. Defendants failed to do so, and Mr. Gonzalez never knew what was wrong with his certifications. Had Defendants communicated the claimed insufficiency to either Mr. Gonzalez or directly to his medical providers, he could and would have cured them.

    **1.**    **Defendants failed to advise Mr. Gonzalez what was required to make his medical certifications complete and sufficient, and therefore cannot justify denial of FMLA leave based on insufficient certification.**

When an employee requests FMLA leave, the employer may either "take the employee at his word and grant the request" or request certification from the healthcare provider. *Hansen v. Fincantieri Marine Group, LLC*, 763 F.3d 832, 837 (7th Cir. 2014), *citing* 29 U.S.C. § 2613(a). Before an employer may deny FMLA leave based on claimed incompleteness or insufficiency of a certification, however, the employer "shall state in writing what additional information is necessary to make the certification complete and sufficient." 29 C.F.R. § 825.305(c). After such notice, the employee must have the opportunity to cure the deficiency—the employer may not just deem the certification insufficient, deny leave, and fire the employee. *See Hansen*, 763 F.3d at 842 (reversing summary judgment for employer where employee's absences continued after the period covered by a certification, and the employer did not provide an adequate opportunity to obtain certification for the additional dates); *see also Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 887 (7th Cir. 2005) (reversing summary judgment for employer where doctor wrote "bronchitis" on form but omitted duration; employer could not "win its case by arguing the form was incomplete" without providing an opportunity to cure the deficiency).

Likewise, Defendants unlawfully denied FMLA leave and fired Mr. Gonzalez without complying with the cure requirement. Defendants assert, with respect to the March 8 Doctor's Note, which stated Mr. Gonzalez could not work until March 12 (a Saturday), that the note lacks sufficient information to permit Defendants to determine if his absences qualified. (Def. Motion 15.) However, Defendants never notified Mr.

Gonzalez that he needed certification for these dates. Defendants' choices were to take Mr. Gonzalez at his word and grant leave, or request certification. *Hansen*, 763 F.3d at 837. For the March 1 to March 14 dates, they failed to do either, despite having actual and constructive notice of his serious health condition. Not only did Defendant Swift's medical staff treat him on March 1 and March 3, on March 4, he provided the March 3 Hospital Note stating he had been to the emergency room at Passavant Hospital, and on March 8, he provided the March 8 Hospital Note, stating he had returned to Passavant and could not work until March 12, 2016 (a Saturday). Defendants never advised Mr. Gonzalez to obtain a certification from Passavant, or that he needed to cure any inadequacy of his March 3 and March 8 Hospital Notes. (Pl.Exhs. B.7, B.16, 65:7-24—67:1-12; 98:23-24—102:1-8.) Because Defendants failed to fulfill their responsibility with respect to obtaining the information they claimed was needed to certify Mr. Gonzalez's request for FMLA leave up to March 14, 2016, they could not deny leave for those dates.

Not only did Defendants fail to provide Mr. Gonzalez with written notice specifying how to cure documentation from Passavant Hospital they rejected as deficient, HR affirmatively suggested that Mr. Gonzalez obtain a new doctor at the Taylor Clinic to complete the certification form, even though no doctor at the Taylor Clinic could have direct knowledge of Mr. Gonzalez's treatment at Passavant. (Pl.Exh. D, #6 at 7.) Thus, not only did Defendants fail to provide correct information, they provided affirmatively *incorrect* information, which could not be expected to result in a certification that covered any period before Mr. Gonzalez's March 14, 2016 appointment at the Taylor Clinic. Defendants affirmatively led Mr. Gonzalez to provide certification that would not cover the dates they knew he needed covered; they may not now claim

54

they were entitled to rely on the deficient certification.

With respect to Mr. Gonzalez's request for leave for dates beginning March 14, 2016, Defendants likewise claim insufficient certification, despite having failed to provide an opportunity to cure. Defendants considered the March 14 Doctor's Note and March 17 Certification insufficient, but provided no notice specifying what would make them complete and correct, as required. (*See* Exhs. B.21, B.29; *see also* Exh. I, #7 at 2.) Mr. Gonzalez acknowledged that someone at HR told him there was a problem with his certification, but he did not know what it was. (Pl.Exh. C, 90:5-25—91:1-7.) HR indicated it would deal directly with his doctor. (Pl.Exh. C, 90:5-25—91:1-7.) Defendants did not tell Mr. Gonzalez orally, let alone in writing, as required.[16]

Moreover, the written notices Defendants *did* provide have form statements for the employer to specify information needed to make the form complete and correct, but Defendants failed to check those provisions or fill in those blanks. (*See* Exhs. B.21, B.29.) Defendants' FMLA denials not only fail to specify the claimed inadequacy of Mr. Gonzalez's medical documents, they affirmatively cite reasons (albeit vague and nonsensical reasons) *other than* insufficiency. These failures squarely foreclose Defendants' claim that they rightly denied FMLA leave based on insufficient certification. *See Hansen*, 763 F.3d at 842; *Kauffman*, 426 F.3d at 887.

Defendants cite to *Ridings v. Riverside Medical Center* and *Stoops v. One Call Communications* for the proposition that they were entitled to rely on the dates in the

---

[16] An employer who elects to require medical certification is required to make that request in writing, and to translate that request if its workforce is comprised of a significant portion of workers who are not literate in English. 29 C.F.R. §§ 825.300(a)(4); 825.300(c)(ii). The spirit of this regulation, at least, requires that written notice of deficiencies in certifications also be in Spanish. In this case, Defendant Swift admitted that a significant portion of its workers spoke Spanish only. (Pl.Exh. B, 20:12-24—21:1-4.) The written request for certification was only in English. (Pl.Exh. B.11.) Defendants' notice of insufficient certification was woefully inadequate and affirmatively incorrect regardless of language.

March 17 Certification without further inquiry. (Def.Mot. 15-16, *citing Ridings*, 537 F.3d 755, 768 (7th Cir. 2008) and *Stoops*, 141 F.3d 309, 313 (7th Cir. 1998).) These cases do not support Defendants' position. In *Ridings*, an employer who received a medical note but wanted additional information repeatedly advised the employee of the insufficiency of the note, requesting certification, but the employee refused. *Ridings*, 537 F.3d at 768. Defendants here, by contrast, claim deficient medical information, but without complying with their duty to specify what was wrong with it, while Mr. Gonzalez cooperated with their requests. (*See* Pl.Exh. B.20-B.21, B.24, B.29; D, #8 at 8-9.) In *Stoops*, the employee's doctor stated that his condition did not keep him from working, and the employee knew the employer was relying on that statement but "did nothing to obtain a contrary opinion." *Id.* at 313. *Stoops* does not apply where the employee does not know about the employer's claimed reliance. *See Lara v. Cent. Grocers Coop., Inc.*, No. 00 C 7828, 2002 U.S. Dist. LEXIS 16745, at *15-17 (N.D. Ill. Sep. 4, 2002). In this case, Mr. Gonzalez did not know Defendants had unilaterally decided to limit his leave to the dates on the March 17 Certification, and had no reason to think they would. (*See* Pl.Exh. C, 129:9-25—130:1-23.) Neither he nor his doctors knew how long his hypertension would remain uncontrolled, and he continuously updated the employer over the course of the month. (*See* Pl.Exh. D, #8 at 8-9.)

Furthermore, the March 25 Doctor's Note affirmatively stated that Dr. Taillefer had, in fact, extended his period of incapacity after her initial opinion that Mr. Gonzalez would be able to work by March 17, 2016. (*See* Pl.Exhs. B.25, J-N.) Employers are not entitled to ignore an obvious contradiction or insist upon a doctor's superceded original estimate. *See Hansen*, 763 F.3d at 842; *Kauffman*, 426 F.3d at 886; *see also Lara*, 2002 U.S. Dist. LEXIS 16745, at *16-17. In *Kauffman*, the certifying doctor wrote only one

date on the certification form as the expected length of incapacity, but had given the employee a note stating he could return to work two days after that. *Id.* The court rejected the employer's argument that it could rely on the stated one-day duration as a "negative certification," since the "only logical conclusion," given the return date in the doctor's note, was that the doctor had misinterpreted the duration question. *Id.* Thus, an employer may not turn a blind eye to obvious contradictions between a doctor's note and a certification and insist upon relying on a certification, particularly where the latter becomes outdated as the doctor obtains a better understanding of the course of the illness. *Id.* at 887; *see also Hansen*, 763 F.3d at 840-41. That is precisely what Defendants seek to do here, and that effort must be rejected.

      **2.**     **The evidence indicates that had Defendants properly specified the deficiencies of the medical certifications, such as the need to update the estimated dates of incapacity, those deficiencies would have been cured.**

Defendants' failure to comply with its obligations regarding the certifications directly resulted in wrongful denials for each of the dates in question. Mr. Gonzalez's medical records provide ample evidence that he met the requirements for FMLA leave on all of the dates he was absent in March 2016.[17] Mr. Gonzalez's medical records from Passavant establish dangerously high blood pressure and contain a medical opinion that he could not work from March 7 to March 12, 2016. (Pl.Exhs. B.16, E, F; *see also* n.12, *supra*.) While Mr. Gonzalez's doctor originally estimated the dates Mr. Gonzalez could not work as March 14-17, 2016, and did not change the dates on the version of the certification faxed March 30, 3016, the medical evidence indicates that this was an

---

[17] In Mr. Gonzalez's Motion for Summary Judgment, he provides undisputed medical evidence establishing that his condition constituted a "serious medical condition" for FMLA purposes. Defendants do not claim that Mr. Gonzalez lacked a serious medical condition or seek summary judgment on that basis, and Mr. Gonzalez therefore does not discuss that evidence in this Response.

oversight on the doctor's part,[18] since she expressly opined, as she continued to treat Mr. Gonzalez, that his incapacity extended well past March 17, 2016 until his blood pressure stabilized (temporarily, it turned out) on March 25, 2016. (*See* Pl.Exh. B.25, J-O.) There is no evidence HR asked the Taylor Clinic to update the dates of coverage; at most, it appears to have advised that the March 17 Certification contained insufficient medical information, since the clinic revised that information to provide a diagnosis and specify medication. (Pl.Exhs. B.31-B.32.) While Dr. Taillefer did believe Mr. Gonzalez's blood pressure had finally stabilized on March 25 (Pl.Exh. N), a Friday, his symptoms returned and he was again hospitalized between Monday, March 28 and March 29, 2016 at St. John's Hospital, where his treating doctor stated he could not work until March 30. (Pl.Exhs. B.26-B.27, C.44.) On that date, Defendants terminated him for excessive absences. (Pl.Exh. B.28; Def.Exh. A(3).)

In short, had Defendants specified the deficiencies in Mr. Gonzalez's documentation, such as the information missing from the March 8 Hospital Note and the dates covered by the March 17 Certification, those deficiencies would have been cured. Defendants' failure to comply with § 825.305(c) resulted in wrongful denial of leave, and Defendants have no basis for judgment in their favor.

## II. Defendant had notice that Mr. Gonzalez needed and claimed intermittent FMLA leave beginning March 1, 2016.

Where leave is not foreseeable, the FMLA requires employees to provide notice

---

[18] Defendant Swift observed that it did not appear that the doctor completed the forms herself, but apparently delegated this task to someone else: "I don't know that the doctor even saw this document other than to sign it . . . ." (Pl.Exh. B, 138:11-14.) Likewise, the March 30 Certification appeared to have been revised by someone with the initials BJL—not Dr. Taillefer. (*See* Def.Exh. E, Pl.Exh. B.32.) Mr. Gonzalez had no control over his doctor delegating this task, but to the extent Defendants objected, they at least had to provide notice of this deficiency and allow a meaningful chance to cure it. *See Hansen*, 763 F.3d at 842; *Kauffman*, 426 F.3d at 886.

"as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). While the employee has the initial burden of providing notice that he needs FMLA leave, that burden requires no more than "'to place the employer on notice of a probable basis for FMLA leave. He doesn't have to write a brief demonstrating a legal entitlement. He just has to give the employer enough information to establish probable cause . . . to believe that he is entitled to FMLA leave.'" *Stevenson*, 505 F.3d at 724, *quoting Aubuchon v. Knauf Fiberglass, GMBH*, 359 F.3d 950, 953 (7th Cir. 2004). Once the employer has that notice, it becomes "'the employer's duty to request such additional information from the employee's doctor or some other reputable source as may be necessary to confirm the employee's entitlement.'" *Stevenson*, 505 F.3d at 725, *quoting Aubuchon*, 249 F.3d at 953. An employer's own observation of symptoms indicating a serious medical condition may constitute constructive notice of such a condition. *See Stevenson*, 505 F.3d at 726.

Defendant Swift stated, in response to Mr. Gonzalez's interrogatories, that it did not contend that Mr. Gonzalez failed to give timely notice of his request for FMLA leave. (Pl.Exh. I, #11 at 4.) Defendants now claim, while acknowledging that Mr. Gonzalez continued to call in sick throughout March 2016, that his "calling in sick without providing additional information" did not suffice as notice for FMLA purposes. (Def.Mot. 14, *citing De la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 688 (7th Cir. 2008).) Defendant Swift's original concession suffices to distinguish this case from *De la Rama*,[19] as does copious evidence that Mr. Gonzalez repeatedly and timely gave

---

[19] In *De la Rama*, the employer provided the needed leave, retroactively, once the employee submitted a written request stating her diagnosis—the employee claimed only that the employer should have been on notice that earlier absences could qualify as well. *De la Rama*, 541 F.3d at 684, 686. In fact, the employer provided even more leave that the law required. *Id.* at 687. Since, as the court noted, there could therefore be no claim that the employer interfered with FMLA entitlement at all, as the employee well exceeded her

notice that he was not just sick, but had a serious health condition that required him to take FMLA leave. First, Mr. Gonzalez's supervisor observed his condition of epistaxis on March 1 and 3, 2016, and Defendants' own medical staff treated him, determining he could not remain at work.[20] (Pl.Exh. C, 97:8-10; 148:11-25—150:1-2; 109:1-17; 147:18-25—148:1-10; Pl.Exh. D, #6 at 6.) Further, it was Defendants' HR representative who suggested to Mr. Gonzalez on March 7, 2016 that he was eligible. (Pl.Exh. D, #6 at 6-7.) Defendant produced numerous documents dated March 7, 2016, reflecting Mr. Gonzalez's express request for intermittent FMLA leave from March 1, 2016 to an unknown date. (Pl.Exhs. B.10-B.14, P, #29.) Mr. Gonzalez could not know the duration of his incapacity; his doctors' opinions evolved as his condition failed to respond to treatment, his incapacity was repeatedly extended as his medical providers adjusted and changed his medications, and he continuously notified HR as soon as he could. (Pl.Exh. D, #6 at 7; #8 at 9; *see also, e.g.*, Pl.Exhs. B.16, B.19, B.23, B.25, F, I, J-O.)

Mr. Gonzalez stated he provided all the hospital and doctors' notes as soon as possible after receiving them, and Defendant's own Turnstyle Log corroborates that assertion—showing Mr. Gonzalez came to the Plant in the mornings of March 8, March 14, March 15, March 18, March 25, and March 30, dates that correspond to the March 8 Hospital Note (covering March 8-12), the March 14 Doctor's Note (covering March 14-17), the March 17 Certification (same), the March 25 Doctor's Note (covering March 14-March 24), and the March 28-29 Hospital Note (covering March 28-30). (*See* Pl.Exh. B.6; Pl.Exh. D, #6 at 7; #8 at 9; Pl.Exhs. B.16, B.19, B.23, B.25, E, F, J-O.) When Mr.

---

limit in any event, the comments Defendants quote from *De la Rama* constitute *dicta*.

[20] Mr. Gonzalez made repeated requests for documents reflecting this treatment, and Defendant asserts none exist. (*See* Pl.Exh. P, #29.) Mr. Gonzalez consistently testified that the Plant's nurse sent him home, and his March 7 Leave Claim, which HR completed, admitted Mr. Gonzalez was "sent hom[] by nursing," and Defendants lack any evidence to the contrary. (Pl.Exh. B.10, C.45; C, 121:9-25—122:1-9.)

Gonzalez visited HR in person and brought in medical notes, he told HR that they were related to his serious medical condition. (Pl.Exh. D, #8 at 9.) Defendant Swift admits it considered requests and documents, dated March 7, 8, 14, 17, and 29, 2016. (Pl.Exh. I, #7 at 2.) Defendants cannot credibly claim they lacked notice.

## III. Defendants' denial of Mr. Gonzalez's FMLA leave directly caused him to be terminated, as Defendant Swift admitted it would not have terminated him but for that denial.

Defendants argue that Mr. Gonzalez would have received points in excess of his limit for days outside of March 14, 15, and 16, and therefore he cannot show that Defendants' denial of FMLA leave prejudiced him. (Def.Mot. 16.) Defendants' circular claim that Mr. Gonzalez's request for leave only covers March 14, 15, and 16 must be rejected, because it is based solely on Mr. Gonzalez's certification, and that deficient certification resulted solely from Defendants' own failure to comply with the cure requirement. (*See* Argument I, *supra*.) Had Defendants complied with the cure requirement, Mr. Gonzalez could and would have established incapacity for all the dates he was charged points in March 2016. Moreover, Defendant Swift admitted that had Mr. Gonzalez provided sufficient medical certification for each day he was absent, he would not have been terminated. (Pl.Exh. B, 177:21-24—179:1-10.) Because Defendant Swift admitted that Mr. Gonzalez *would not* have been terminated but for the FMLA denial, Defendants' post-hoc claim that he *could have* been terminated fails.

Defendants also claim, in a footnote, that their Call Log reflects Mr. Gonzalez's classification as a "no call/no show" on March 15 and 16, and that "these points would not have been retracted" even if his FMLA had been approved. (Def.Mot. 16, n.1.) Defendants' only purported evidence for this claim is Mr. Holland's statement that points are generally retracted for FMLA-qualified leave "where the employee provided

proper notice." (Def.Exh. B, ¶ 13.) To the extent Defendants claim "proper notice" means a daily call 30 minutes prior to the start of the employee's shift, or that *without* such notice points are *not* retracted, the claim is contradicted by Holland's testimony that points *are* retracted whenever proper certification is provided, and would have been in Mr. Gonzalez's case. (Pl.Exh. B, 177:21-24—179:1-10.) To the extent an affidavit conflicts with a prior deposition, it must be disregarded. *See Howell v. Smith*, 853 F.3d 892, 899 n.18 (7th Cir. 2017). Defendants' claim that non-FMLA covered absences would have caused Mr. Gonzalez to be terminated must be rejected. Such claim, moreover, is foreclosed by both the applicable law and the evidence of record.

### A.   Mr. Gonzalez disputes Defendants' claim that Mr. Gonzalez did not timely call in some absences.

First, Mr. Gonzalez disputes the accuracy of Defendant's Call Log, and testified that he called on time each day in addition to bringing medical documentation personally to HR as set out above. (Pl.Exh. C, 80:23-25—82:1-8; 82:23-25—83:1-7; 143:2-7.) Defendants' records, moreover, contain numerous errors that negate any claim of reliability, as Defendants repeatedly charged Mr. Gonzalez three points and classified him as a "no call, no show" on days that Defendants' own records showed he both came into the Plant *and* timely called. Defendant's records indicate Mr. Gonzalez came to the Plant the morning of March 11, 2016, and also timely called in sick. (Pl.Exh. B.5, B.6, B.8; Def.Exh. A(11).) Defendant Swift had no explanation for the erroneous claim that Mr. Gonzalez was a "no call, no show" on that date. (Pl.Exh. B, Holland Dep., 112:21-23.) Likewise, Defendants' records indicate Mr. Gonzalez came to the Plant the morning of March 25 and made the required call before his shift that day. (Pl.Exhs. B, 150:14-24; 151:16-21; B.5, B.6, B.8; Def.Exh. A(11).) Defendant Swift had no explanation why it

classified that absence as "no call/no show." (Pl.Exh. B, 150:24—151:1-15.) Against

Defendants' self-contradictory claims, Mr. Gonzalez's testimony that he called on time

and provided all the notice he could despite his illness is credible and consistent, and

reflects his good-faith cooperation with Defendants' requests, foreclosing summary

judgment for Defendants.

> **B.    Under the circumstances, Mr. Gonzalez could not lawfully be denied leave based on strict enforcement of Defendants' internal call-in Policy, even if Mr. Gonzalez had failed to comply as claimed.**

Not only does Mr. Gonzalez dispute Defendants' claims that he failed to call on

some of the days he missed work in March 2016, applying the Policy to deny leave in

this case would violate the FMLA.

> **1.    Mr. Gonzalez gave the notice required by the FMLA and Defendants' Employee Handbook.**

The FMLA regulation requires "practicable" notice that accounts for "facts and

circumstances in the individual case." 29 C.F.R. § 825.303(a). Defendants' Employee

Handbook states that in cases of unforeseeable leave, the employee must notify the

company "as soon as possible and generally within 1 or 2 business days of learning of

your need for leave." (Def.Exh. A(1), App. 27.) The Handbook does not condition leave

on calling in daily. (Def.Exh. A(1), App. 27.) Putting aside the disputed issue of whether

Mr. Gonzalez did call in daily, the evidence shows that Mr. Gonzalez provided such

*advance* notice to the extent possible of all of his absences, including those which

Defendant deemed him a "no show," March 15 and 16, 2016. In particular, Defendant

cannot dispute that it was in possession of Mr. Gonzalez's March 14 Doctor's Note

(stating he should be excused from March 14-March 17) on March 14, because it issued

the March 14 Denial on that day. (Pl.Exh. B.20.) The March 14 Doctor's Note (Pl.Exh.

B.19) was the only document up to that date that specifically requested March 14 to March 17, 2016 as leave, and Defendant's March 14 Denial referred only to those dates. (Pl.Exh. B.20.) Therefore, Defendant had to have known on March 14, 2016 that Mr. Gonzalez specifically needed leave March 14 to March 17, 2016. Defendant therefore had ample *advance* notice of Mr. Gonzalez's absences, regardless of whether he called. Defendant Swift admitted it would not expect an employee to work when a physician had advised against doing so. (Pl.Exh. B, 103:4-8.)

### 2. Mr. Gonzalez gave all the notice required under the facts and circumstances of this case.

Despite acknowledging Mr. Gonzalez would not be "expected" to come to work on dates a doctor stated he would be unable to work, Defendant Swift imposed the requirement that he call each separate day. (Pl.Exh. B, 103:4-8; *see also* 109:15-24—110:1-10.) That requirement, under the circumstances of this case, would serve no purpose but to impose an arbitrary burden and impediment upon an employee suffering a serious health condition in need of leave. The evidence shows Mr. Gonzalez continuously provided actual notice as soon as he could, as the FMLA requires and Defendants' Employee Handbook requires, *and* continued to make timely calls in good faith. (*See* Pl.Exh. D #6 at 7, #7 at 8; C., 81:21-23.)

In addition, the governing regulation makes clear that the determination of when an employee could practicably provide notice must take into account the employee's individual facts and circumstances. *See* 29 C.F.R. § 825.304(d). Mr. Gonzalez testified he always called on time, but acknowledged that his medication "knock[ed him] out," and that this condition could have caused him to call late on some days in March 2016.[21]

---

[21] This Court may take judicial notice that high blood pressure itself can cause memory loss and trouble

(Pl.Exh. C, 81:21-25—82:1-8, 82:23-25—83:1-7, 164:6-25—165:1-6.) To the extent Defendant can credibly claim Mr. Gonzalez forgot to call or called late on March 14 and 15, or any other relevant date, his condition and medication caused that situation. Thus, even if Defendant were correct that there were days Mr. Gonzalez called late or forgot to call, the facts and circumstances—being debilitated by his condition—provide ample evidence excusing any failure to provide notice to the strictest letter of Defendant's Policy.

### 3.    The evidence establishes Defendants' policy was in fact to waive points on FMLA-qualified dates.

Defendants make a post-hoc claim that they could have terminated Mr. Gonzalez for his alleged failure to call on March 15 and 16, 2016, dates covered by his certification, stating they are permitted to require an employee to comply with "usual and customary" requirements for requesting leave, and that Defendant's Call Log does not show calls registered on those dates. (Def.Mot. 16 n.1, *citing* 29 C.F.R. § 825.302(d).) An employer may not justify negative employment action based on such customary notice requirements when those requirements have been waived. *See* 29 C.F.R. § 825.304(e); *see also Jones v. Maywood*, No. 16-cv-09652, 2018 U.S. Dist. LEXIS 151220, at *29-31 (N.D. Ill. Sep. 5, 2018). In *Jones*, an employer sought summary judgment based on the employee's failure to follow customary notice procedures, but the evidence showed that the employer "received, processed, and ultimately denied" the FMLA request for

---

concentrating when it reaches the levels Mr. Gonzalez experienced. *See* Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/high-blood-pressure/art-20045868. *See* Fed. R. Evid. 201(b); *Wesley Health Sys., LLC v. Forrest Cty. Bd. of Supervisors*, No. 2:12-CV-59-KS-MTP, 2014 U.S. Dist. LEXIS 7764, at *43 n.14 (S.D. Miss. Jan. 22, 2014) (taking judicial notice that nausea and vomiting are common symptoms of concussion); *Schenk v. City of N.Y.*, No. 08-CV-914 (SLT)(LB), 2010 U.S. Dist. LEXIS 94576, at *15 (E.D.N.Y. Aug. 12, 2010) (taking judicial notice of symptom of low pressure CSF syndrome).

different reasons. *Id.* at *29. The court denied summary judgment, noting "a reasonable factfinder could conclude that Defendants waived the notice requirement in this situation by virtue of the fact that Defendants admit they received Plaintiff's FMLA Request and denied it for reasons other than a lack of notice." *Id.* at *30. *See also McLaren v. Wheaton Coll.*, 194 F. Supp. 3d 743, 755 (N.D. Ill. 2016) (noting question for jury was whether employee abided by "true notice policy;" not just written terms, but protocols it actually followed in practice).

In this case, putting aside the factual dispute about whether Mr. Gonzalez made a timely call each day he was absent, ample evidence indicates Defendants waived any claim that Mr. Gonzalez did not comply with usual and customary notice requirements. First, Defendant Swift averred it does not claim insufficient notice, and did not do so as a basis to deny leave or to terminate Mr. Gonzalez. (*See* Pl.Exh. I, #11 at 4, B.24, B.28; Def.Exh. A(3).) Defendant Swift testified that Mr. Gonzalez would not have been terminated for his absences, including on dates he allegedly failed to call in, if he had been able to provide satisfactory certification for those dates. (Pl.Exh. B, 177:21-24—179:1-10.) The March 7 FMLA Receipt states that if leave is approved, "your points will be removed for the qualifying days." (Pl.Exh. B.11; Def.Exh. A(8).) Defendants admit in their Motion that HR told Mr. Gonzalez his points would be retracted if he qualified for leave; they did not say only single-point charges would be retracted. (Def.Mot. ¶ 22.) Similarly, Defendants' Employee Handbook does not state that failure to register a timely call will result in points remaining regardless of the outcome of a FMLA request. (*See* Def.Exh. A(1), App. 27-28.) Defendant Swift said the opposite. (Pl.Exh. B, 172:1-8; *see also* 128:8-14 (noting an injured person who could not call would "still be assessed three points until such time that we got their FMLA paperwork together and all that,

66

then all that would come off").) This evidence indicates that Defendants waived the call-in requirement, at least retroactively, once absences were found to be FMLA-qualifying, foreclosing summary judgment. *See Jones*, 2018 U.S. Dist. LEXIS 151220, at *29-31.

### 4. Defendants could not lawfully refuse to waive its Policy in FMLA cases, while waiving it in non-FMLA cases.

Finally, where an employer chooses not to waive an internal notification policy, that choice may not "discriminate against employees taking FMLA leave." 29 C.F.R. § 825.304(e). Defendant Swift admitted that for some non-FMLA-related leaves, it waived the requirement of a daily call. For example, where an employee experienced a house fire and needed to be out for a few days, it did not expect daily calls. (Pl.Exh. B, 31:20-24.) Defendant Swift insisted, however, that an employee who was not expected to work because he presented a doctor's note saying he should not come to work *is* still required to call each day. (Pl.Exh. B, 110:4-10.) To the extent Defendants do not waive the Policy for FMLA claims, at least retroactively, the refusal to do so would constitute unlawful discrimination against those claims, compared to other reasons employees need leave.

### IV. Mr. Gonzalez establishes that Defendants' wrongful conduct caused his termination, which suffices to establish both his interference and retaliation claims.

Defendants terminated Mr. Gonzalez for exceeding the maximum number of attendance points after denying FMLA leave, giving as reasons, "You have no active FMLA on file" and "does not meet criteria." (Def.Mot. ¶ 34; Pl.Exhs. B.20, B.24; I, #7 at 2.) Because ample evidence establishes Defendants wrongfully denied FMLA leave, because Defendants were thus required to retract his attendance points for March 2016, and because, had they done so, Mr. Gonzalez would not have been terminated, he

67

establishes both interference and retaliation. A claim for interference does not require ill

intent. *Preddie v. Bartholomew Consol. Sch. Corp.,* 799 F.3d 806, 816 (7th Cir. 2015).

An FMLA retaliation claim requires only that the plaintiff show: (1) that he was engaged

in a protected activity; (2) that the employer took an "adverse employment action"

against him; and (3) the protected activity caused the adverse employment action. *King

v. Preferred Tech. Grp.,* 166 F.3d 887, 893 (7th Cir. 1999).

Where an employer, as here, expressly terminates an employee for excessive

absences when it knows that the absences were taken for an FMLA-qualifying reason,

retaliation is established. *See Preddie*, 799 F.3d at 819 (where employee offered

evidence that he was terminated, at least in part, based on his absences, and that the

employer knew that many absences were attributable to serious health conditions,

reasonable jury could find in employee's favor on retaliation); *Hansen*, 763 F.3d at 835

n.1 (where employer expressly terminated due to excessive absences, retaliation would

be established by showing absences qualified for FMLA leave). In this case, there is no

question of causation—the employer expressly terminated for leave-qualifying absences

instead of granting FMLA leave. There is no need for inferences from "suspicious

timing" or other circumstantial evidence; Defendants' decisions to deny FMLA and to

terminate Mr. Gonzalez for the FMLA-qualifying absences were express. (*See* Pl.Exhs.

B.20, B.24, B.28; Def.Exh. A(3).)

Defendants claim that in relying on the medical certification and assessing points

under its policy, they acted in good faith, and therefore cannot be liable for retaliation.

(Def.Mot. 18.) First, *Preddie* makes clear that to establish retaliation, a plaintiff need not

show bad faith, hostility or malice; denial of leave in violation of the employer's legal

obligations, and then using an employee's absences to justify termination, suffices to

constitute the required intent. *See Preddie*, 799 F.3d at 819 (plaintiff required to submit evidence that the employer demoted or fired him because he took valid leave). In this case, Defendants improperly treated Mr. Gonzalez's leave request, arbitrarily deeming the request not to cover absences resulting from his serious health condition. Good faith or not, the law was clear that by choosing to require medical certification, Defendants bore a responsibility to follow up, communicate and specify claimed inadequacies with the certification rather than simply claiming ignorance, denying leave, and terminating. Employers have superior knowledge of the FMLA, and the law places a burden on them to enable employees to avail themselves of leave. *See McLaren*, 194 F. Supp. 3d at 755. There is no "ostrich defense." *Id*. Such considerations bear particular weight where the worker is one like Mr. Gonzalez, lacking education past fourth grade, and unable to speak or read English, who nonetheless made every good-faith effort to comply with all of Defendants' requirements, while suffering from a serious illness.

In any event, the record does contain evidence of bad intent, were such evidence required. First, Defendants' overall handling of the FMLA claim evinces unlawful barriers to Mr. Gonzalez's rights—failing to provide written information in Spanish, failing to provide him with information about the claimed reasons his certifications were insufficient, failing to include his claim in its "FMLA Log" or maintain records of his visits to nursing. (*See* Pl.Exhs. B.20; B.24; B.28; G; P, #29 at 1-2.) On March 14, 2016, Defendant falsely claimed Mr. Gonzalez had "no active FMLA on file," despite the numerous documents Mr. Gonzalez submitted on March 7 and March 8, 2016, expressly applying for leave beginning March 1, 2016. (Pl.Exhs. B.21, B.10-B.15.) A reasonable jury, given this and other evidence, could certainly conclude Defendants' hostility to Mr. Gonzalez's assertion of rights under the FMLA formed a deliberate basis of these

failures, and that Defendants purposely burdened Mr. Gonzalez's exercise of FMLA

rights, culminating in termination.

**V.     Mr. Gonzalez has produced ample evidence of a joint or integrated employer relationship.**

Determination of joint or integrated employer status is fact-specific.

*Moldenhauer v. Tazewell Pekin Consol. Communs. Ctr.*, 536 F.3d 640, 644 (7th Cir.

2008). Employers may be jointly liable based on factors including common

management; interrelation between operations; centralized control of labor relations;

and common ownership or financial control. 29 C.F.R. § 825.104(c); *Cuff v. Trans*

*States Holdings, Inc.*, No. 10 C 1349, 2010 U.S. Dist. LEXIS 68063, at *14 (N.D. Ill. July

8, 2010). As set forth in Section (b)(2), above, Defendant JBS USA described a high level

of integration between the Defendants, including HR policies shared across

subsidiaries; shared negotiation of the union contract; shared use of the JBS logo;

shared access to resources, including shared bank accounts; shared employees,

including HR employees; common ownership; and indirect control over operations. (*See*

Pl.Exh. R, *passim.*) Defendants are not entitled to summary judgment.

## CONCLUSION

For all the above reasons, Mr. Gonzalez prays that this Court deny Defendants'

Motion for Summary Judgment.

October 18, 2019                                    /s/<u>Miriam Hallbauer</u>

Miriam Hallbauer
Carlos Cisneros-Vilchis
Legal Aid Chicago
120 South LaSalle Street, Suite 900
Chicago, IL  60603
Phone: 312-229-6360
mhallbauer@legalaidchicago.com

ATTORNEYS FOR PLAINTIFF GABRIEL GONZALEZ

**CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMTATION**
**Rule 7.1(B)(4)(c) and 7.1(D)(5)**

Counsel for Mr. Gonzalez hereby certifies that the Argument section of this Motion for Summary Judgment contains 6864 words as counted by Microsoft Word word processing system.

October 18, 2019                                     /s/Miriam Hallbauer _____


Miriam Hallbauer
Carlos Cisneros-Vilchis
Legal Aid Chicago
120 South LaSalle Street, Suite 900
Chicago, IL  60603
Phone: 312-229-6360
mhallbauer@legalaidchicago.com

ATTORNEYS FOR PLAINTIFF GABRIEL GONZALEZ

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that the attached document, including exhibits (except as indicated below), were filed electronically on October 18, 2019, and was served upon the following persons, all registered ECF filers. It was served upon the persons listed below by electronic mail on October 18, 2019.

The undersigned attorney certifies that pursuant to Local Rule 49.9 and the Protective Order entered in this case (Doc. #29), Exhibits E-F and J-O were filed upon filing of a motion for leave to file under seal, using the separate docket event "sealed document." Those exhibits were served upon the persons listed below by electronic mail on October 18, 2019.

Ruth A. Horvatich
Aaron A. Clark
McGrath North Mullin & Kratz
1601 Dodge Street, First National Tower Suite 3700
Omaha, NE  68102
rhorvatich@mcgrathnorth.com
aclark@mcgrathnorth.com

Lance T. Jones
HeplerBroom, LLC
4340 Acer Grove Drive, Suite A
Springfield, IL  62711
(212) 528-3674
Lance.jones@heplerbroom.com

Dated: October 18, 2019                    Respectfully submitted,

                                           /s/ Miriam Hallbauer

                                           Attorney for Plaintiff
                                           Miriam Hallbauer
                                           Legal Aid Chicago
                                           120 South LaSalle Street, Suite 900
                                           Chicago, IL  60603
                                           312-229-6360
                                           mhallbauer@legalaidchicago.org